# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

**GERMAN C. SINISTERRA,**
　　　　**Movant,**

No. 08-1925

**v.**

**UNITED STATED OF AMERICA,**
　　　　**Respondent.**


## MOVANT'S APPLICATION FOR CERTIFICATE OF APPEALABILITY

John Jenab, #47452
JENAB & MCCAULEY LLP
110 S. Cherry Street, Suite 200
Olathe, KS 66061
(913) 390-5023
(913) 764-5539 Fax

ATTORNEY FOR MOVANT
GERMAN C. SINISTERRA

# Table of Contents

I. Factual and Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. The Composition of the Defense Team and Preparation for Trial . . . . . . . . . . . 2

    B. The Defense Team's Penalty Phase Mitigation Presentation . . . . . . . . . . . . . . . 4

    C. The Readily Available Mitigation Evidence That Was Not Presented at Trial . 6

    D. The § 2255 Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II. Legal Standard for Issuance of a COA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. The District Court Failed to State reasons for Denying a COA . . . . . . . . . . . . . . . . . . 13

IV. Claims on Which a COA Should Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A. Jurists of Reason Could Debate Whether Counsel Rendered Ineffective
        Assistance in Their Investigation and Presentation of Mitigating Evidence . . . 14

        1. The *Strickland* Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2. Failure to Retain and Utilize a Qualified Mitigation Expert . . . . . . . . . . 17

            a. The defense team did not include a qualified mitigation
                investigator, but only a fact investigator – Dan Grothaus –
                who was neither qualified to perform a mitigation
                investigation, nor tasked with conducting such a mitigation
                investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            b. The defense team did not possess any member qualified by
                training and experience to screen individuals for the presence
                of mental or psychological disorders or impairments . . . . . . . . 25

            c. The failure to retain and utilize a qualified mitigation
                investigator resulted in prejudice to Mr. Sinisterra . . . . . . . . . . 27

        3. Failure to Conduct a Thorough Mitigation Investigation and
            Present Available Mitigation Evidence to the Jury . . . . . . . . . . . . . . . . 28

            a. The record indicates that the defense team was not
                previously aware of the compelling mitigation

i

evidence regarding Mr. Sinisterra that was readily available at the time of his trial . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

b.    The videotaped testimony of the Colombian witnesses was superficial and ineffective, and was never intended to be, nor was it in fact, a substitute for a competently performed mitigation investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

c.    The record strongly suggests that the defense team did not make any attempts to gather crucial records regarding Mr. Sinisterra's background from Colombian authorities . . . . . . . . . 36

d.    The inability of the Colombian witnesses to obtain visas to attend the trial does not excuse counsel's failure to immediately contact these witnesses as part of a competent mitigation investigation, rather than wait until the eve of trial to hastily conduct initial interviews with them . . . . . . . . . . . . . . 37

e.    Mr. Sinisterra was prejudiced by trial counsel's failure to conduct a thorough mitigation investigation and present all readily available mitigation evidence at his capital trial . . . . . . . 40

4.    Failure to Investigate and Present Mental Health Evidence . . . . . . . . . . 47

a.    Trial counsel never submitted readily available evidence regarding Mr. Sinisterra's low I.Q. as mitigating evidence in the penalty phase of his capital trial, nor argued to the jury that it was a mitigating fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

b.    The pre-trial evaluation by Dr. Dos Santos was inadequate and did not excuse counsel from conducting an adequate mental health investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

c.    Counsel's assertion that he would not have submitted evidence of Mr. Sinisterra's low I.Q., organic brain damage and dampened intellectual functioning as mitigating evidence demonstrates his incompetence regarding his duty to present such constitutionally recognized mitigation evidence to a capital jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

5.    As to Each of the Above Issues, the Requisite Standard for Issuance of a COA Has Been Established . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Appellate Case: 08-1925    Page: 3    Date Filed: 07/17/2008   Entry ID: 3452810

6.     An Evidentiary Hearing Should Have Been Held On These Claims And Mr. Sinisterra Should Have Been Provided With The Resources To Further Develop His Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    a.     Mr. Sinisterra has met the standard entitling him to an evidentiary hearing on his § 2255 claims . . . . . . . . . . . . . . . . . 60

    b.     The district court committed legal error in resolving disputed issues of material fact and making credibility determinations based on the submitted affidavits and declarations, and without hearing from the witnesses themselves at an evidentiary hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    c.     Mr. Sinisterra is statutorily entitled to investigative and expert services to assist in the litigation of his claims . . . . . . . . . . . . . 67

B.     Jurists of Reason Could Debate Whether Mr. Sinisterra's Fifth, Sixth and Eighth Amendment Rights Were Violated by, and Whether Trial and Appellate Counsel Were Ineffective in Failing to Object to, Prosecutorial Misconduct in Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    1.     The Prosecutor's Remarks Were Unquestionably Improper . . . . . . . . . . 73

    a.     The Fact That The Improper Remarks Were Made In The Penalty Phase Does Not Excuse Counsel's Failure To Make Proper Challenges, As The Eighth Amendment Requires A More Searching Review Of The Impact Of Improper Remarks Made In The Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

    b.     Viewed in context of the entirety of the prosecutor's closing argument, the improper remarks were not mere "references to the evidence the jury heard," but rather part of larger argument designed to distract the jury's attention from making an individualized determination about Mr. Sinisterra's sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

    2.     A COA Should Issue On Trial And Appellate Counsel's Failure To Object To These Improper Remarks . . . . . . . . . . . . . . . . . . . . . . . . . . 88

C.     Jurists of Reason Could Debate Whether the FDPA Unconstitutionally Relaxes Penalty Phase Evidentiary Standards and Trial and Appellate Counsel Were Ineffective for Failing to Object to the Relaxed Standards and to Inflammatory Hearsay in the Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . 93

iii

Appellate Case: 08-1925     Page: 4     Date Filed: 07/17/2008 Entry ID: 3452810

           1.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

           2.      Admission of hearsay evidence unrelated to Mr. Sinisterra . . . . . . . . . 93

           3.      Constitutional requirements of individualized sentencing and reliability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

           4.      Reasonable jurists could debate correctness of lower court ruling . . . . . 98

    D.      Jurists of Reason Could Debate Whether Failure to Charge Statutory Aggravating Factors in the Indictment Violates the Constitution . . . . . . . . . . . 101

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Appellate Case: 08-1925    Page: 5    Date Filed: 07/17/2008 Entry ID: 3452810

## MOVANT'S APPLICATION FOR CERTIFICATE OF APPEALABILITY

COMES NOW movant, German C. Sinisterra, by counsel, and moves this Court, pursuant to 28 U.S.C. § 2253 and Fed. R. App. P. 22(b)(1) & (2), to grant a Certificate of Appealability ("COA") with respect to Claims A through D described below to permit Mr. Sinisterra to appeal the district court's Memorandum and Order in which it denied those specific claims contained in Mr. Sinisterra's Motion to Vacate, Set Aside or Correct Convictions and Sentences Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure, without authorizing funds for a mitigation investigation and without conducting a hearing. The district court denied a COA application on April 18, 2008. The application filed in the district court presumed the district judge's familiarity with the record, pleadings and case proceedings, and was accordingly written with brevity given that familiarity and for purposes of judicial economy. The present application is in no way intended to burden this Court, but rather to provide the Court with a consolidated pleading which incorporates the relevant facts and excerpts from the record that are pertinent to each claim on which Mr. Sinisterra seeks a COA and to direct the Court's attention to key issues and facts with which the district court was already familiar and therefore were not pled in the application below. In support of this application, Mr. Sinisterra states as follows:

## I.   FACTUAL AND PROCEDURAL BACKGROUND.

German Sinisterra is a federally death-sentenced prisoner. He was charged, by way of a Second Superceding Indictment, with conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) & 21 U.S.C. § 846; aiding and abetting the use of a firearm in relation to a drug trafficking crime and the commission of murder in the perpetration of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), (j)(1) & 18 U.S.C. § 2; and interstate travel with intent to commit

1

Appellate Case: 08-1925   Page: 6   Date Filed: 07/17/2008 Entry ID: 3452810

murder for hire, in violation of 18 U.S.C. § 1958 & 18 U.S.C. § 2. On April 11, 2000, Mr. Sinisterra was jointly tried with his co-defendants, Arboleda Ortiz and Plutarco Tello. (A fourth co-defendant, Edwin Hinestroza, was also charged capitally, but was a fugitive at the time of Mr. Sinisterra's trial. He was later tried separately after being apprehended.) All three were found guilty of capital crimes, but their penalty phase proceedings were severed from one another and were tried separately by the same jury for purposes of sentencing. On May 3, 2000, the jury sentenced Mr. Sinisterra to death on two counts, and the district court entered the formal judgment of convictions and sentences on December 18, 2000. This Court affirmed the convictions and sentences on November 5, 2002. *United States v. Ortiz et al*, 315 F.3d 873 (8th Cir.2002).

**A.    The Composition of the Defense Team and Preparation for Trial.**

The trial team consisted of two attorneys, Frederick Duchardt and Jennifer Herndon, and a fact investigator, Dan Grothaus. At no time during the course of Mr. Sinisterra's capital prosecution did the defense team retain or utilize a qualified mitigation investigator to conduct an investigation into Mr. Sinisterra's background and life history in order to develop mitigation evidence that could be presented at his penalty phase hearing. Although Mr. Duchardt had hoped that Mr. Grothaus could perform a dual role as both fact investigator and mitigation investigator, Mr. Grothaus had no qualifications or expertise in conducting a mitigation investigation, and, ultimately, his work on the case was largely restricted to tasks relevant to the guilt-phase proceedings, and he was never asked to conduct a mitigation investigation. The task of preparing for the penalty phase proceedings was shouldered almost exclusively by Ms. Herndon, who was neither qualified nor trained to conduct a mitigation investigation.

The lack of a qualified mitigation investigator resulted in counsel failing to complete a

thorough social history of Mr. Sinisterra's life. Ms. Herndon was simply unable to conduct such an investigation on her own; not only did she lack the proper training to interview individuals about such sensitive topics, but she simply did not have the time to devote to such a labor-intensive task given the legal-related assignments that she was responsible for discharging in preparation for Mr. Sinisterra's trial. Moreover, Ms. Herndon did not have the time to locate and obtain any of Mr. Sinisterra's social service and institutional records, so that duty was never carried out. As Ms. Herndon has explained in a sworn affidavit: "The fact that this entire process was solely my responsibility resulted in a disorganized and less effective presentation of the evidence than would have been possible with the assistance of a mitigation specialist." (Doc. 41, Ex. 2, Herndon Aff. ¶ 13)

Ms. Herndon located several witnesses in the Houston area, where Mr. Sinisterra had been living for about six years immediately prior to his arrest. These witnesses consisted primarily of his wife, Michelle, his two young daughters, and several friends of Michelle's, and they were interviewed during the course of a visit that Ms. Herndon made to Houston in March of 1999. None of these witnesses were from Colombia or had any knowledge of the intimate details of Mr. Sinisterra's upbringing and life history prior to coming to the United States.

Ms. Herndon's only attempt to conduct interviews with Mr. Sinisterra's family and friends in Colombia occurred approximately three weeks before his trial. At that time, Ms. Herndon traveled to Buenaventura, Colombia, and conducted videotaped interviews with eight of Mr. Sinisterra's family members and friends. As Ms. Herndon explained in her affidavit, these were merely introductory meetings, and the videotapes were not made with the intent that they be introduced at trial. (Doc. 68, Ex. 1, Herndon Second Aff. ¶¶ 11-12.) Indeed, Mr. Sinisterra's mother was not even

3

Appellate Case: 08-1925    Page: 8    Date Filed: 07/17/2008 Entry ID: 3452810

aware that her son was facing the death penalty until Ms. Herndon explained that to her while in Colombia. (*Id*. ¶ 12.) Consequently, the information contained in the videotaped interviews was of a superficial nature: general statements that the witnesses remembered Mr. Sinisterra as being a good person and hard working. Ms. Herndon did not broach any sensitive topics with these witnesses regarding the family dynamics in the Sinisterra household, physical and sexual abuse, multigenerational substance abuse or mental illness.

At some time prior to trial, Mr. Duchardt retained Dr. Enrique Dos Santos, a Spanish-speaking psychiatrist, to perform an evaluation of Mr. Sinisterra. The record is unclear as to what kind of an evaluation Dr. Dos Santos was asked to perform, and what, if any, diagnostic instruments were administered to Mr. Sinisterra. According to Mr. Duchardt, Dr. Dos Santos provided him with an oral report indicating that he found "no mental problems." (Doc. 50, Duchardt Stmt. ¶ 19.) Mr. Duchardt also retained Dr. Warren Wheelock to administer an I.Q. test to Mr. Sinisterra. Dr. Wheelock concluded that Mr. Sinisterra had a performance I.Q. of 75.[1] Despite the fact that such a score put Mr. Sinisterra within the range of the medically accepted definition of mental retardation, the defense team did not pursue any further neuropsychological testing or conduct any further mental health investigation. The defense team did not even submit Mr. Sinisterra's low I.Q. to the jury be considered as a mitigating factor in the penalty phase proceedings.

**B.      The Defense Team's Penalty Phase Mitigation Presentation.**

---

[1] Dr. Antolin Llorente, who evaluated Mr. Sinisterra as part of the § 2255 proceedings, noted in his report that the I.Q. test, the WAIS-III, that Dr. Wheelock administered to Mr. Sinisterra pretrial only measured his "Performance scale (restricted to visual reasoning, and as such, whatever deficits existed in this client in verbal reasoning were not investigated." (Doc. 41, Ex. 6, Llorente Report at 6). Given Mr. Sinisterra's illiteracy, a full-scale I.Q. test, which would have included a verbal scale, likely would have yielded an even lower score.

4

As a result of the lack of a thorough mitigation investigation, counsel was left with only the barest understanding of Mr. Sinisterra's background and life history, and this was reflected in the mitigation presentation counsel put on at trial. The defense mitigation case consisted largely of a single theme: that Mr. Sinisterra was a good person. Counsel called ten live witnesses who variously testified that Mr. Sinisterra was a good cook, a tidy housekeeper, a hard worker, and a good husband and father. All of these witnesses were individuals who had only met Mr. Sinisterra since he immigrated to the United States. None of the witnesses were asked about or provided the jury any information about the details of his life back in Colombia, his formative years, the circumstances of his upbringing, the nature of his family dynamics, or any of the significant experiences and relationships he had had prior to coming to the United States.

The defense team had anticipated calling some of the Colombian witnesses, but when their visas were denied, the defense was forced to use the videotaped testimony of those witnesses that Ms. Herndon had obtained weeks before. As was previously stated, the videotapes "were not made with the intent that they be introduced at trial," and the questions asked of the witnesses on the videotape "did not mirror what [counsel] would have asked the witnesses on direct examination at trial." (Doc. 68, Ex. 1, Herndon Second Aff. ¶ 12) Mr. Duchardt did not even have a chance to review the videotapes prior to trial. (Doc. 50, Duchardt Stmt. ¶ 13) As Ms. Herndon noted, many of the videotapes "were edited because the government objected to my narrative on the tape." (Doc. 41, Ex. 2, Herndon Aff. ¶ 10) The video recordings were of poor quality and difficult to understand, so much so that the district judge repeatedly told counsel that the recordings were "extremely taxing," "incomprehensible," "fruitless," and that in the court's opinion, it was doubtful that the jury could understand them. (Sinisterra Penalty Phase Tr. at 2791-94.) Additionally, because the defense

5

team only belatedly decided to use the videotapes at trial, the government successfully argued that the jury be instructed that: "The government was not provided with copies of these tapes until April 28th of Two Thousand. As such, the government is unable to cross examine these witnesses to test their credibility as well as reliability of the information provided. You may consider this fact in deciding what weight, if any, to give to these interviews." (*Id*. at 2713, 2794-95.) Additionally, various parts of the videotapes had to be redacted in response to objections by the government. Regardless, the videotaped testimony covered the same limited range of information provided by the live witnesses – that Mr. Sinisterra was a good person and hard working – and provided few details into Mr. Sinisterra's background and life history. Tellingly, not a single juror found that there were factors in Mr. Sinisterra's "background, record, or character, or any other circumstances of the offenses, that mitigate against imposition of the death sentence." Sinisterra Verdict Form. As Mr. Duchardt later conceded: "In retrospect, I believe we should have employed . . . a forensic social worker because, had we had such a person on our defense team, that person could have stepped into the void left when the witness visas were disallowed, and could have presented the Colombia witness information in that fashion." (Doc. 50, Duchardt Stmt. ¶ 15)

### C. The Readily Available Mitigation Evidence That Was Not Presented At Trial.

Had trial counsel conducted a thorough mitigation investigation, they would have been able to share at least the following details about Mr. Sinisterra's life history with the jury, all of which was readily available mitigation information at the time of trial and was pled before the district court in Mr. Sinisterra's § 2255 motion:

German Sinisterra was born on November 9, 1964 in the violence-ravaged Colombian port city of Buenaventura, in an environment of civil war, social unrest and frequent murder. He was born

6

Appellate Case: 08-1925　　Page: 11　　Date Filed: 07/17/2008　Entry ID: 3452810

into abject poverty, and both of his parents were illiterate. Mr. Sinisterra's father may have been mentally retarded, and lacked basic living skills.  Mr. Sinisterra's father virtually never bathed, changed his clothes, or groomed himself, nor did he ever work or help support his family in any way. When Mr. Sinisterra was 5 or 6 years old, his father apparently had a psychotic episode, and chased Mr. Sinisterra's mother around the house with a machete. Although his mother escaped, his father's rage continued and he hacked down a banana tree with the machete.  Mr. Sinisterra was forced to watch the entire violent outburst.

After the machete incident, Mr. Sinisterra's father left the family hovel and Mr. Sinisterra never lived with him again.  Meanwhile, and continuing throughout the portion of his childhood in which he lived with his family, Mr. Sinisterra suffered brutal beatings at the hands of his mother, who would whip him with a leather horsewhip, often causing extensive bleeding.

When he was about 7 years old, Mr. Sinisterra dropped out of school, where he had always had serious behavioral problems, and was unable to learn to read.  The highest level of education Mr. Sinisterra achieved was completion of the first grade.  Mr. Sinisterra's behavioral problems and subsequent termination of his schooling happened at about this same time that he suffered a brutal sexual assault. One evening, shortly after dark, he and a young friend were walking in Buenaventura when they were accosted by four much older youths, probably in their late teens.  Mr. Sinisterra and his friend were forced into an abandoned house where they were both brutally gang-raped.

Within a few months after the sexual assault, Mr. Sinisterra ran away from home and went to Cali, where he lived on the streets.  He fell in with a gang of 5 or 6 other homeless youths, who survived by committing petty thefts.  The youths protected each other from the occasional attempted sexual assaults perpetrated by unknown adults in the streets of Cali.  Mr. Sinisterra lived as a

7

homeless child in Cali for approximately 6 years, with two interruptions when he was taken into custody and placed in juvenile correctional facilities. The first time, Sinisterra was in juvenile correctional facilities for about a year before escaping. The second time, he was in custody for about four months before escaping. While in custody, Sinisterra attended school, and was again unable to advance in almost any subject, and could not learn to read or write.

When he was 12 or 13, Mr. Sinisterra left Cali and went back to Buenaventura to live with his family. At this time, his oldest brother Paolo, who was about 5 years older than Mr. Sinisterra, had recently been released from prison for brutally assaulting a woman and was abusing narcotics heavily. When Paolo was high on narcotics, he would attempt, and often succeed in, sexually fondling Mr. Sinisterra and his younger brothers, Luis Eduardo and Ricouter.

His older brother by two years, Luis Eduardo, was murdered in 1986. Mr. Sinisterra's family found Luis Eduardo with two bullet holes in his head near some train tracks in Buenaventura. Mr. Sinisterra's younger brother by five years, Ricouter, was murdered in 1994, apparently by the Colombian police. All of the brothers except Paolo were illiterate. Mr. Sinisterra's three full sisters and one half-sister are all able to read and write, and one finished at least high school and possibly college. Growing up, the girls had luxuries that the boys did not have (such as learning to ride a bicycle and even having a bicycle) while only the boys were beaten.

Mr. Sinisterra suffered at least three instances of serious head trauma in his childhood and adolescent years. As a very young child, Mr. Sinisterra hit his head while diving into a pool, which resulted in an extended period of unconsciousness and nearly resulted in drowning. When he was about 7 or 8, and living in the streets of Cali, he got into a fight and struck his head against a lamppost so hard that he was knocked unconscious. A Cali housewife found him and took him to

8

Appellate Case: 08-1925     Page: 13     Date Filed: 07/17/2008 Entry ID: 3452810

her home, where he awoke after being unconscious for two full days. On another occasion, when he was 17 or 18 years old, he and his brother got into a fight with some other boys, and Mr. Sinisterra received a debilitating blow to the side of his head from a metal stick. None of these injuries ever received any medical attention, and Mr. Sinisterra suffers to this day from excruciating headaches and a feeling of intense pressure in his skull.

In his early twenties, Mr. Sinisterra heavily abused marijuana and "primo," a pasty cocaine precursor that was ingested by mixing it with tobacco and wrapping it into a cigar. During these periods of drug use, Mr. Sinisterra would sometimes experience "crazy episodes" where the pounding in his head became unbearable.

Mr. Sinisterra lived with his family until he was about 20 years old, never holding a steady job or supporting himself. The family was supported almost exclusively by his mother, who sold fish and wood on the streets. In 1984, Mr. Sinisterra made it to the United States as a stowaway on a commercial boat, despite the fact that it was common knowledge that stowaways were often thrown into the ocean if they were caught. Mr. Sinisterra arrived in Newark, New Jersey, and made his way to Manhattan, where he again lived in the streets with no means of support, until after a month or so he was discovered and taken in by a charitable organization. This organization sent him to Boston, where he lived in a shelter sponsored by an evangelical church for about two months. until he was kicked out for violating their rules. He was later deported back to Colombia.

In 1989, Mr. Sinisterra again risked passage on a boat to come back to the United States. He arrived in Miami and made his way to Houston, where he lived with a friend for about four months, during which time he fathered a child with Tawana Lynn. In November of 1990, some months after the pregnancy, Mr. Sinisterra returned to Colombia and once again lived with his mother.

9

Appellate Case: 08-1925     Page: 14     Date Filed: 07/17/2008 Entry ID: 3452810

A third boat passage brought him back to the United States in April 1992, again to Miami. Mr. Sinisterra was homeless until a Cuban man let him stay with him. During this time, Mr. Sinisterra worked in the fields, picking cucumbers for $3 an hour. After about two months, Mr. Sinisterra again went to Houston, where he lived with Tawana and her sister for about a year. Mr. Sinisterra was unable to find work, and made no money except for small amounts of cash from petty dealing drugs. During this time, Mr. Sinisterra impregnated his future wife, Michelle. Eventually they married, and Mr. Sinisterra and Michelle had a second child.

Mr. Sinisterra has never rented an apartment. He has never had a checking account. He has never held a regular job. He did not even pass his driver's license test himself. After he failed the test, a friend of his impersonated Mr. Sinisterra and passed the written driver's test for him. He has never, at any age, lived without depending on someone else.

The disastrous result of counsel's failure to investigate and present critical mitigating evidence in this case is well-summarized by Mr. Stetler, who reviewed the mitigation work done in this case, and concluded as follows: "What the jurors learned about Mr. Sinisterra was a fragment of the available mitigating evidence. Ultimately, they were deprived of the full quantum of evidence they needed to make a reasoned moral decision about whether Mr. Sinisterra should live or die." (Doc. 68, Ex. 3, Stetler Dec. ¶ 43)

**D.     The § 2255 Proceedings.**

Mr. Sinisterra filed his § 2255 motion on December 7, 2004. Prior to filing that motion, counsel for Mr. Sinisterra moved for funding to retain a mitigation investigator to conduct a life history investigation, as such an investigation had not been previously been performed on behalf of Mr. Sinisterra, and the results of such an investigation were pertinent to developing a constitutional

10

claim that trial counsel's mitigation presentation was defective. The district court denied that motion. Shortly after filing his § 2255 motion, in which he alleged various claims with respect to trial counsel's deficient performance in investigating and presenting readily available mitigation evidence, and in which habeas counsel presented the results of a preliminary mitigation investigation conducted on his own (summarized above), habeas counsel renewed his motion for funds to hire a mitigation investigator. That motion was once again denied. Finally, prior to filing his Traverse, Mr. Sinisterra moved for a substitution of counsel and appointment of Jon M. Sands, the Federal Defender of Arizona. Such appointment would have provided Mr. Sinisterra access to qualified, bilingual mitigation investigators capable of conducting a mitigation investigation in Colombia, all at no cost to the court. The district court also denied that motion. Thus, at no point in time during Mr. Sinisterra's capital prosecution has he ever had the benefit of the services of a qualified mitigation investigator to conduct a thorough life history investigation on his behalf.

The only funding that the district court authorized was for purposes of a neuropsychological evaluation of Mr. Sinisterra, which was conducted by Dr. Antonin M. Llorente. Dr. Llorente's evaluation yielded additional readily available mitigation evidence which trial counsel failed to investigate and present – namely, that Mr. Sinisterra suffers from organic brain damage, dampened intellectual functioning, and low I.Q. (Doc. 41, Ex. 6) As with preliminary information regarding Mr. Sinisterra's nightmarish childhood in Colombia, none of this mental health evidence was ever presented to the jury that sentenced Mr. Sinisterra to death.

Along with his legal pleadings, Mr. Sinisterra submitted numerous affidavits and sworn declarations regarding the performance of trial counsel, including two affidavits from Ms. Herndon, a sworn declaration from Mr. Grothaus, and a sworn declaration from Mr. Stetler regarding, *inter*

11

Appellate Case: 08-1925     Page: 16     Date Filed: 07/17/2008 Entry ID: 3452810

*alia*, the manner and scope of the mitigation investigation and preparation for trial. The government submitted a written statement by Mr. Duchardt, in which Mr. Duchardt responded to the claims of ineffective assistance contained in the § 2255 motion. Despite the fact that Mr. Duchardt's statement was contradicted by, or was inconsistent with, the affidavits and declaration of Ms. Herndon and Mr. Grothaus on numerous material questions of fact, the district court denied Mr Sinisterra's request for an evidentiary hearing. Rather, the district court made factual findings and credibility determinations on the basis of the affidavits and statements alone, without having the witnesses testify under oath and subject to cross-examination.

On December 14, 2007, the district court denied Mr. Sinisterra's § 2255 motion without a hearing and issued a written opinion. On April 18, 2008, the district court denied Mr. Sinisterra's application for a Certificate of Appealability (COA) in a two-sentence order. Contrary to Federal Rule of Appellate Procedure 22 (b)(1), the district court did not state the reasons for its denial of a COA. Pursuant to FRAP 22(b)(1) & (2), Mr. Sinisterra respectfully submits the following express request for a COA to this Court.

## II.    LEGAL STANDARD FOR ISSUANCE OF A COA.

The standard for the issuance of a COA is set out in 28 U.S.C. § 2255, which provides, in pertinent part, that the movant make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2255 (c)(2). Under this standard, a movant need only "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (internal citations and quotation marks omitted). As the Supreme Court has articulated more recently in *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003), "a COA does

12

Appellate Case: 08-1925     Page: 17     Date Filed: 07/17/2008 Entry ID: 3452810

not require a showing that the appeal will succeed," and neither should the Court deny "the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* [*v. McDaniel*, 529 U.S. 473, 483 (2000)] would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner 'has already failed in that endeavor.' *Barefoot*, supra, at 893 n. 4, 103 S.Ct. 3383." *Miller-El* at 336-37 (internal quotation marks omitted). *Miller-El* summarized:

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, ***a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail***.

*Id*. at 337-38 (emphasis added).

In capital cases, "the nature of the penalty is a proper consideration in determining whether to issue a certificate of appealability." *Barefoot*, 463 U.S. at 893. Because this case involves the death penalty, "any doubts as to whether a certificate of appealability should issue must be resolved in [Movant's] favor." *Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004) (citing *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)).

## III. THE DISTRICT COURT FAILED TO STATE REASONS FOR DENYING A COA.

As noted previously, the district court failed to comply with the express dictates of Fed. R. App. P. 22(b)(1), which requires that "the district judge who rendered the judgment ***must*** either issue a certificate of appealability ***or state why a certificate should not issue***." (emphasis added.) As the 1967 Advisory Committee Notes to Subdivision (b) of Rule 22 further explain:

13

> In the interest of insuring that the matter of the certificate will not be overlooked and that, if the certificate is denied, the reasons for denial in the first instance will be available on any subsequent application, the proposed rule ***requires the district judge*** to issue the certificate or ***to state reasons for its denial***.

(emphasis added.) The district court's failure to state reasons for its denial of the COA application makes it difficult, if not impossible, for this Court to review the correctness of the district court's denial. The district court's order, issued barely one hour after the filing of the COA application, was a mere one sentence long, and contained no analysis of any of the submitted claims, much less any explanation for why the claims did not meet the standard for the issuance of a COA as set out in 28 U.S.C. § 2255 and *Barefoot v. Estelle* and its progeny.

In the absence of any stated reasons for the denial of the COA, Mr. Sinisterra has no choice but to refer to the district court's reasoning in its order denying the § 2255 motion on the merits (Doc. 69) to articulate why a COA should issue in this case. As noted earlier, however, the standard for issuance of a COA is distinct from, and substantially lower than, the standard applied for purposes of merits review of a § 2255 motion. Therefore, the fact that the district court did not grant relief on these claims has no bearing on whether a COA should issue. *See* Section II, *supra*.

## IV.  CLAIMS ON WHICH A COA SHOULD ISSUE.

### A.  Jurists of Reason Could Debate Whether Counsel Rendered Ineffective Assistance In Their Investigation and Presentation of Mitigation Evidence.

Mr. Sinisterra raised three claims in his § 2255 motion with respect to trial counsel's deficient and prejudicial performance in investigating and presenting mitigation evidence at the penalty phase of his capital trial: (1) failure to retain and utilize anyone qualified to conduct a penalty phase mitigation investigation as required by prevailing professional norms; (2) failure to conduct a thorough mitigation investigation and present readily available mitigation evidence to the jury; and

14

(3) failure to investigate and present mental health evidence. *See* First Amended § 2255 Motion, ¶¶ 12.E.5 - 7 (Doc. 41).

The allegations contained in the district court pleadings, in addition to the numerous affidavits and sworn statements submitted with the pleadings, establish a compelling record of a tragic and enormously prejudicial deficiency in the composition and resultant performance of Mr. Sinisterra's trial team: namely, that Mr. Sinisterra's team lacked a mitigation investigator; that no one on the defense team was qualified to perform a mitigation investigation; that no mitigation investigation was in fact performed; and that as a result a wealth of inherently mitigating evidence went undiscovered by counsel and unpresented to the jury. The result was that what could have been a powerful, compelling penalty phase presentation, one that would have given the jury a social, environmental, and life history context within which to view the evidence presented by the government in its case-in-chief – in short, a context that would help explain how a person could be drawn into the violent world of drug trafficking, and be involved in a drug-related homicide, and yet should be spared the death penalty – was never presented. It is respectfully requested that a COA should be issued with respect to these claims.

### 1. The *Strickland* Standard.

In order to establish ineffective assistance of counsel, a habeas petitioner, or in this case a § 2255 movant, must meet both parts of the Supreme Court's familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must first show that counsel's performance was deficient, and then demonstrate that the deficiency prejudiced the defense. *Id*. at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In capital cases, an objective standard of reasonableness requires counsel to conduct an adequate investigation for potentially relevant

15

mitigation evidence. Specifically, it is well-settled that trial counsel have a duty to investigate a client's background, including his social history and mental health. *See, e.g., Wiggins*, 539 U.S. at 522-23 (citing *Strickland*, 466 U.S. at 690-91). Moreover, "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. In evaluating the reasonableness of counsel's performance, *Strickland* requires consideration of standards such as those in the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines").[2] *See Wiggins*, 539 U.S. at 524 (citing *Strickland*, 466 U.S. at 688 and *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

A habeas petitioner meets the second part of the *Strickland* test by demonstrating that "there

---

[2] The district court's attempt to minimize the relevance of the ABA Guidelines by characterizing them as merely "advisory," *see* Doc. 69 at 19, is at odds with the United States Supreme Court's own high regard and use of the Guidelines in adjudicating ineffective assistance claims in capital cases. The Supreme Court initially relied upon the ABA Guidelines as an appropriate guide for assessing attorney competence in capital cases in *Strickland v. Washington*, 466 U.S. at 688 (approvingly citing ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function")). In *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), the Supreme Court held that these standards are the appropriate guides for establishing what constitutes reasonably effective assistance under the Sixth Amendment. As the Court recognized in *Rompilla*, the 1989 and 2003 versions of the Guidelines "applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases." 545 U.S. at 387 n.7. *See also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("Although the instant case was tried before the 1989 ABA edition of the standards was published, the standards merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*. They are the same type of longstanding norms referred to in *Strickland* in 1984 as 'guided' by American Bar Association standards and the like."); *Pickens v. Lockhart*, 714 F.2d 1455, 1460 (8th Cir. 1983) (relying on 1980 ABA Standards for Criminal Justice in finding that trial counsel rendered ineffective assistance in failing to fully investigate mitigating evidence).

16

Appellate Case: 08-1925    Page: 21    Date Filed: 07/17/2008 Entry ID: 3452810

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This standard presumes an objective sentencer: "The idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency . . . are irrelevant to the prejudice inquiry." *Id*. at 695. In order to establish *Strickland* prejudice, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at 693. This is because counsel's deficient performance raises serious questions concerning whether the petitioner received the fundamentally fair trial guaranteed by the Constitution. As the Court explained in *Strickland*:

> An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Id*. at 694. Put simply, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. This inquiry naturally turns on the other evidence before the sentencer, because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id*. at 696.

The standard for establishing why a COA should issue on a claim is, of course, considerably lower than the standard for winning a claim on the merits – Mr. Sinisterra does not need to prove "that some jurists would grant the petition for habeas corpus," but rather that the claim is debatable "even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 337-38.

### 2. Failure To Retain And Utilize A Qualified Mitigation Investigator.

17

The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("Guidelines") in effect at the time of Mr. Sinisterra's trial, which took place in 2000, made it clear that counsel had a well established duty to investigate a capital client's social history and background in preparation for the penalty phase of trial.[3] The Guidelines, published in 1989, include the following: Guideline 11.4.1 sets forth capital defense counsel's duty to conduct "independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously." In addition, the penalty phase investigation should "comprise efforts to discover all reasonably available mitigating evidence." *Id*. Guideline 11.8.3 instructs counsel to formulate a penalty phase strategy after "considering witnesses familiar with and evidence relating to the client's life and development from birth to the time of sentencing, who would be favorable to the client [or] explicative of the offense(s) for which the client is being sentenced." It further directs trial counsel to consider expert witnesses to provide "medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced [or] to give a favorable opinion as to the client's capacity for rehabilitation." Guideline 11.8.6 provides a list of evidence a capital lawyer should consider presenting at the penalty phase, including: medical records, educational records, employment and training history, family and social history evidence, and expert testimony concerning the client's life history and "the resulting impact on the client." The Commentary to this guideline asserts that "[t]he assistance of one or more experts (e.g. social

---

[3] As discussed previously, the Supreme Court has long recognized the ABA Guidelines as being an appropriate guide for assessing attorney competence in capital cases and, even prior to *Strickland*, this Court has looked to the ABA Guidelines as a guide for assessing the performance of counsel in capital cases. *See* note 2, above.

Appellate Case: 08-1925    Page: 23    Date Filed: 07/17/2008 Entry ID: 3452810

worker, psychologist, psychiatrist, investigator, etc.) may be determinative as to the outcome [of the penalty phase.] . . ***Counsel may not choose, without investigation and preparation to sit back and do nothing at sentencing***."  (emphasis added.)

The Revised Edition of the Guidelines, published in 2003, amplifies these longstanding basic standards for the defense of capital cases. *See* American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Revised Edition (2003) ("Revised Guidelines") at 2 (stating that the Guidelines were designed to express "existing 'practice norms and constitutional requirements'" and "are not aspirational"). As such, the Revised Guidelines also apply to an evaluation of Mr. Sinisterra's trial counsel's performance. The Revised Guidelines include Guideline 4.1, "The Defense Team and Supporting Services," which prescribes that the defense team should include two attorneys, an investigator and a mitigation specialist. *See also* Revised Guidelines at 5-6 ("Counsel must promptly obtain the investigative resources necessary to prepare for both phases [of trial], including at a minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case.") (emphasis added.)

In Mr. Sinisterra's case, counsel's hiring a single investigator to perform both guilt phase and penalty phase work in this complex, multi-defendant federal capital trial fell below the standards set forth in the ABA Guidelines for the defense of any capital case, quite apart from the fact that Mr. Grothaus did not actually serve both roles. *See also* Guideline 10.4(C)(2)(a). The Commentary to Revised Guideline 4.1(A)(1) makes this plain:

> A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing, and often humiliating evidence (e.g. family sexual abuse) that the defendant may have never disclosed.

19

They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.

Contrary to ABA Guideline 4.1(A)(1), which states that the "defense team should consist of *__no fewer than__* two attorneys . . ., an investigator, and a mitigation specialist," Mr. Sinisterra's defense lacked a crucial member – someone qualified to perform a mitigation investigation. As is argued in more detail below, the record demonstrates that Dan Grothaus, the fact investigator, did not perform in a dual capacity as a mitigation investigator. Not only was he not qualified to perform that function, but all the submissions in the district court § 2255 proceedings indicate that Mr. Grothaus was never, in fact, tasked with conducting a mitigation investigation by trial counsel.

As is explained in a sworn declaration prepared by Russell Stetler, the National Mitigation Coordinator for the Federal Defender Program and one of the nation's leading mitigation investigation experts, a mitigation investigation into a client's life history is an incredibly labor-intensive task, requiring hundreds of hours of work. (Doc. 68, Ex. 3, Stetler Dec. ¶ 20) The mitigation investigator must conduct a detailed, multi-generational investigation into the client's background. (*Id*. ¶¶ 12, 15) This involves identifying, locating, and interviewing as many people as possible – family members, friends, employers, co-workers, etc – with first-hand knowledge of the client's family history, childhood, developmental years and adult life. (*Id*. ¶¶ 12, 19) Additionally, the mitigation investigator must devote a substantial amount of time to collect and

20

Appellate Case: 08-1925    Page: 25    Date Filed: 07/17/2008 Entry ID: 3452810

analyze all available documentation about the client and his family, including medical, educational, employment, social service and court records, as such records often document events which the client or family might be too ashamed or traumatized to disclose, or disclose investigative leads regarding additional evidence which must be pursued. (*Id*. ¶ 18) Such a thorough social history investigation further provides counsel with necessary information to be able to determine whether the assistance of an expert – for example, a mental health expert -- is necessary in order to properly represent the client. (*Id*. ¶ 17) In turn, such experts often require social history information in order to conduct a thorough and reliable evaluation of the client. (*Id*.) Thus, the importance of a thorough and careful mitigation investigation in a capital case cannot be overstated. Indeed, prevailing professional norms ***require*** that such an investigation be conducted by a qualified mitigation investigator. *See* ABA Guideline 10.4(C)(2)(a).

Mr. Sinisterra's defense team was structurally compromised by the lack of any such mitigation investigator. (*See* Doc. 68, Ex. 3, Stetler Dec. ¶ 28) As Mr. Stetler explained, conducting an interview of a mitigation witness requires particular expertise and a substantial amount of time given the nature of the information which is sought. (*Id*. ¶¶ 18-19) That is, the life of a capital defendant is often marked by intra-familial abuse, physical and sexual assault, multigenerational substance abuse and mental illness – dark and shameful secrets that individuals are understandably reluctant to discuss. For this reason, initial interviews with such witnesses often yield incomplete or superficial information, as these witnesses are typically defensive and wary of disclosing personal or sensitive information to a stranger. (*Id*. ¶ 19) Such barriers can only be broken by establishing a rapport and trust with the witnesses – a process that requires many hours and multiple visits with the witnesses. (*Id*. ¶ 20) For this reason, the mitigation investigation must be initiated as soon as

Appellate Case: 08-1925    Page: 26    Date Filed: 07/17/2008 Entry ID: 3452810

possible after counsel is appointed on the case; given the intense amount of work involved in conducting a life history investigation, such a task cannot be completed in a matter of days and weeks. (*Id*. ¶¶ 16, 20; *see also* ABA Guideline 10.4)

In Mr. Sinisterra's case, the need to devote substantial time and care to the preparation of his mitigation case was further compounded by the fact that Mr. Sinisterra was born and raised in Buenaventura, Colombia. Conducting an adequate investigation into Mr. Sinisterra's life history, therefore, necessarily required traveling abroad to locate and interview family members and friends who were most familiar with the intimate details of his background and upbringing. (Doc. 68, Ex. 3, Stetler Dec. ¶¶ 21-22) Additionally, it would require particular diligence in attempting to gather social service and other institutional records from Colombian agencies in order to compile the available documentary record of Mr. Sinisterra's life abroad, from his earliest years until his immigration to the United States. (*Id*. ¶¶ 18, 21)

> **a.    The defense team did not include a qualified mitigation investigator, but only a fact investigator – Dan Grothaus – who was neither qualified to perform a mitigation investigation, nor tasked with conducting such a mitigation investigation.**

The district court relied exclusively on the affidavit filed by Frederick Duchardt, in which he claims that Dan Grothaus, who served as the guilt-phase investigator in the case, was qualified to perform a mitigation investigation and was employed as a mitigation specialist by the defense. Conspicuously absent from the district court's opinion is any mention of the fact that Mr. Grothaus himself filed a sworn declaration which disputed this assertion in the Duchardt affidavit. Contrary to the district court's conclusion that Mr. Grothaus "served in the dual role as a mitigation investigator and specialist in both phases of trial" (Doc. 69 at 16), Mr. Grothaus stated in his

Appellate Case: 08-1925     Page: 27     Date Filed: 07/17/2008 Entry ID: 3452810

declaration that he was neither asked to investigate, nor was he aware of, any of the available

mitigation evidence regarding Mr. Sinisterra's background and social history which the defense team

failed to develop and present at trial:

> I do not recall doing any other investigation that would have been relevant to Mr. Sinisterra's penalty phase. I did not interview any relatives of Mr. Sinisterra other than his wife and family. I did not gather any records of his life history or that of his family members, all of which could only be found in his homeland of Colombia. I did not interview anyone who had first-hand knowledge of Mr. Sinisterra's childhood, developmental years, or life in Colombia. I did not interview anyone about his immigration experience. I did not accompany Ms. Herndon when she made a trip to Colombia.

> I was not asked to investigate Mr. Sinisterra's biography or social history. I was not asked to develop mitigation themes or to prepare demonstrative evidence for the penalty phase of Mr. Sinisterra's trial or to assist in drafting the mitigating factors to be considered by the jurors on the verdict sheet. The interviews I conducted relevant to mitigation focused exclusively on Mr. Sinisterra's relationship with his wife, children and extended family in Houston.

> I have reviewed the evidence presented in Mr. Sinisterra's amended 2255 motion concerning his background in Colombia. I did not know of any of the details of his exposure to family violence, sexual violence, or his lack of education, or his exposure to head trauma. I did not know that when Mr. Sinisterra was five or six years old, he witnessed his father chase Mr. Sinisterra's mother around with a machete during a psychotic episode, I did not know that Mr. Sinisterra's father abandoned his family after that incident and Mr. Sinisterra's mother raised the children alone and would beat him with a leather whip, often causing him to bleed, throughout the time he lived with his family. I did not know that Mr. Sinisterra was gang-raped when he was about seven years old, or that after that incident he ran away from home and lived on the streets for six years. I did not know that when Mr. Sinisterra returned to his family when he was about twelve, his older brother would molest him, and I did not know that Mr. Sinisterra had suffered several head traumas.

(Doc. 68, Ex. 2, Grothaus Dec. ¶¶ 6-8. *See also id*. ¶ 3) ("I recall spending the vast majority of my

time on this case investigating issues related to Mr. Sinisterra's guilt-innocence phase.")

Moreover, Mr. Grothaus' declaration makes plain that he did not have any specialized

training or expertise with respect to investigating and developing mitigation evidence, and certainly

23

not with respect to conducting a mitigation investigation into the background and social history of a foreign national. (*Id*. ¶ 1). Mr. Grothaus' account of the scope of his duties on the case and his qualifications was also confirmed by Attorney Jennifer Herndon, who was the attorney in charge of Mr. Sinisterra's penalty phase case. As she stated:

> I did not ask the guilt/innocence investigator in the case, Dan Grothaus, to do any mitigation investigation in the case. Mr. Grothaus was consumed with work on the guilt phase of the case. I was very aware of the work Mr. Grothaus was doing, having accompanied him on at least one trip to Houston and a trip to North Carolina in an attempt to locate the government's star witness Andres Borja Molina. My mitigation investigation of Mr. Sinisterra's family in Houston was conducted by myself, including the preparation of the family to testify at trial and the videotaping of Mr. Sinisterra's daughter to be used at trial.

(Doc. 68, Ex. 1, Herndon Second Aff. ¶ 7)

Clearly, the persons in the best position to speak to the issue of whether Mr. Grothaus actually performed a mitigation investigation at trial are Mr. Grothaus himself and Attorney Herndon, the lead lawyer on the penalty phase case. Yet despite unequivocal sworn statements by both Mr. Grothaus and Ms. Herndon refuting Attorney Duchardt's claim that Mr. Grothaus served as a mitigation specialist in the case, the district court simply accepted Attorney Duchardt's claim at face value, without even *mentioning* that Mr. Grothaus and Ms. Herndon submitted contrary affidavits. Indeed, there is not a single citation to either Mr. Grothaus' affidavit or Ms. Herndon's second affidavit in the entire 25-page Order denying Mr. Sinisterra's § 2255 Motion.[4]

In looking at the entirety of the pleadings and declarations submitted to the district court, it is clear that Mr. Grothaus did not serve "in the dual role as a mitigation investigator and specialist

---

[4]Actually, nothing in Doc. 69, the district court's Order denying the § 2255 motion, suggests that the district court ever read or considered any of the facts and arguments presented in Mr. Sinisterra's Traverse and its attachments.

24

in both phases of the trial" as found by the district court.[5] (Doc. 69 at 16) Mr. Duchardt hired Mr. Grothaus to be the fact and mitigation investigator, despite the fact that Mr. Grothaus had never worked as a mitigation specialist. (Doc. 50, Duchardt Stmt. ¶ 4). Mr. Grothaus was not directed to pursue a mitigation investigation in Mr. Sinisterra's case. (Doc. 68, Ex. 2, Grothaus Dec. ¶¶ 4-7; Doc. 41, Ex. 2, Herndon Aff. ¶ 9; Doc. 50 ¶ 6; Doc. 68, Ex. 1, Herndon Second Aff. ¶¶ 6-7). "The vast majority" of Mr. Grothaus's time was spent on guilt-innocence investigation. (Doc. 68, Ex. 2, Grothaus Dec. ¶ 3). The facts he gathered that were relevant to Mr. Sinisterra's penalty phase were incidental to his guilt-innocence phase investigation and were limited to information he learned from Mr. Sinisterra's wife and a few other witnesses he interviewed in Houston. These witnesses provided accounts of Mr. Sinisterra's "life as a husband and father." (*Id*. ¶ 5). Mr. Grothaus was not asked to, nor did he, investigate Mr. Sinisterra's biography or social history, collect records or life history, develop mitigation themes or gather demonstrative evidence for the penalty phase. (*Id*. ¶¶ 6-7; Doc. 50, Duchardt Stmt. ¶ 6; Doc. 41, Ex. 2, Herndon Aff. ¶¶ 9-13; Doc. 68, Ex. 1, Herndon Second Aff. ¶ 7). He did not travel to Colombia to conduct any investigation. (Doc. 68, Ex. 2, Grothaus Dec. ¶ 6; Doc. 41, Ex. 2, Herndon Aff. 9). The record is absolutely clear that Mr. Grothaus, who lead trial counsel Fred Duchardt had insisted would double as Mr. Sinisterra's fact and mitigation investigator (Doc. 50, Duchardt Stmt. ¶ 4), did not perform any other investigation relevant to the penalty phase of trial, nor was he qualified to. (Doc. 41, Ex. 2, Herndon Aff. ¶ 9; Doc. 68, Ex. 2, Grothaus Dec. ¶¶ 4-7; Doc. 50, Duchardt Stmt. ¶ 6; Doc. 68, Ex. 1, Herndon Second

---

[5] Indeed, the district court contradicted itself in its own opinion on this very point. Just a few sentences after saying that Mr. Grothaus served in the dual role in both phases of the trial, the district court then found "Mr. Grothaus was assigned the investigation work ***for the first phase of trial***, while Mr. Duchardt and Ms. Herndon developed 'mitigation themes and evidence.'" Order Denying § 2255 Motion at 17. (emphasis added) (Internal quotations marks in original).

25

Appellate Case: 08-1925   Page: 30   Date Filed: 07/17/2008 Entry ID: 3452810

Aff. ¶ 7). The foregoing demonstrates that the district court's conclusion regarding whether the defense team possessed a qualified mitigation investigator could have been resolved in a different manner, or at least that the questions regarding this issue are adequate to deserve encouragement to proceed further. Thus, a COA should issue on this claim.

> **b.** **The defense team did not possess any member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.**

Contrary to the district court's statement that "the defense team possessed the clinical skills contemplated by the ABA Guidelines in death penalty cases," Doc. 69 at 17, the record in the proceedings below demonstrates the opposite. The relevant ABA Guideline is 4.1(A)(2), which states that "[t]he defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." *See also* Guideline 10.4(C)(2)(b). The Commentary to Guideline 4.1 expands on the reason for this requirement:

> Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses . . . Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions . . . that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subjects as may seem appropriate.

As the declarations submitted in the district court make clear, Mr. Sinisterra's defense team lacked any person with such training or experience. *See* Doc. 68, Ex. 2, Grothaus Dec. ¶ 1 ("I have no specialized training or expertise in mental disorders or impairments. . . . I have never claimed to be qualified by training or experience to screen for mental disorders or impairments."); Doc. 68, Ex.

26

1, Herndon Second Aff. ¶ 8 ("No one on Mr. Sinisterra's defense team was qualified to do mental health screening or to discover and evaluate Mr. Sinisterra's mental health history."); Doc. 68, Ex. 3, Stetler Dec. ¶ 28 ("Mr. Sinisterra's defense team at trial was structurally compromised: there was no mitigation specialist, and no one qualified to screen for mental disorders or impairments.") Nor did Mr. Duchardt claim in his statement that he possessed the requisite clinical skills to screen individuals for the presence of mental or psychological disorders or impairments. Simply put, there is no support in the record for the district court's conclusion that the defense team possessed the clinical skills contemplated by the ABA Guidelines in death penalty cases. Therefore, a COA should issue on this claim, as a court could have resolved the issues in a different manner.

c. **The failure to retain and utilize a qualified mitigation investigator resulted in prejudice to Mr. Sinisterra.**

The record is clear that the defense team did not contain a qualified mitigation investigator. The consequences of that failure and the resulting prejudice to Mr. Sinisterra are discussed in more detail in section IV.A.3., *infra*. However, as the foregoing discussion of Mr. Grothaus' and Ms. Herndon's statements demonstrates, crucial tasks necessary for the competent development and presentation of mitigation evidence at Mr. Sinisterra's capital trial were never performed. As Ms. Herndon's affidavit makes clear, Mr. Sinisterra's penalty phase investigation was rushed, and she undertook its preparation alone. (Doc. 41, Ex. 2, Herndon Aff. ¶ 7). She was forced to conduct the mitigation interviews with Mr. Sinisterra's family members in Colombia from behind a videotape less than a month before he was going to be tried for capital murder. Those same family members had only learned that Mr. Sinisterra was facing a death sentence two days before Ms. Herndon conducted the video-interviews and were still in shock over the news. They limited most of their

27

comments to descriptions of Mr. Sinisterra's kindness to his family and pleas for his life. Because the family was unable to attend Mr. Sinisterra's trial, and Ms. Herndon, as his attorney, could not testify to the information she learned while she performed the penalty phase investigation unaccompanied in Colombia, no one was able to testify to the conditions of stark poverty and ever-present social violence that Ms. Herndon observed and Mr. Sinisterra's family members reported they lived in. (*Id*. ¶ 10).[6]

Ms. Herndon also did not perform the critical task of collecting social history records central to preparing for the penalty phase of any capital case. (Doc. 68, Ex. 1, Herndon Second Aff. ¶ 14; Guideline 10.11(F)(2) (discussing the evidence counsel should consider presenting during the penalty phase, including records providing supporting documentation of the client's medical, psychological, sociological, and cultural background)). Thus, even readily apparent mitigating evidence of poverty and the culture of violence in which Mr. Sinisterra's early life was steeped was not presented to his jury. As discussed further below, neither was the wealth of other social and psychological evidence Mr. Sinisterra was constitutionally entitled to put before his capital jury.

Additionally, as stated earlier, the declarations of Mr. Grothaus, Ms. Herndon, and Mr. Duchardt make clear that Mr. Sinisterra's defense team did not "contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." Guideline 4.1(A)(2). *See also* Guideline 10.4(C)(2)(b). That lack resulted in Ms. Herndon, the attorney in charge of preparing Mr. Sinisterra's penalty phase, not knowing to pursue mitigating evidence of mental retardation or other disease or defect in Mr.

---

[6] As is explained in more detail below, despite the district court's statement that the videotapes "depicted how Sinisterra was raised and the cultural environment in Colombia," Doc. 69 at 18, the videotapes did not contain such information. *See* Section IV.A.3.b., *infra*.

28

Appellate Case: 08-1925     Page: 33     Date Filed: 07/17/2008 Entry ID: 3452810

Sinisterra's trial. (Doc. 41, Ex. 2, Herndon Aff.¶19). As discussed further below, counsel also failed to present or investigate mitigating evidence related to Mr. Sinisterra's low I.Q., history of head injuries, or organic brain damage, despite the low I.Q. score of which counsel was aware pre-trial. Based on the foregoing, it is evident that this issue is debatable among jurists of reason and that the questions are adequate to deserve further encouragement. Thus, a COA should issue.

### 3. Failure to Conduct a Thorough Mitigation Investigation and Present Available Mitigation Evidence to the Jury.

In *Wiggins v. Smith*, 539 U.S. 510, 522 (2003), the Supreme Court affirmed that under *Strickland*, counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'" (quoting *Williams v. Taylor*, 529 U.S. at 396). The Supreme Court recognized that Mr. Wiggins' counsel's failure to investigate their client's background violated the ABA's provision that investigation into mitigating evidence "'should comprise efforts to discover *all reasonably available* mitigating evidence.'" *Id*. at 524 (emphasis in original) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(c)). The Supreme Court concluded that Wiggins' trial counsel's performance was deficient because counsel failed to pursue avenues of mitigation investigation that were warranted based on leads that became evident to counsel during their initial investigation. *Id*. at 525; *see also id*. at 519 ("[T]he scope of [counsel's] investigation was also unreasonable in light of what counsel" had discovered from their limited investigation. Trial counsel "knew at least some details of Wiggins' childhood.").

As recounted in the First Amended § 2255 Motion, there was a wealth of highly probative and compelling mitigation information regarding Mr. Sinisterra's background and life history that was readily available at the time of trial. Trial counsel, however, failed to investigate and present

29

this evidence to the jury that sentenced Mr. Sinisterra to death. The available mitigation information included evidence that Mr. Sinisterra was gang-raped as a seven-year-old child, that his mother used to beat him with a leather whip until he bled, that his older brother used to regularly sexually molest him, that he had suffered repeated head injuries, and that he had organic brain damage and dampened intellectual functioning. (Doc. 41 at 34-40) The Supreme Court has recognized that a failure to investigate and present precisely this kind of mitigating evidence constitutes ineffective assistance of counsel, as such evidence directly bears on a capital defendant's moral culpability and the propriety of a death sentence. *See Wiggins*, 539 U.S. at 517, 535-36 (2003) (counsel ineffective for failing to investigate and present evidence of capital defendant's "excruciating life history," including that he was gang raped at the age of 16, was regularly beaten by his biological mother, was molested and physically abused by his foster parents, and suffered from diminished mental capacities); *Rompilla v. Beard*, 545 U.S. 374, 390-392 (2005) (counsel ineffective for failing to investigate and present evidence that capital defendant's father used to beat him with a leather strap and that capital defendant suffered from organic brain damage and a low I.Q.); *Williams v. Taylor*, 529 U.S. 362, 370, 395-96 (2000) (counsel ineffective for failing to investigate and present evidence that capital defendant was severely and repeatedly beaten by his father as a child, had suffered repeated head injuries, and was borderline mentally retarded); *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) (noting that "impaired intellectual functioning is inherently mitigating" and that "evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death") (internal quotation marks and citation omitted). Counsel's failure to investigate and present this mitigating evidence at Mr. Sinisterra's trial constituted deficient performance.

30

### a. The record indicates that the defense team was not previously aware of the compelling mitigation evidence regarding Mr. Sinisterra that was readily available at the time of his trial.

The district court appears to have credited Mr. Duchardt's statement that he was aware of "all" of the extensive life history evidence that is pled at pages 34-40 of Mr. Sinisterra's amended § 2255 motion. (Doc. 50, Duchardt Stmt. ¶ 13) It is respectfully submitted, however, that Mr. Duchardt's claim regarding his knowledge of the available mitigation evidence is not only unsupported by the record, but is incredible on its face.

If Mr. Duchardt was aware of this evidence, he shared none of it with Ms. Herndon, lead penalty phase counsel, who was never aware of the vast majority of it until she read the amended § 2255 motion. (Doc. 68, Ex. 1, Herndon Second Aff. ¶ 10). Nor did he share any of it with his investigator, Mr. Grothaus, who also learned it for the first time when he read the motion. (Doc. 68, Ex. 2, Grothaus Dec. ¶ 8). Nor did he take any steps, of any kind, to investigate this evidence or present it to the jury. It defies all reason to believe that Mr. Duchardt was aware of the extensive mitigation evidence detailed in the § 2255 motion, but never disclosed any of that information to either his co-counsel, who by his own admission was in charge of preparing the penalty phase case, or to his investigator, who was ostensibly responsible for locating and interviewing potential witnesses. Nor is there is any evidence in the record that indicates that Mr. Duchardt investigated any of the mitigation evidence discussed in the § 2255 motion himself.

Mr. Duchardt summarily asserted in his declaration that it had been his "intention" to present that evidence through Mr. Sinisterra's mother. (Doc. 50, Duchardt Stmt. ¶ 13). However, there is nothing in the record to suggest that Mr. Duchardt had ever spoken to Mr. Sinisterra's mother, much less learned anything regarding Mr. Sinsiterra's childhood physical and sexual abuse from her.

31

Appellate Case: 08-1925    Page: 36    Date Filed: 07/17/2008 Entry ID: 3452810

Indeed, Mr. Duchardt never stated in his declaration that he had ever interviewed Mr. Sinisterra's mother, nor had any idea whether she would acknowledge the shameful facts of Mr. Sinisterra's life history, or even was aware of those in which she was not personally involved. To the contrary, Mr. Duchardt stated that it was Ms. Herndon who had responsibility for the Colombian witnesses (*Id.* ¶ 8). As previously noted, she was not aware of any of the information that Mr. Duchardt claimed he would have presented through Mr. Sinisterra's mother. There is simply no credible evidence in the record to corroborate Mr. Duchardt's claim that he was "aware" of the mitigation information disclosed in the § 2255 motion, as neither of the other members of the defense team were aware of this information, nor is there any evidence to suggest that Mr. Duchardt had ever sought and received such information from Mr. Sinisterra's mother or any other witness.

Moreover, even if Mr. Duchardt's statement that he was aware of all the readily available mitigation evidence is taken at face value, it is undisputed that none of that mitigating evidence was ever presented to the jury at Mr. Sinisterra's penalty phase. Counsel's failure to present that readily available mitigation evidence "cannot be considered a product of a reasonable trial strategy because there was no justifiable reason to prevent the jury from learning about [the petitioner's] childhood experiences." *Simmons v. Luebbers*, 299 F.3d 929, 938 (8th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003). Indeed, it is well-established law that the failure to present mitigating evidence of the kind that was readily available in Mr. Sinisterra's case constitutes deficient performance under *Strickland*. *See Wiggins*, 539 U.S. at 519; *Williams*, 529 U.S. at 395 (counsel ineffective for failing to investigate and present evidence of petitioner's "nightmarish childhood"); *Simmons*, 299 F.3d at 935-38 (trial counsel ineffective for failing to present evidence that petitioner was raised in abusive home and was himself beaten as a child; that at the age of 12 or 13 he ran away from home and was

32

raped; that he grew up in an impoverished neighborhood with frequent street violence; and that he had an I.Q. of 83; state supreme court's view of "attorneys' penalty phase actions . . . [as] part of a sound trial strategy" was rejected because "there was no justifiable reason to prevent the jury from learning about Simmons's [mitigating] childhood experiences").[7]  Given all of the foregoing, it is clear that this issue is debatable among jurists of reason, and that the inconsistencies in the record demonstrate that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further.  Thus, a COA should issue on this claim.

> **b.      The videotaped testimony of the Colombian witnesses was superficial and ineffective, and was never intended to be, nor was it in fact, a substitute for a competently performed mitigation investigation.**

In deeming trial counsel's mitigation investigation adequate, the district court relied heavily on the fact that Ms. Herndon traveled to Colombia and made videotapes of interviews with several

---

[7] *See also Jermyn v. Horn*, 266 F.3d 257, 306 4 (3d Cir. 2001) (counsel ineffective in failing to investigate and present the circumstances surrounding petitioner's childhood, even though counsel had information prior to trial that petitioner "had been abused as a child, and . . . that the abuse was a critical component to understanding [his] mental illness"); *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) (*per curiam*) (counsel was ineffective in failing to investigate and present mitigating evidence of petitioner's "abusive childhood"; "It is axiomatic – particularly since *Wiggins* – that such a decision [to forego pursuit of mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose."); *Karis v. Calderon*, 283 F.3d 1117, 1135 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003) (counsel ineffective in failing to investigate and present mitigating evidence; "a substantial mitigating case may be impossible to construct without a life-history investigation"); *Collier v. Turpin*, 177 F.3d 1184, 1201, 1204 (11th Cir. 1999) (although defense attorneys presented ten witnesses at penalty phase, lawyer's ineffective investigation and presentation resulted in "hollow shell" of mitigation, omitting "particularized circumstances of [petitioner's] past and of his actions on the day of the crime that would have allowed [jurors] fairly to balance the seriousness of his transgressions with the conditions of his life"); *Cunningham v. Zant*, 928 F.2d 1006, 1017 (11th Cir. 1991) (ineffective assistance found where counsel failed to present significant mitigating evidence regarding petitioner's mild retardation, limited education, and "poverty-stricken socioeconomic background").

Appellate Case: 08-1925      Page: 38      Date Filed: 07/17/2008 Entry ID: 3452810

of Mr. Sinisterra's friends and family members. (Doc. 69 at 18-19) The district court, however, cited only to Mr. Duchardt's statement on this issue and made no mention of Ms. Herndon's second affidavit, in which she explained that her efforts in Colombia were inadequate and failed to explore any of the mitigation evidence recounted in Mr. Sinisterra's § 2255 Motion:

> The mitigation work that I did in Mr. Sinisterra's case was far from a thorough social history of Mr. Sinisterra. My work consisted solely of family interviews in Houston, Texas and Buenaventura, Colombia. The interviews that I did in Colombia were nothing more than initial "get acquainted" interviews. Usually, such interviews are done to establish rapport and trust with the family. The next step would be to ask the more difficult questions to discover any discord, abuse, or other "secrets" within the family. My interviews in Colombia were superficial and never reached this next step. The work I did in Colombia did not constitute an adequate social history of Mr. Sinisterra's life there, but rather is better characterized as preliminary work.

> The videotapes I made while in Colombia were not made with the intent that they be introduced at trial. The questions I asked were to gather information, and did not mirror what I would have asked the witnesses on direct examination at trial. Neither the questions I asked on tape, nor additional conversations that occurred off tape, explored any of the "darker" areas of Mr. Sinisterra's growing up that have since been uncovered. This is generally the kind of information that I first allow the mitigation specialist to probe and uncover, due to her experience in this area.

> Another fact that made the interviewing in Colombia difficult was that Mr. Sinisterra's mother was not aware that he was facing the death penalty until I explained that to her (through the interpreter and family members) while in Colombia. After breaking the news, I would usually want to allow sufficient time and several interviews to pass before getting into any sensitive subject matters in my questioning. Because my week in Colombia was the only time I talked with Ms. Sinisterra, there wasn't sufficient time to allow this to sink in and to do the type of in depth interviewing that was needed to develop an adequate social history and/or complete a videotape that was an adequate substitute for live testimony.

(Doc. 68, Ex. 1, Herndon Second Aff. ¶¶ 11-13)

The mitigation evidence that was presented through videotapes of Mr. Sinisterra's family members and neighbors hinted at the family's poverty but did not disclose, or even scratch the surface of, the remaining powerful mitigating evidence that characterized Mr. Sinisterra's life and

34

background. (*See* Doc. 41 at 34-40; Doc. 68, Ex. 2, Stetler Dec. ¶¶ 33-35) No one interviewed on the videotapes discussed the family's violence, including the physical and sexual abuse of Mr. Sinisterra; no one mentioned his head injuries or his father's apparent mental illness or the circumstances of his father's abandonment of the family. No one mentioned that during his childhood and early adolescence Mr. Sinisterra was homeless and lived on the streets away from his family. (*See* Trial Exs. 63-69, 71-72) (videotapes). Contrary to the district court's conclusion that the videotapes "sufficiently conveyed to the jury information deemed as mitigating factors" (Doc. 69 at 19),[8] the videotaped interviews did not include any of the extensive mitigation information disclosed in Mr. Sinisterra's § 2255 Motion – evidence which was available at the time of the trial, but which counsel unreasonably failed to investigate and present.

The district court's opinion also relies heavily on Mr. Duchardt's statement that he believed that the mitigation presentation could be best accomplished through the testimony of Mr. Sinisterra's family members "as opposed to the jury hearing hearsay information from a forensic social worker." (Doc. 69 at 18, 20) Both Mr. Duchardt's statement and the district court's Order, however, misstate the nature of Mr. Sinisterra's ineffective assistance claim. The claim in Mr. Sinsiterra's § 2255 motion is not that trial counsel should have hired a forensic social worker to provide second-hand information to the jury regarding Mr. Sinisterra's background and life history instead of calling

_____

[8] Indeed, it is worth noting that the district court made contemporaneous observations about the videotaped testimony presented during Mr. Sinisterra's penalty phase that called into question the quality of the recordings, as well as whether they were providing the jury with relevant and probative mitigation information. In the district court's words, the videos were "extremely taxing," Sinisterra Penalty Phase Tr. at 2791, and the court repeatedly characterized the videotapes as "incomprehensible" and doubted whether the jury could understand the content of the videotapes. *Id.* at 2792-93. The district court even recognized at trial that the playing of the videotapes for the jury was "difficult" and "fruitless." *Id*. at 2794.

Appellate Case: 08-1925     Page: 40     Date Filed: 07/17/2008 Entry ID: 3452810

family members and friends to testify.  Rather, the claim is that trial counsel's incompetence in conducting the mitigation investigation resulted in a failure to develop and present *any* information, witnesses or evidence regarding the horrific facts in Mr. Sinisterra's background and life history that could help explain to the jury how he became involved with the terrible crimes of which he was convicted.  For example, Ms. Herndon did not even make her trip to Colombia until the eve of trial – her interviews in Colombia were conducted March 15-20, 2000, and Mr. Sinisterra's capital trial began on April 11, 2000.  As Ms.  Herndon explained in her second affidavit, this was the first time that the defense team had ever had any conversations with these witnesses about potentially relevant penalty phase testimony.  Indeed, Mr. Sinisterra's mother was not even aware that her son was facing the death penalty until Attorney Herndon's meeting with her in Colombia.  While it is good and well for Mr. Duchardt to claim that he believes a mitigation presentation is best accomplished through the testimony of family and friends, it is objectively unreasonable for trial counsel to have waited until literally weeks before trial to conduct their first interviews with these witnesses.  Such last-minute preparation made it all but certain that trial counsel would not be able to sufficiently develop the necessary trust and rapport with these witnesses to be able to elicit information regarding embarrassing and highly sensitive information about Mr. Sinisterra's social history, including dire poverty and physical and sexual abuse.  (Doc. 68, Ex. 3, Stetler Dec. ¶¶ 18-19).  As a result, Mr. Sinisterra was deprived of his constitutional right to have his capital jury consider this mitigating evidence.  At the very least, though, the question is debatable among jurists of reason, so a COA should issue.

> c. **The record strongly suggests that the defense team did not make any attempts to gather crucial records regarding Mr. Sinisterra's background from Colombian authorities**.

36

Appellate Case: 08-1925    Page: 41    Date Filed: 07/17/2008 Entry ID: 3452810

The district court also credited Mr. Duchardt's statement that "there were no records about Mr. Sinisterra's childhood which were available from Colombian authorities." (Doc. 69 at 19) However, Mr. Duchardt's statement is dubious in light of the fact that there is no evidence in the record that the defense team made any efforts to identify and gather any such records. As Attorney Herndon explained:

> I do not know whether any records on Mr. Sinisterra are available in Colombia. I never made any attempt to gather any records from Colombia, and never requested that any of Mr. Sinisterra's family members in Colombia gather any records for me. If Mr. Duchardt made any such attempts, he never conveyed that fact to me. I am not aware of Mr. Duchardt doing any work on the mitigation case other than the previously mentioned hiring of a mental health expert and a bureau of prisons expert.

(Doc. 68, Ex. 1, Herndon Second Aff. ¶ 14). This was also corroborated by Mr Grothaus, who stated in his declaration: "I did not gather any records of [Mr. Sinisterra's] life history or that of his family members, all of which could only be found in his homeland of Colombia." (Doc. 68, Ex. 2, Grothaus Dec. ¶ 6). A fair reading of the record thus suggests not that there were no available records from Colombian authorities regarding Mr. Sinisterra's childhood, but rather that the defense team never made any effort to gather such records. Once again, however, the district court made no mention of the contrary affidavits in the record, and cited exclusively to Mr. Duchardt's statement on this issue. These inconsistencies demonstrate that a COA should issue, as they clearly show that a court could resolve these issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further.

> **d.  The inability of the Colombian witnesses to obtain visas to attend the trial does not excuse counsel's failure to immediately contact these witnesses as part of a competent mitigation investigation, rather than wait until the eve of trial to hastily conduct initial interviews with them.**

37

Appellate Case: 08-1925     Page: 42     Date Filed: 07/17/2008 Entry ID: 3452810

The district court also credited Mr. Duchardt's assertion that he would have presented the readily available mitigation information through the Colombian witnesses, but for the fact that their visas were denied through no fault of counsel. (Doc. 69 at 17) That assertion, however, is belied by the undisputed chronology of the case – the defense team did not even conduct initial interviews with the Colombian witnesses regarding their potential penalty phase testimony until three weeks before trial. In other words, the defense team could not have known who the relevant witnesses were for whom it would have to obtain visas, as the defense team had not conducted any investigation until the eve of trial to find out what any of these witnesses might have been able to say. As Mr. Stetler noted, "there is no evidence that trial counsel would have explored additional areas of mitigation if the Colombian family members had obtained visas and been available for live testimony. Because of the defense structural deficits – lacking a mitigation specialist or anyone with expertise in mental disorders or impairments – the presentation of live witnesses would have been preferable to the videotapes, but would still have explored only a fraction of the mitigation potentially available." (Doc. 68, Ex. 3, Stetler Dec. ¶ 31)

Clearly, Mr. Sinisterra's family and friends in Colombia were crucial witnesses, as they were the people that had known Mr. Sinisterra the longest and were intimately familiar with his upbringing and life history. Counsel's failure to conduct even superficial, introductory interviews of these Colombian witnesses until a few weeks before trial virtually guaranteed that counsel would not be able to develop and present all the readily available mitigation information in time for Mr. Sinisterra's trial. As Mr. Stetler explained:

> A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important

Appellate Case: 08-1925     Page: 43     Date Filed: 07/17/2008 Entry ID: 3452810

information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. . . .

Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at a minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. . . .

Mitigation investigation is particularly important when the client does not share the attorney's cultural background. In those cases, attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural difference. In my experience, the process of compiling an accurate social history is even more time-consuming and delicate when interviewing clients and family members from foreign cultures, due to inevitable cultural misunderstandings about the nature of the legal process and the purpose of the investigation.

(*Id*. ¶¶ 19-21)

Moreover, the district court's reliance on the fact that this Court did not find sufficient prejudice from the denial of the visas is misplaced – this Court's earlier opinion merely found that there was no prejudice that results from providing testimony via videotape rather than through live witnesses. *See United States v. Ortiz*, 315 F.3d 873, 904 (8th Cir. 2002). Whether the Colombian witnesses testified live or via tape, however, is not central to Mr. Sinisterra's claim. The key issue is that trial counsel's mitigation investigation was a case of "too little, too late." A thorough and competent mitigation investigation of a client's social history cannot be conducted in a matter of weeks. (Doc. 68, Ex. 3, Stetler Dec. ¶ 19). Had counsel initiated its mitigation investigation properly at the outset of their appointment on the case, as advised by the ABA Guidelines, *see* 1989 Guideline 11.4.1 ("Counsel should conduct independent investigations relating to the guilt/innocence

Appellate Case: 08-1925     Page: 44     Date Filed: 07/17/2008 Entry ID: 3452810

phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously."), trial counsel would not have been in the position of scrambling to find and interview witnesses in Colombia on the eve of trial. Indeed, even Mr. Duchardt has conceded that if counsel had hired a mitigation investigator to properly conduct interviews with the Colombian witnesses, "that person could have stepped into the void left when the witness visas were disallowed, and could have presented the Colombia witness information in that fashion." (Doc. 50, Duchardt Stmt. ¶ 15) Thus, even if the witnesses were ultimately unable to travel to the United States for the trial, whether because their visas were denied, or due to health reasons (*see* Doc. 69 at 17), counsel would have had a safeguard to insure that relevant mitigation information from these witnesses would be presented to the jury. As documented in Mr. Stetler's declaration, however, the investigation that trial counsel conducted with respect to the Colombian witnesses was belated and superficial, and therefore was virtually guaranteed to fail – and did fail – to elicit the significant and probative mitigation information documented in the § 2255 motion. (Doc. 68, Ex. 3, Stetler Dec. ¶¶ 26-43) Given the foregoing, this issue is debatable among jurists of reason and the questions are adequate to deserve encouragement to proceed further. Thus, a COA should issue.

> e. **Mr. Sinisterra was prejudiced by trial counsel's failure to conduct a thorough mitigation investigation and present all readily available mitigation evidence at his capital trial.**

The prejudice to Mr. Sinisterra is amply demonstrated by comparing the evidence which was put on at trial with the readily available evidence that *could have been* presented if only trial counsel had conducted a thorough and proper mitigation investigation. Trial counsel's mitigation

40

Appellate Case: 08-1925    Page: 45    Date Filed: 07/17/2008 Entry ID: 3452810

presentation was focused on a single theme: that Mr. Sinisterra was a good person.[9] To that end, counsel called ten live witnesses: Michelle Sinisterra (Mr. Sinisterra's wife); Delores Rankin (Mr. Sinisterra's mother-in-law); Kaniesha Sinisterra (Mr. Sinisterra's daughter); Tawana Lynn (Mr. Sinisterra's ex-girlfriend); Christie Barrs (Michelle's cousin); Barbara Dillingham (family friend); Vivian Dumas (former employer); Bruno Stolc (warden at Leavenworth prison); Eloise Garza (correctional officer at Leavenworth prison); and Joseph Brandenburg (retired probation officer). Each of these witnesses provided relatively brief, but often repetitive, testimony that Mr. Sinisterra was a good husband and father, a good cook, and a hard worker. Additionally, Mr. Stolc and Ms. Garza testified that Mr. Sinisterra was a relatively peaceful inmate, and Mr. Brandenburg testified regarding the security conditions at federal prisons where life sentenced inmates are housed. None of these witnesses had any knowledge of the circumstances of Mr. Sinisterra's upbringing in Colombia or his life history, nor were they asked to provide any such information while on the stand.

Additionally, counsel presented the videotaped testimony of nine witnesses, which, with the exception of one videotaped interview of Mr. Sinisterra's daughter, consisted of the videotapes that Ms. Herndon made in Colombia three weeks before trial. As Ms. Herndon explained in her affidavit: "The interviews that I did in Colombia were nothing more than initial 'get acquainted' interviews. . . . The videotapes I made while in Colombia were not made with the intent that they be introduced at trial. The questions I asked were to gather information, and did not mirror what I would have

---

[9] As is explained in more detail below, trial counsel's one-dimensional mitigation presentation was not the product of "strategy" but rather was owing to counsel's failure to conduct a thorough mitigation investigation. *See Eldridge v. Atkins*, 665 F.2d 228, 237 n.5 (8th Cir. 1981), *cert. denied*, 456 U.S. 910 (1982) ("counsel's 'strategy' not to use [certain witnesses] was not so much trial strategy as it was an accommodation to his own inadequate trial preparation. …although it may have been a trial decision of counsel not to pursue [certain] testimony it was counsel's lack of preparation which went a long way in inducing him to make it")

41

Appellate Case: 08-1925     Page: 46     Date Filed: 07/17/2008 Entry ID: 3452810

asked the witnesses on direct examination at trial. Neither the questions I asked on tape, nor additional conversations that occurred off tape, explored any of the 'darker' areas of Mr. Sinisterra's growing up that have since been uncovered." (Doc. 68, Ex. 1, Herndon Second Aff. ¶¶ 11-12)

Indeed, much like the live witnesses, the videotaped testimony covered the same limited ranges of areas that the live testimony did. As Mr. Stetler, who reviewed the videotaped testimony, explained:

> Based on the information provided by counsel and the materials I have reviewed, the only investigation in Colombia was by Ms. Herndon, and the work product is reflected in the superficial and vague videotaped interviews that were presented at trial. Recording has a chilling effect on interview subjects unless there has been an opportunity to build trust and rapport in advance. It is apparent from the videos that most of Mr. Sinisterra's family had not even been informed that he was potentially facing the death penalty, and the few who were informed had learned the news from Ms. Herndon when she arrived just a couple of days before the videos were made. There had been little time for Ms. Herndon to build rapport prior to the videotaped interviews, and the information she elicited is typical of what is provided in the initial contacts with family members when they first learn that a loved one faces capital charges, particularly a loved one who lives far away in another country. They are in a state of disbelief about his guilt; they offer conclusory attestations of good character and nonviolence; and they deny any knowledge of Mr. Sinisterra's involvement in the drug world.
>
> The videos are of poor technical quality. Interior lighting is often inadequate, and the poor sound quality is exacerbated by ambient noise. (Ms. Herndon points out in paragraph 10 of her affidavit that the trial court recognized the poor quality of the videos and that there was simply no quiet place to conduct such interviews. Mr. Duchardt concurs in paragraph 13 of his statement.) More importantly, the interviews themselves simply do not paint vivid pictures of Mr. Sinisterra. The jurors learned very basic facts: he worked in a car wash and a wood shop, but we have no description of what a car wash looks like in Buenaventura, Colombia, or whether the work was hard. The jurors learned vaguely that they made beds and other pieces of furniture, but we know nothing of the skill required or the quality of the finished products. The jurors were told that Mr. Sinisterra had "good relationships," "treated people well," and showed "kindness and respect," but there is not a single example of what led the witnesses to these conclusions.
>
> But the larger problem is the very limited range of areas explored. There is no

Appellate Case: 08-1925     Page: 47     Date Filed: 07/17/2008 Entry ID: 3452810

discussion of multigenerational family histories of alcoholism, mental disorders and impairments. Mr. Sinisterra's exposure to domestic violence and childhood maltreatment are never mentioned. The jurors learned that two of his brothers died – apparently violently, but there are no details about these traumatic events and their potential impact on Mr. Sinisterra. (When deaths are mentioned, for example in Exhibits 67 and 72, there are no follow-up questions.) The jurors learned nothing of Mr. Sinisterra's developmental years at all. In Exhibit 66, an older brother is simply asked closed-ended questions about whether it was "normal" to leave school after first grade or to go to work at age seven. I am informed that Ms. Herndon has confirmed that she simply did not know the significant information elicited by postconviction counsel's bilingual mental health expert, Dr. Llorente, including evidence of extreme domestic violence (father "going after his mother with a machete") and sexual assault in childhood. Mitigation interviews are invasive of sensitive and shameful subjects, and these topics require a skilled ethnoculturally competent interviewer – a bilingual mitigation specialist, not a lawyer working through an interpreter and conducting the interviews on camera. Mr. Sinisterra's penalty phase reflected the deficits of the trial team's approach to the mitigation case, particularly its failure to overcome the cultural barriers to mitigation investigation or to probe the critical areas of trauma, brain damage, and intellectual impairment.

(Doc. 68, Ex. 3, Stetler Dec. ¶¶ 33-35). Simply put, trial counsel's mitigation presentation was one-dimensional and failed to provide the jury with any meaningful information about Mr. Sinisterra's life history or his background and upbringing. The jury was exposed to repetitive and superficial testimony about what a good person Mr. Sinisterra was, rather than information that could explain the trajectory of his life and contextualize the crimes of which they found him guilty.

Had Mr. Sinisterra's counsel conducted the kind of thorough mitigation investigation required of a capital case, they would have learned the following evidence that the jury never heard: Mr. Sinisterra was born to impoverished, illiterate parents in the violence ravaged city of Buenaventura, Colombia. (Doc. 41 at 34)[10] His father exhibited signs of mental illness, was

---

[10] As Ms. Herndon acknowledges, Mr. Sinisterra's life history, of which as lead counsel for the penalty phase she was almost completely unaware, is "exactly the type of information that would have been discovered by a mitigation specialist doing a thorough social history." (Doc. 68, Ex. 1, Herndon Second Aff. ¶ 10).

Appellate Case: 08-1925     Page: 48     Date Filed: 07/17/2008 Entry ID: 3452810

exceedingly violent, unable to hold a job and lacked basic living skills. *Id*. at 34. Mr. Sinisterra witnessed an incident in which his father, during a psychotic episode, chased his mother with a machete. *Id*. at 34. Shortly thereafter, Mr. Sinisterra's father abandoned the family. Mr. Sinisterra's mother subjected him to brutal beatings -- some so severe that he would bleed as a result – throughout his time living with her. *Id*. at 35. Mr. Sinisterra dropped out of school when he was seven years old because he was utterly unable to read or learn anything. The highest level of education he has attained is first grade. *Id*. at 35. Also when Mr. Sinisterra was about seven, he was gang-raped by four youths who were in their late teens. *Id*. at 35. This incident changed his personality and exacerbated feelings of fear that he had already experienced. *Id*. at 36. Mr. Sinisterra fled his home shortly after he was gang-raped. *Id*. at 36. He lived on the streets of Cali, Colombia, with other homeless youth who protected each other from adults' repeated attempted sexual assaults on them. *Id*. at 36. Mr. Sinisterra was put in youth detention facilities twice during the six years he was homeless. *Id*. at 36. His inability to learn made itself apparent again when he attended school during his detention; again he failed even to learn to read and write. *Id*. at 36. When he was about twelve years old, Mr. Sinisterra returned to his family; again, he was subjected to violence: his older brother began sexually molesting him and his younger brothers. *Id*. at 37. His family's intractable poverty and dire life circumstances led to Mr. Sinisterra's immigration to the United States. *Id*. at 37.

The fact that Mr. Sinisterra was prejudiced by his counsel's failure to discover or present such evidence is amply demonstrated by the fact that not a single juror found even the statutory "catch-all" mitigator that would have allowed them to find "factors in German Sinisterra's background, record, or character, or any other circumstances of the offenses, that mitigate against

44

Appellate Case: 08-1925     Page: 49     Date Filed: 07/17/2008 Entry ID: 3452810

imposition of the death sentence." *See* Verdict Form. Trial counsel did not even submit any mitigating factors asking the jury to consider Mr. Sinisterra's upbringing in a violence-ravaged and poverty-stricken part of Colombia. This was despite counsel's awareness that these conditions characterized Mr. Sinisterra's life. Nor did counsel submit any mitigators asking the jury to consider specifically Mr. Sinisterra's low I.Q. – again, a circumstance of which trial counsel clearly were aware. In other words, not only was Mr. Sinisterra prejudiced by trial counsel's failure to learn and present readily available mitigation due to a lack of investigation, but he was also prejudiced by trial counsel's failure to submit mitigating factors regarding relevant information about Mr. Sinisterra's life history and background of which they were in fact aware at the time of trial.

Additionally, prejudice can be demonstrated by comparing Mr. Sinisterra's penalty phase with that of his co-defendant, Plutarco Tello, who was sentenced to life by the same jury that presided over Mr. Sinisterra's sentencing. As demonstrated by Mr. Tello's verdict sheet, seven jurors found the existence of the "catchall" statutory mitigator in Mr. Tello's case. *See* Tello Verdict Form. In addition, the jury independently found that "Tello's mental incapacity/deficiency played a role in his decision making." Tello Verdict Form. This was despite the fact that Mr. Tello's family members were also denied visas and their testimony was presented via videotape. *See* Mark Morris, Jurors Review Video; Family Members Plead for Life of Colombian Man, Kansas City Star, May 9, 2000 at B3; Mark Morris, Deadlocked Jurors Spare Defendant's Life, Kansas City Star, May 11, 2000 at B1 (reporting that jurors viewed six hours of video testimony of Mr. Tello's relatives). Significantly, the jury spared Mr. Tello's life despite the prosecution's argument that Mr. Tello was the "foreman" of the hit squad that killed the victim. *Id*. The difference in sentencing outcomes demonstrates that this was not the kind of jury that would be unmoved by mitigating evidence

45

regarding a capital defendant's troubled background or mental deficiencies – indeed, it was precisely that kind of mitigating evidence that the jury relied on in sentencing Mr. Tello to life, despite the fact that he was a leader in the charged crime and more culpable than his co-defendants. Given the difference in sentences between Mr. Sinisterra and Mr. Tello, there is a reasonable probability that the outcome of Mr. Sinisterra's proceedings would have been different if they had investigated and presented the readily available mitigation evidence regarding Mr. Sinisterra's childhood physical and sexual abuse, as well as his brain damage and mental impairments.

Finally, it should be noted that the district court erroneously based its decision regarding the effectiveness of counsel's mitigation presentation on an alleged jury finding which Mr. Sinisterra's verdict form conclusively demonstrates that the jury never made. Specifically, the district court stated in its order that the effectiveness of trial counsel's penalty phase case was "demonstrated in the jurors finding as a non-statutory mitgating factor that Sinisterra's 'lack of guidance and support as an adolescent made him an easy target of the violent drug culture.'" (Doc. 69 at 19) This point is easy to refute – as the verdict form from Mr. Sinisterra's trial demonstrates, ***the jury made no such finding.***[11] Indeed, as a review of the verdict form plainly demonstrates, the jury was never

---

[11] The district court's error is explainable by comparing its Order to the government's reply to the § 2255 motion, where the government erroneously made this assertion. *See* Gov't Reply at 45. As with much of the Order, it appears that the district court simply adopted the government's reply verbatim – mistakes and all. The fact that the district court could make such an egregious mistake as basing its decision on a penalty phase jury finding that was never actually made, at a trial at which the district court presided – in addition to the fact that Mr. Sinisterra's Traverse expressly pointed out the government's error and the fact that the district court never cited any of the three critical declarations attached to the Traverse– seriously calls into question whether the district court actually reviewed the record before it in this case before denying the § 2255 motion without benefit of a hearing.

As a point of fact, it was the jury that presided over the sentencing of the undisputed ringleader of the enterprise, Edwin Hinestroza, that made this mitigation finding. (Doc. 41 at 43)

Appellate Case: 08-1925     Page: 51     Date Filed: 07/17/2008 Entry ID: 3452810

even presented with any mitigating factors related to Mr. Sinisterra's troubled background, despite available mitigation evidence regarding his brutal upbringing at the hands of family members and others who violently beat him until he bled and viciously gang raped him and molested him during his childhood.

Given the wealth of unpresented, but readily available, mitigation evidence which was non-cumulative to trial presentation, the differences in sentencing outcomes and verdict findings between Mr. Sinisterra and Mr. Tello, and the district court's reliance on a jury finding that was never actually made in Mr. Sinisterra's case in order to dispose of this claim, it is clear that the effectiveness of trial counsel's investigation and presentation of mitigation evidence is debatable among jurists of reason. Moreover, there are enough factual discrepancies between the various accounts given by the members of the defense team about the nature and extent of the defense team's investigations and preparedness for the penalty phase proceedings that a court could resolve the issues in a different manner, and the questions are adequate to deserve encouragement to proceed further. Thus, a COA should issue on this claim.

### 4. Failure to Investigate and Present Mental Health Evidence.

In addition to the readily available evidence of Mr. Sinisterra's impoverished, violent upbringing, trial counsel also failed to discover evidence of Mr. Sinisterra's history of head injuries, diminished mental capacity, and potential retardation. Mr. Sinisterra sustained a number of head injuries throughout his youth: when he was seven or eight years old, he was knocked unconscious

---

If anything, this only further demonstrates how Mr. Sinisterra was prejudiced by his counsel's deficient mitigation presentation. Mr. Hinestroza – the undisputed ringleader of the murder-for-hire conspiracy – was sentenced to life after presenting mitigation evidence which is strikingly similar to that which could have been presented on behalf of Mr. Sinisterra. *Id*.

Appellate Case: 08-1925     Page: 52     Date Filed: 07/17/2008 Entry ID: 3452810

for two days as a result of injuries he sustained during a fight.  (Doc. 41 at 39)  Also when he was a very young child, Mr. Sinisterra hit his head diving into a pool, which resulted in another extended period of unconsciousness.  (*Id*. at 40.)  When he was in his late teens, he suffered a blow to the side of the head with a metal stick.  (*Id*.)  None of these injuries was medically treated.  (*Id*.)  To this day, Mr. Sinisterra suffers from excruciating headaches and intense pressure in his skull.  (*Id*.)  As the Supreme Court has noted, evidence that a capital defendant has suffered head injuries is constitutionally relevant mitigating evidence because it bears on the issue of the defendant's cognitive functioning and moral culpability.  *See Williams v. Taylor*, 529 U.S. at 395-96 (2000).  *See also Coleman v. Mitchell*, 268 F.3d 417, 450-51 (6th Cir. 2001), *cert. denied sub nom. Coleman v. Bagley*, 535 U.S. 1031 (2002) (counsel ineffective for failing to investigate and present evidence of petitioner's head injuries).

In addition, Mr. Sinisterra's trial expert, Dr. Wheelock, had assessed Mr. Sinisterra's performance I.Q. at 75, which is considered within the range of mental retardation by the American Association on Mental Retardation (AAMR).  *See* AAMR, Mental Retardation: Definition, Classification and Systems of Support 59 (10th Ed. 2002).  Although Dr. Wheelock testified during a pretrial suppression hearing and during the guilt phase about Mr. Sinisterra's ability to understand his Miranda rights, trial counsel never presented evidence of Mr. Sinisterra's low I.Q. to the trial jury in either the guilt phase or the penalty phase, much less explained what mitigating impact his low I.Q. should have had on his sentence.  Tr. Supp. H. at 706-42; Trial Tr. at 2251-86.  The Supreme Court has recognized that evidence of low I.Q. is inherently mitigating.  *See Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) (noting that "impaired intellectual functioning is inherently mitigating" and that "evidence of significantly impaired intellectual functioning is obviously evidence that might

48

serve as a basis for a sentence less than death") (internal quotation marks and citation omitted); *Wiggins*, 539 U.S. 510, 535 (2003) (observing, with respect to individual with I.Q. of 79, that "Wiggins['] . . . diminished mental capacitie[s] further augment his mitigation case"); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (finding prejudice due to failure to present evidence that defendant was "borderline mentally retarded"); *Smith v. Texas*, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's I.Q. scores [of 75 and 78] and history of participation in special-education classes as a reason to impose a sentence more lenient than death."); *Brewer v. Quarterman*, __ U.S. __, 127 S. Ct. 1706, 1712-13 (2007) (rejecting Fifth Circuit's contention that only mental health impairments that are "chronic and/or immutable," such as mental retardation, qualify as mitigating).

In addition to evidence of his low I.Q. – which the district court does not dispute – Mr. Sinisterra has produced expert evidence that he suffers from organic brain damage and dampened intellectual functioning. (Doc. 41, Ex. 6, Llorente Report). Trial counsel failed to discover any of this evidence, despite knowing from Dr. Wheelock's report that Mr. Sinisterra had a low I.Q. (Doc. 41, Ex. 2, Herndon Aff. ¶ 19). As previously discussed, this is exactly the kind of lead that trial counsel was obligated to pursue in developing mitigation evidence in Mr. Sinisterra's capital case; failure to pursue such leads amounts to deficient performance under *Strickland*. *See Wiggins*, 539 U.S. at 527. At the very least, the issue is debatable among jurists of reason, therefore a COA should issue on this claim.

> **a.** **Trial counsel never submitted readily available evidence regarding Mr. Sinisterra's low I.Q. as mitigating evidence in the penalty phase of his capital trial, nor argued to the jury that it was a mitigating fact.**

49

Trial counsel failed to investigate and present any evidence regarding Mr. Sinisterra's mental health as mitigation evidence in the penalty phase of his capital trial. The district court resolved this claim by crediting Mr. Duchardt's statement that trial counsel introduced testimony regarding Mr. Sinisterra's low I.Q. during the guilt phase of the trial. (Doc. 69 at 20) Mr. Duchardt's statement is simply wrong. Trial counsel did call an expert witness (Dr. Warren Wheelock) during the guilt phase of the trial to testify regarding Mr. Sinisterra's illiteracy and inability to understand the *Miranda* waiver in English, but **no evidence was offered of Mr. Sinisterra's low I.Q.** *See* Trial Tr. 2251-86. Dr. Wheelock's testimony was presented only as to a narrow issue relevant to the guilt-phase of the proceedings – whether Mr. Sinisterra validly waived his *Miranda* rights. Dr. Wheelock <u>never</u> testified as to Mr. Sinisterra's low I.Q., even in the guilt phase, and was not called as a penalty phase witness at all. The defense never offered any evidence regarding Mr. Sinisterra's low I.Q., or regarding how Mr. Sinisterra's cognitive deficits bore on the question of his moral culpability, and never presented Mr. Sinisterra's impaired intellectual functioning as a mitigating factor for the jury in any way. *See* Verdict Form.

The district court's resolution of this issue was simply and irrefutably wrong and a COA should issue on this claim.

> **b.      The pre-trial evaluation by Dr. Dos Santos was inadequate and did not excuse counsel from conducting an adequate mental health investigation.**

With respect to the district court's reliance on the fact that Mr. Sinisterra was evaluated by Dr. Enrique Dos Santos prior to trial, the district court made no mention of the inherent inadequacies of that pre-trial evaluation given that Dr. Dos Santos was never provided with crucial information about Mr. Sinisterra's background before conducting his examination. As Attorney Herndon

Appellate Case: 08-1925      Page: 55      Date Filed: 07/17/2008 Entry ID: 3452810

explained in her affidavit:

> It is my practice in capital cases to work with the mitigation specialist to choose a psychologist and neuropsychologist to do an initial evaluation of my client, regardless of my lay assessment of the client's mental health history and current mental state. Prior to these expert evaluations, the mitigation specialist does significant investigation, including record gathering, so that this initial background information can be given to the expert prior to the mental health evaluation. The expert's in person evaluation of the client is only one component of his conclusions. All of the mental health experts I have worked with require as much background information as exists prior to making determinations as to the client's mental history and status. Because there was no mitigation specialist in this case, this procedure was not followed.

> I am unaware of what information Mr. Duchardt gave the expert he retained to evaluate Mr. Sinisterra. At the time of the evaluation, I had not given Mr. Duchardt any of the mitigation investigation I had done. In fact, very little investigation had been done at that time. No records had been collected. If Mr. Duchardt had any mitigation materials or records to give the expert, he never shared them with me.

(Doc. 68, Ex. 1, Herndon Second Aff. ¶¶ 8-9.) There is no indication in the record that Dr. Dos Santos was aware of any of Mr. Sinisterra's life, family, or social history, nor did he have access to any of Mr. Sinisterra's school, medical, prison or other records. Such information can and often does result in a very different diagnosis. *Rompilla v. Beard*, 545 U.S. at 378-79. *See also* Commentary to ABA Guideline 10.11.6.[12]

_____

[12] The Commentary reads in part:

> Since an understanding of the client's extended, multigenerational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present. Expert witnesses may be useful for this purpose and, in any event, are almost always crucial to explain the significance of the observations. For example, expert testimony may explain the permanent neurological damage caused by fetal alcohol syndrome or childhood abuse, or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control. Counsel should choose experts who are tailored specifically to the needs of the case.... Family members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives

51

Moreover, Mr. Duchardt nowhere states that he retained Dr. Dos Santos to evaluate Mr. Sinisterra in preparation for his penalty phase. There is a critical distinction between a mental evaluation of a capital defendant for competence or other guilt-related issues, and one that is designed to mitigate his crime and establish a case for life; pre-trial consultation with a mental health expert is no substitute for a thorough mental health investigation. *Rompilla*, 545 U.S. at 392; *Kenley v. Armontrout*, 937 F.2d 1298, 1307 (8th Cir.), *cert. denied*, 502 U.S. 964 (1991) ("The fact that [the pre-trial psychiatric] report rules out a mental disease or defect and incompetency does not mean it rules out lesser but potentially mitigating conditions and disorders. We are aware of no legal authority strictly limiting mitigating medical, psychiatric and psychological evidence to that of legal insanity or incompetence. In fact, evidence of conditions, disorders and disturbances are precisely the kinds of facts which may be considered by a jury as mitigating evidence.") (citing *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982)).

Here, trial counsel had ample reason to pursue further mental health investigation, despite the alleged oral report he received from Dr. Dos Santos. Specifically, counsel was aware that his other trial expert, Dr. Wheelock, had already assessed Mr. Sinisterra with a performance I.Q. of 75. Evidence of Mr. Sinisterra's low I.Q. unquestionably warranted further investigation into the *reasons* for his dampened intellectual ability. *See Rompilla*, 545 U.S. at 378-79. *See also* Doc. 68, Ex. 3, Stetler Dec. ¶ 41 ("Dr. Wheelock's findings of intellectual impairment should have triggered a full neuropsychological evaluation, which would have disclosed the static encephalopathy found by Dr. Llorente. A psychiatrists's clinical interview or mental status examination is no substitute for the

_____

of many capital defendants.

Commentary, ABA Guideline 10.11.6.

52

rigors of a neuropsychological assessment."). Indeed, Dr. Antolin Llorente, who evaluated Mr. Sinisterra as part of the § 2255 proceedings, noted in his report that the I.Q. test, the WAIS-III, that Dr. Wheelock administered to Mr. Sinisterra pretrial only measured his "Performance scale (restricted to visual reasoning, and as such, whatever deficits existed in this client in verbal reasoning were not investigated." (Doc. 41, Ex. 6, Llorente Report at 6). Given Mr. Sinisterra's illiteracy, a full-scale I.Q. test, which would have included a verbal scale, likely would have yielded an even lower score.

Dr. Dos Santos's oral report did nothing to cut against a presentation to the jury of the mitigating effect of Mr. Sinisterra's low I.Q. Indeed, failure to present available evidence about a capital defendant's low I.Q. and dampened intellectual functioning at a capital defendant's penalty phase amounts to deficient and prejudicial performance. *See, e.g., Wiggins*, 39 U.S. at 535 (counsel rendered deficient performance in failing to present evidence of capital petitioner's low I.Q. of 79 at sentencing); *Williams* 529 U.S. at 418 (failure to present evidence of capital defendant's low I.Q. at sentencing hearing was prejudicial despite the fact that the jury also heard evidence that defendant had savagely beaten an elderly woman, stolen two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw); *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) ("impaired intellectual functioning is inherently mitigating"; "evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death") (internal quotation marks and citation omitted); *Smith v. Texas*, 543 U.S. 37, 44 (2004) ("There is no question that a jury might well have considered petitioner's I.Q. scores [of 75 and 78] and history of participation in special-education classes as a reason to impose a sentence more lenient than death.");

53

*Brewer v. Quarterman*, __ U.S. __, 127 S. Ct. 1706, 1712-13 (2007) (rejecting Fifth Circuit's contention that only mental health impairments that are "chronic and/or immutable," such as mental retardation, qualify as mitigating, and holding that evidence that the petitioner was involuntarily committed for "major depression, single episode, without psychotic features, polysubstance abuse" was relevant mitigating evidence which the jury should have been permitted to consider); *Fraizier v. Hoffman*, 343 F.3d 780, 794-99 (6th Cir. 2003) (finding prejudice where counsel failed to develop and present mitigating evidence of defendant's "functional brain impairment" based on defendant's fall from a ladder); *Harries v. Bell*, 417 F.3d 632, 638-39 (6th Cir. 2005) (counsel ineffective for failing to adequately investigate and present evidence of defendant's mental illness, I.Q. of 80, and organic brain dysfunction).

Given all the foregoing, jurists of reason could debate whether counsel were ineffective in failing to conduct a full mental health investigation, especially in light of the fact that one of their trial experts assessed Mr. Sinisterra with a performance I.Q. of 75. Indeed, a court could have resolved the issue differently and found that Dr. Wheelock's examination should have alerted counsel to the need for more investigation to ascertain why his score was so low. Thus, the questions are adequate to deserve encouragement to proceed further, and a COA should issue on this claim.

> **c.** **Counsel's assertion that he would not have submitted evidence of Mr. Sinisterra's low I.Q., organic brain damage and dampened intellectual functioning as mitigating evidence demonstrates his incompetence regarding his duty to present such constitutionally recognized mitigation evidence to a capital jury.**

The district court credited Mr. Duchardt's claim that even if he had had available to him the mental health evidence which has since been developed as part of the preliminary § 2255 investigation – namely, evidence of low I.Q., organic brain damage and dampened intellectual

54

functioning – he would not have pursued it because of its "lack of strength." (Doc. 69 at 20) Mr. Duchardt's assessment that such mitigation evidence is "weak," and the district court's reliance on that assessment, is at odds with established law in both the Supreme Court and this Court, which has consistently held that such evidence is highly important mitigation evidence, and the failure to investigate it and present it to a capital jury constituted ineffective assistance. *See Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005) (counsel ineffective for failing to present evidence of petitioner's mental health problems); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to investigate and present evidence that petitioner was borderline mentally retarded); *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) (evidence of "impaired intellectual functioning is inherently mitigating"); *Simmons v. Luebbers*, 299 F.3d 929, 935-38 (8th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003) (counsel was ineffective in "fail[ing] to present any meaningful mitigating evidence" despite availability of mental health evidence); *Hill v. Lockhart*, 28 F.3d 832, 845-47 (8th Cir. 1994), *cert. denied*, 513 U.S. 1102 (1995) (although receiving information that petitioner was previously hospitalized, counsel was ineffective for failing to make any effort to obtain medical records, which would have shown that petitioner had long history of mental problems); *Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir.), *cert. denied*, 502 U.S. 964 (1991) (ineffective assistance found where counsel failed to investigate available mitigating evidence of petitioner's mental problems because of erroneous belief that evidence was too old and insubstantial); *Pickens v. Lockhart*, 714 F.2d 1455, 1465-68 (8th Cir. 1983) (counsel ineffective for failing to investigate and present available mitigating evidence, including failing to use a mental

55

health expert to examine the petitioner and testify about his rehabilitation prospects).[13]

The district court also credited Mr. Duchardt's statement that he would not have pursued a mental health mitigation presentation because it would have exposed Mr. Sinisterra to a mental health examination by a government expert, and Mr. Duchardt "believe[d] that the evidence from such an expert would likely be quite damaging, so as to counterbalance whatever benefit would be gained by Dr. Llorente's opinions." (Doc. 69 at 21) Mr. Duchardt's fear, however, is mere speculation on his part – the fact of the matter is that he never initiated the kind of thorough mental investigation that would have allowed him to know whether his client was vulnerable to any "damaging" rebuttal testimony. Mr. Duchardt's statement about what he would have done given Dr. Llorente's mental health evidence is nothing more than a post-hoc rationalization of his failure to pursue mental health mitigation evidence. *See Eldridge v. Atkins*, 665 F.2d 228, 237 n.5 (8th Cir. 1981), *cert. denied*, 456 U.S. 910 (1982) ("counsel's 'strategy' not to use [certain witnesses] was not so much trial strategy as it was an accommodation to his own inadequate trial preparation.

---

[13] *See also Jones v. Thigpen*, 788 F.2d 1101 (5th Cir. 1986), cert. denied, 479 U.S. 1087 (1987) (ineffective assistance found where counsel conducted no investigation in mitigation and did not realize, or inform jury, of petitioner's low I.Q.); *Frazier v. Huffman*, 343 F.3d 780, 794 (6th Cir. 2003), supplemented, 348 F.3d 174 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095 (2004) (trial counsel was ineffective in failing to "investigate and present evidence of [petitioner's] brain impairment."; "We can conceive of no rational trial strategy that would justify the failure . . . to investigate and present evidence of [petitioner's] brain impairment"); *Coleman v. Mitchell*, 268 F.3d 417, 450-51 (6th Cir. 2001), *cert. denied sub nom. Coleman v. Bagley*, 535 U.S. 1031 (2002) (counsel ineffective for "fail[ing] to [develop and] present . . . any aspects of Petitioner's personal history," which included evidence of head injuries and possible psychological and organic brain disorders); *Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991) (counsel failed to investigate and find readily available mitigating evidence of petitioner's low I.Q., susceptibility to influence of companions and disadvantaged background); *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) (counsel ineffective in failing to present mitigating evidence of petitioner's brain damage, mental retardation and troubled background); *Brownlee v. Haley*, 306 F.3d 1043, 1067 (11th Cir. 2003) (ineffective assistance found where counsel failed to "investigate, obtain, or present" mitigating evidence, despite availability of mitigating evidence of petitioner's borderline mental retardation and mental health problems).

56

Appellate Case: 08-1925    Page: 61    Date Filed: 07/17/2008 Entry ID: 3452810

…although it may have been a trial decision of counsel not to pursue [certain] testimony it was counsel's lack of preparation which went a long way in inducing him to make it").

Moreover, trial counsel was not in a position to make an informed strategic choice about whether to pursue mental health mitigation evidence because he failed to undertake a reasonable investigation *before* making that choice. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Wiggins*, 539 U.S. at 533-34 (counsel's failure to investigate capital defendant's sexual abuse was not a "reasoned strategic judgment," but rather was the "result of inattention" to investigative leads that counsel was aware of from social services records that he uncovered); *Kenley v. Armontrout*, 937 F.2d at 1308 ("it was not a reasonable strategy that led counsel not to investigate, but lack of thoroughness and preparation. Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made") (internal citation and quotation marks omitted); *Pickens v. Lockhart*, 714 F.2d at 1467 ("it is only after a full investigation of *all* the mitigating circumstances that counsel can make an informed, tactical decision about which information would be the most helpful to the client's case" (emphasis in original). Indeed, there is no evidence in the record that Mr. Duchardt asked Dr. Dos Santos to perform any neurological or any other diagnostic testing to inform counsel's decision about whether or not to present the kind of mental health evidence found by Dr. Llorente.

In light of the fact that trial counsel did not undertake the requisite preliminary investigations necessary in order to make a reasoned strategic judgment as to whether or not submit evidence of Mr. Sinisterra's organic brain damage and dampened intellectual functioning as mitigation evidence,

Appellate Case: 08-1925   Page: 62   Date Filed: 07/17/2008 Entry ID: 3452810

and given that such evidence has routinely been recognized as powerful and effective mitigation evidence, this issue is debatable among jurists of reason. Thus, a COA should issue on this claim.

> **5. As to Each of the Above Issues, the Requisite Standard for Issuance of a COA Has Been Established.**

The record is clear and unrebutted that Mr. Sinisterra's trial counsel failed to hire a qualified mitigation specialist to investigate and prepare a cogent penalty phase theory. They also failed to hire other experts who could have testified to his mental deficits and neurological impairments. As a result, Mr. Sinisterra's jury did not hear anything approaching a coherent mitigation case presenting a holistic picture of his background, which he was constitutionally entitled to have his capital jury consider. Counsel's failures deprived the jury that sentenced Mr. Sinisterra to death of the opportunity to consider powerful mitigating evidence; as a result, confidence in the outcome of Mr. Sinisterra's trial is significantly undermined. Had the jury been allowed to hear this evidence, there is a reasonable probability that the outcome of the trial would have been different. *Wiggins*, 539 U.S. at 535; *Williams*, 529 U.S. at 418; Stetler Dec. ¶ 43. Indeed, the same jury, when presented with remarkably similar mitigation evidence on behalf of Mr. Tello as that which could have been presented on behalf of Mr. Sinisterra, sentenced Mr. Tello to life, even though he was far more culpable (as a representative of the Colombian cartel known as "The Office") than Mr. Sinisterra under the government's theory of the case.

The standard for the issuance of a COA on a claim, however, does not require that a petitioner demonstrate at this stage that he would ultimately prevail on his claim, only that the issue is debatable among jurists of reason. *Miller-El*, 537 U.S. at 337-38. It is respectfully submitted that based on the foregoing that standard has been met, and a COA should issue on the claims regarding

Appellate Case: 08-1925    Page: 63    Date Filed: 07/17/2008 Entry ID: 3452810

trial counsel's failure to retain and utilize a mitigation specialist, failure to conduct a thorough

mitigation investigation and present available mitigation evidence to the jury, and failure to

investigate and present mental health evidence.

> **6.** **An Evidentiary Hearing Should Have Been Held On These Claims And Mr. Sinisterra Should Have Been Provided With The Resources To Further Develop His Claims**.[14]

---

[14] Although caselaw establishes that a movant need not obtain a COA in order to appeal the denial of resources and an evidentiary hearing pursuant to 18 U.S.C. § 3599 and 28 U.S.C. § 2255 – *see e.g.*, *Smith v. Dretke*, 422 F.3d 269, 287-88 (5th Cir. 2005) (no COA required to appeal denial of request for funds for expert services); *Harbison v. Bell*, 503 F.3d 566, 570 (6th Cir. 2007) (no COA required to appeal denial of counsel motion); *Reyes v. Quarterman*, 195 Fed. Appx. 272, 279 n.2 (5th Cir. 2006) (no COA required to appeal denial of request for evidentiary hearing) – Mr. Sinisterra includes these issues here in an abundance of caution.

The Supreme Court has also made it clear that a COA may issue with respect to procedural issues that affect the fullness of consideration given by a district court to a habeas petitioner's claims for relief.

> [W]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack*, 529 U.S. at 484. In this case, procedural issues are at the heart of the fairness of these proceedings, implicating Mr. Sinisterra's access to adequate resources to present and prosecute his motion, and to investigate, develop and present his claims in court. The Court in *Miller-El* made clear that a COA must issue where, as in Mr. Sinisterra's case, the record reflects that "the District Court did not give full consideration to the substantial evidence petitioner put forth in support of the prima facie case." 537 U.S. at 341.

As discussed above in connection with Mr. Sinisterra's specific issues, not only could "jurists of reason . . . disagree with the district court's resolution of [Mr. Sinisterra's] constitutional claims," *Miller-El*, 537 U.S. at 327, but such jurists could also find that in many ways the district court "did not give full consideration" to the allegations in Mr. Sinisterra's petition. In denying an evidentiary hearing and resources for a mitigation investigation, the district court acted as if the supporting facts alleged by Mr. Sinisterra simply did not exist and ignored any facts in the record which conflicted with its resolution of the claims on the merits. It is therefore respectfully submitted that the district court erred in denying Mr. Sinisterra's § 2255 motion without an evidentiary hearing, and denying his motions for authorization to hire a mitigation specialist and to substitute counsel.

59

Mr. Sinisterra is entitled to a hearing on his § 2255 motion "unless the motion, files, and record ***conclusively*** show that he is not entitled to relief." *See* 28 U.S.C. § 2255 (emphasis added). As is explained below, the district court did not comport with either the statutory standard or extant precedent in denying Mr. Sinisterra's § 2255 motion without an evidentiary hearing. Mr. Sinisterra therefore respectfully moves that his case be remanded to the district court so that such an evidentiary hearing can be conducted. Additionally, Mr. Sinisterra moves that his case be remanded with instructions that the district court provide him with funding to acquire reasonably necessary services, as mandated by 18 U.S.C. § 3599, so that he can fairly litigate his claims in the district court.

> **a. Mr. Sinisterra has met the standard entitling him to an evidentiary hearing on his § 2255 claims.**

The United States Supreme Court addressed the standard for granting an evidentiary hearing in a § 2255 proceeding in *Machibroda v. United States*, 368 U.S. 487 (1962).[15] There, the Court remanded for an evidentiary hearing to determine whether the movant's plea was involuntary because it was allegedly induced by promises made by the prosecuting attorney as to the length of

---

[15] It should be noted that *Machibroda* is cited in Rule 5 of the Rules Governing Section 2255 Proceedings, which concerns the government's answer and the movant's traverse. As the Advisory Committee Notes state:

> Numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held. *Machibroda v. United States*, 368 U.S. 487, 494, 495 (1962); *United States v. Salerno*, 290 F.2d 105, 106 (2d Cir.1961); *Romero v. United States*, 327 F.2d 711, 712 (5th Cir.1964); *Scott v. United States*, 349 F.2d 641, 642, 643 (6th Cir.1965); *Schiebelhut v. United States*, 357 F.2d 743, 745 (6th Cir.1966); and *Del Piano v. United States*, 362 F.2d 931, 932, 933 (3d Cir.1966).

Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Cases.

Appellate Case: 08-1925     Page: 65     Date Filed: 07/17/2008 Entry ID: 3452810

the sentences that would be imposed.  The movant and the prosecutor filed conflicting affidavits on the factual matter of whether such promises were made.  The district judge decided, without a hearing, that the movant's allegations were false and denied the § 2255 motion.  The Supreme Court held that the district court did not act in conformity with the provisions of section 2255.  As it noted:

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court.  ***The factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light.***  Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

368 U.S. at 494-495 (emphasis added).  As the Court further noted:

> ***Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge***.  The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence.  On this record it is his right to be heard.

368 U.S. at 495 (emphasis added) (citation and quotation marks omitted).  *See also United States v. Unger*, 665 F.2d 251, 254 (8th Cir. 1981) (explicitly adopting the *Machibroda* standard and holding that  "an evidentiary hearing should be held where . . . the factual allegations contained in the petitioner's motion and affidavit relate primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light and where the circumstances alleged are not of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection") (citations and internal quotation marks omitted).

As *Machibroda* makes clear, an evidentiary hearing must be conducted when there are material facts in dispute and those facts relate to events that occurred outside the courtroom and, therefore, are not memorialized in the trial record.  These are precisely the kinds of material facts

Appellate Case: 08-1925     Page: 66     Date Filed: 07/17/2008 Entry ID: 3452810

which are in dispute here – namely, the actions that trial counsel did and did not take in investigating and preparing the mitigation case for Mr. Sinisterra's trial. The facts regarding counsel's mitigation investigation and preparation are not contained in the trial record, and to the extent that some of those facts have been adduced in the § 2255 proceedings, in the form of affidavits and sworn declarations, there are numerous conflicting statements with respect to the disputed issues of material fact. As in *Machibroda*, the only way these factual disputes can be resolved is through an evidentiary hearing, at which witnesses can be called and questioned, and specific factual findings regarding counsel's mitigating investigation and preparation can be made.

As is detailed above, there are numerous material facts which are in dispute in the extant record. For example:

- Mr. Duchardt states that Mr. Grothaus served in a dual capacity as both a fact investigator for the guilt-phase of the trial and a mitigation investigator for the penalty phase proceedings. Both Mr. Grothaus and Ms. Herndon, however, dispute this account, and note that the vast majority of Mr. Grothaus' work was related to the guilt-phase proceedings, and he was given few, if any, investigative tasks related to the mitigation case.

- Mr. Duchardt claims that he was aware of all of the mitigation evidence discussed in the § 2255 motion, but chose not to present it at trial for various reasons. Both Mr. Grothaus, who Mr. Duchardt claims was doing the mitigation investigation, and Ms. Herndon, who was in charge of the mitigation case, however, stated that they were unaware of this mitigation information until reading the § 2255 motion, and that Mr. Duchardt had never previously discussed with them any of this mitigation evidence, nor indicated that he aware of it. Indeed, there is no evidence in the existing record to corroborate Mr. Duchardt's

62

claim that he was aware of this information, or to explain what his source was for this information given that he was not in charge of the mitigation case.

● Mr. Duchardt claims that the reason that they did not obtain any of Mr. Sinisterra's records from Colombia is because there were no such records available from Colombian authorities. Mr. Grothaus and Ms. Herndon, however, state that they never made any records requests to Colombian authorities, and Ms. Herndon specifically states that Mr. Duchardt never conveyed to her that he made any attempts to gather records from Colombia. The statements of Mr. Grothaus and Ms. Herndon suggest that the lack of any such records in their files is explained by the fact that they never made any attempts to gather them.

● Mr. Duchardt claims that he intended all along to introduce the mitigation evidence contained in the § 2255 motion through Mr. Sinisterra's family and friends in Colombia. However, Ms. Herndon indicates that the first time these witnesses were ever interviewed was less than a month before trial, and as she further indicated – and as the videotapes themselves demonstrate – those interviews mere merely initial contacts with the witnesses, were not made with the intent that they be introduced at trial, and did not probe any of the mitigation areas contained in the § 2255 motion.

● Mr. Duchardt claims that the reason he did not pursue further psychological evaluation of Mr. Sinisterra is because it would have opened the door to "damaging" mental health evidence by the government. However, there is no evidence in the record to corroborate Mr. Duchardt's claim that any further testing would have "likely" led to damaging results. Indeed, further testing was conducted as part of the § 2255 investigation, and as Dr. Llorente's report indicates, the results were uniformly beneficial for Mr.

63

Sinisterra, insofar as the testing yielding evidence about significant mitigating evidence, including organic brain damage, static encephalopathy, and dampened intellectual functioning.

• The district court also made a finding that the defense team possessed the requisite clinical skills to screen individuals for mental illness and other psychological disorders, yet both Mr. Grothaus and Ms. Herndon unequivocally state that they do not possess these skills, and Mr. Duchardt's statement is silent as to this issue.

• It should also be noted that the district court did not make a single reference to the sworn declaration submitted by Russell Stetler. As noted previously, Mr. Stetler is a nationally recognized expert in the investigation of mitigation evidence. He conducted a careful review of a variety of the materials in this case, including the penalty phase transcripts and video exhibits, the statements provided by Mr. Duchardt, Mr. Grothaus and Ms. Herndon, Dr. Llorente's neuropsychological evaluation of Mr. Sinisterra, and the decision in *United States v. Ortiz et al*, 315 F.3d 873 (8th Cir. 2003). Based on his review of these materials, it was his opinion that trial counsel failed to discover all reasonably available mitigation evidence, and that this was owing to deficiencies in the performance of their duties. The rationale for his opinion is explained in great detail in his 22-page sworn declaration, none of which the district court addressed in its order denying the § 2255 motion.

As the above examples demonstrate, this is far from a case where the motion, files, and record conclusively show that Mr. Sinisterra is not entitled to relief. There are a number of disputed issues of material fact that cannot be resolved – much less ***conclusively*** resolved – on the existing

64

record.  The factual allegations contained in Mr. Sinisterra's motion and submitted affidavits and declarations  relate primarily to occurrences outside the trial courtroom and upon which the record can, therefore, cast no real light.  Moreover, the circumstances alleged are not of a kind that the district judge could completely resolve by drawing upon his own personal knowledge or recollection, as the district judge was not privy to any of the defense team's investigation and preparation of the mitigation case.

        **b.**       **The district court committed legal error in resolving disputed issues of material fact and making credibility determinations based on the submitted affidavits and declarations, and without hearing from the witnesses themselves at an evidentiary hearing.**

Notwithstanding these obvious shortcomings in the existing record, the district court appears to have resolved these factual matters based on a selective reliance on the submitted affidavits and declarations alone.  Throughout its order, the district court credited the claims made in Mr. Duchardt's statement, citing to it repeatedly in support of its resolution of the various claims.  The district court, however, made no mention of any of the contrary statements contained in the declarations submitted by Mr. Grothaus and Mr. Stetler, nor to the two affidavits submitted by Ms. Herndon.  Indeed, the district court referred to Ms. Herndon's allegations once, and only to generally characterize them as "inherently incredible" (Doc. 69 at 25), but without explaining why any of her specific and detailed allegations were less credible than Mr. Duchardt's.  In doing so, the district court acted contrary to clear precedent which states that a district court cannot make credibility determinations based on the pleadings and affidavits alone.  *See*, *e.g.*, *Koskela v. United States*, 235 F.3d 1148 (8th Cir. 2001) (district court abused its discretion in finding a hearing unnecessary and making credibility determinations about the witnesses based solely on competing affidavits); *Watson v. United States*, 493 F.3d 960, 964 (8th Cir. 2007) ("Although the district court was not required

65

to credit [the movant's] assertion, it was required to hold a hearing before making factual determinations about [the movant's] credibility."); *Latorre v. United States*, 193 F.3d 1035, 1039 (8th Cir. 1999) (government's proffer of testimony by trial counsel and other witnesses to refute movant's allegations was an insufficient basis to deny an evidentiary hearing; "[T]hese witnesses were not heard at the § 2255 hearing in the District Court. Assertions by counsel cannot foreclose an evidentiary hearing, at which such testimony can be taken and subject to cross-examination."); *Smith v. United States*, 182 F.3d 1023, 1026 (8th Cir. 1999) (where movant and trial counsel filed conflicting affidavits regarding their out-of-court discussions, a hearing was necessary to resolve the facts that were in dispute). *See also Daniels v. United States*, 54 F.3d 290, 295 (7th Cir. 1995) ("The only evidence before the district court . . . consisted of the conflicting, sworn affidavits of [trial counsel] and [movant]. The district court attempted to judge the credibility of [movant's] claim based on the affidavits alone, and we are compelled to conclude that this approach was in error. A determination of credibility cannot be made on the basis of an affidavit."); *Castillo v. United States*, 34 F.3d 443, 445-46 (7th Cir. 1994) ("a determination of credibility cannot be made on the basis of an affidavit. That is, a judge cannot take two affidavits which swear to opposite things and say, 'I find one of the affidavits more credible than the other, and therefore I shall accept it as true.' The purpose of inviting affidavits . . . is to determine whether there is a dispute over a material issue of fact, rather than to enable the judge to resolve the dispute by picking one affidavit over another that contradicts it, as the judge did here. . . . [T]he judge did with the probation officer's affidavit what he was not permitted to do, and determined that the affidavit, though contradicted by another affidavit, was true"). The district court erred in resolving factual questions and making credibility findings with respect to the assertions of Mr. Duchardt and Ms. Herndon in the absence of a hearing,

66

where these witnesses could be called and their conflicting statements could be questioned under oath.

Every inference must be drawn in Mr. Sinisterra's favor, particularly where, as here, Mr. Sinisterra has pled facts that if true would entitle him to relief, and yet, the district court has not granted an evidentiary hearing. *See* 28 U.S.C. § 2255 ¶ 2; *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963) (requiring a hearing in federal habeas proceedings where the petitioner has alleged facts which, if proven, would entitle him to relief and where the district court has not resolved the merits of the factual dispute in a full and fair hearing); *Fontaine v. United States*, 411 U.S. 213, 215 (1973); *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) ("The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only allege–not prove– reasonably specific, non-conclusory facts that, if true, would entitle him to relief.") (emphasis in original); *See Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) (remanding to the district court for evidentiary hearing on ineffective assistance of counsel claims); *Lawrence v. Armontrout*, 900 F.2d 127 (8th Cir. 1990); *Simmons v. Lockhart*, 856 F.2d 1144 (8th Cir. 1988); *Grigsby v. Mabry*, 637 F.2d 525 (8th Cir. 1980) (citing *Townsend v. Sain*). It is respectfully submitted, therefore, that consistent with this Court's precedent, this case must be remanded for an evidentiary hearing so that a factual record can be made on these claims.

> **c.      Mr. Sinisterra is statutorily entitled to investigative and expert services to assist in the litigation of his claims.**

Additionally, Mr. Sinisterra should be provided with the resources that he is entitled to by statute in order to be able to further develop his claims. In *McFarland v. Scott*, 512 U.S. 849 (1994), the United States Supreme Court held that a petitioner in a capital § 2254 proceeding has a statutory right to qualified legal counsel prior to the filing of a formal, legally sufficient petition. 512 U.S.

67

Appellate Case: 08-1925     Page: 72     Date Filed: 07/17/2008 Entry ID: 3452810

at 855. In construing the relevant statutory provision, 21 U.S.C. § 848 (q), the Supreme Court noted

that the statute also created a right to investigative and expert services upon a showing that such

services were "reasonably necessary" for the representation of the capital petitioner:

> Section 848(q)(4)(B) expressly incorporates 21 U.S.C. § 848 (q)(9), which entitles capital defendants to a variety of expert and investigative services upon a showing of necessity ... The services of investigators and other experts may be critical in the preapplication phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified.

*Id.* (block quotation of § 848 (q)(9) omitted).[16]

The statute does not define "reasonably necessary." However, "Congress intended to provide

prisoners with all resources needed to discover, plead, develop, and present evidence determinative

of their colorable constitutional claims." *Patrick v. Johnson*, 48 F. Supp. 2d 645, 646 (N.D. Tex.

---

[16] This statutory provision was repealed effective March 9, 2006 by the USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title II, §§ 221(4), 222(c), 120 Stat. 192, 231-32 (2006), and recodified, in pertinent part, at 18 U.S.C. § 3599:

> (a)(1) Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either –
> (A) before judgment; or
> (B) after the entry of a judgment imposing a sentence of death but before the execution of that judgment;
> shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with [subsection (f)].
> ...
> (f) Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor [.]

18 U.S.C. § 3599 (2007).

Appellate Case: 08-1925     Page: 73     Date Filed: 07/17/2008 Entry ID: 3452810

1999). "The services of an expert are reasonably necessary if either: (a) the services are needed to prepare the claims in the habeas petition, or to obtain evidence not yet acquired to support a claim in the habeas petition; or (b) the habeas petition raises claims entitling the petitioner to a hearing at which an expert would testify." *Brinkley v. Warden*, No. 4:06CV0110, 2007 U.S. Dist. LEXIS 37911, *1 (N. D. Ohio May 24, 2007) (Memorandum of Opinion and Order).

The services of a mitigation specialist are reasonably necessary to Mr. Sinisterra's § 2255 litigation. As the Supreme Court has recognized, a thorough and complete mitigation investigation is absolutely necessary in capital cases. *See Rompilla*, 545 U.S. at 374 n.7; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 395. *See also Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("it was the duty of [petitioner's] lawyers to collect *as much information as possible about [petitioner]* for use at the penalty phase of [his trial]") (emphasis added); *Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006) (conducting a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland*'s requirements). Mr. Sinisterra, however, has never had the benefit of such a mitigation investigation at any stage of his capital case, i.e. at the trial level or for his § 2255 proceedings. A qualified mitigation investigator has never worked on behalf of Mr. Sinisterra, and crucial tasks associated with the competent investigation and development of issues central to the questions of whether Mr. Sinisterra deserves a death sentence, therefore, have never been performed in this case. (*See* Doc. 41, Ex. 2, Herndon Aff. ¶¶ 10-13; Doc. 68, Ex. 1, Herndon Second Aff. ¶¶ 8-15; Doc. 68, Ex. 3, Stetler Dec. ¶¶ 28-43) Mr. Sinisterra diligently made numerous attempts to obtain funding for a mitigation specialist in the district court both prior to and after the filing of his § 2255 motion, but each of his requests were summarily denied. *See* Doc. 8 (Order filed Sept. 7, 2004 denying pre-motion request for leave to hire mitigation specialist); Doc. 19 (Order filed Jan. 5, 2005 denying

69

renewed request for leave to hire mitigation specialist); Doc. 67 (Order filed Sept. 25, 2007 denying motion to substitute counsel)[17].

Despite these denials, his habeas counsel was able to gather some of the basic information that a mitigation investigation would have revealed on his own, and even that partial effort yielded a wealth of crucial mitigation information about Mr. Sinisterra's life history that was readily available at trial, but was never presented to the jury. Still, a comprehensive social history remains undone in this case. Mr. Sinisterra has alleged the partial mitigation information uncovered by post-conviction counsel in his § 2255 motion. A mitigation specialist is reasonably necessary in order to competently complete the mitigation investigation and to present that mitigation evidence at an evidentiary hearing. *See Brinkley v. Warden*, No. 4:06CV0110, 2007 U.S. Dist. LEXIS 37911, *1 (N. D. Ohio May 24, 2007) (Memorandum of Opinion and Order) (granting petitioner's request to hire mitigation specialist where petitioner alleged mitigation facts that were not presented by trial counsel); *Bell v. King*, No. 7:04CV00752, 2006 U.S. Dist. LEXIS 18365 (W.D. Va. April 11, 2006) (Opinion and Order) (petitioner's request to hire investigator was reasonably necessary to the petitioner's ineffective assistance claim that trial counsel failed to interview available witnesses and develop available mitigation evidence at trial because any such uncovered evidence would be relevant to the prejudice prong of *Strickland*); *Patterson v. Johnson*, No. 3:99-CV-0808-G, 2000 U.S. Dist. LEXIS 12694 (N.D. Tex. August 31, 2000) (Memorandum Order) (granting petitioner's request for investigative funds to develop an ineffective assistance of counsel claim that trial counsel

---

[17] The motion for substitution of counsel, Doc. No. 64, sought the appointment of the Arizona Federal Public Defender (Arizona FPD). As explained in that motion, the Arizona FPD, if appointed, was prepared to use its own bilingual mitigation specialists to conduct a Columbia-based mitigation investigation within its already allocated budget, so its involvement in the case would have been without additional cost to the court.

Appellate Case: 08-1925    Page: 75    Date Filed: 07/17/2008 Entry ID: 3452810

failed to investigate and develop available mitigation evidence at trial).

**B.** **Jurists of Reason Could Debate Whether Mr. Sinisterra's Fifth, Sixth and Eighth Amendment Rights Were Violated by, and Whether Trial and Appellate Counsel Were Ineffective in Failing to Object to, Prosecutorial Misconduct in Closing Argument.**

Mr. Sinisterra alleged in his § 2255 Petition that improper remarks by government counsel in penalty phase closing argments violated his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution, and that trial and appellate counsel's failure to object to these remarks constituted ineffective assistance of counsel, such that but for counsel's deficient performance, there is a reasonable probability that the outcome of the penalty phase proceedings would have been different. (Doc. 41, Claims 12E8, 12F)

> The line of improper argument began in the government's initial summation, where it argued:

> You can have the courage to act as the conscience of this community, to weigh the fact (sic), to apply the law and to determine no matter how much his family may love him [Sinisterra] what he did on November 28, 1998 shall never be repeated and ***send a message to all other drug dealers that this community will not tolerate it.***

(Trial Tr. 2892) (emphasis added). This same argument was then repeated in the government's rebuttal closing argument:

> Ladies and gentlemen, decent people, decent citizens, fear for their lives because of drug traffickers like German Sinisterra. We cannot forget he was a member of a very efficient but unforgiving cocaine distribution organization and American society is a much different place than it was 50 years ago because of the German Sinisterras of the world.

> It is time to turn the tables on drug traffickers like this defendant. ***Finish the message that you began with your verdict of guilt in this case. Tell this defendant and those like him that murder will not be tolerated especially murder committed to further drug trafficking schemes. There is no worse crime.*** As you sit there you are not just twelve people. You are, like Mr. Valenti told you, the conscience of the community and you have a unique opportunity to make a difference. ***You have a unique opportunity to send a message. Don't squander that opportunity. Have the courage to do the right thing.***

71

...

> German Sinisterra believes by his actions that murdering couriers over a drug debt is just a part of doing business. Tell him he's wrong and ***tell the other drug traffickers of the world if they come to Kansas City they are going to be dealt with in the most severe way, that are going to receive a sentence of death.***

(*Id*. at 2910-2911) (emphasis added).

As is discussed in detail below, there is ample caselaw in this Circuit and in sister jurisdictions which establishes that the above remarks are improper and constitute reversible error. *See, e.g., United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992); *United States v. Lee*, 743 F.2d 1240 (8th Cir. 1984). *See also United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United States v. Arrieta-Agressot*, 3 F.3d 525 (1st Cir. 1993). Competent trial counsel should have been aware of this law and made timely objections to the prosecutor's improper remarks and made an appropriate motion for a mistrial and/or a new trial. However, Ms. Herndon, who was responsible for making any such objections and motions, did not do so. As she explained in her sworn affidavit, her failure to do so was not for any tactical reasons, but owing to her ignorance of the law:

> At the time of Mr. Sinisterra's trial, I was not aware of the case law prohibiting "send a message" arguments such as those made by the government. In the appellate work that I have done since Mr. Sinisterra's trial I have discovered several cases, including cases in the Eighth Circuit, that hold such arguments to be reversible error.
>
> At the time of the prosecutor's comments in Mr. Sinisterra's trial, I did not have any strategic reason for not objecting to the comments; I simply did not know that such argument constituted reversible error. With the benefit of my substantial experience since Mr. Sinisterra's trial, I recognize that I should have objected to the government's argument. There is no strategic reason for failing to object to an argument that under the law the government is precluded from making.

(Doc. 68, Ex. 1, Herndon Second Aff. ¶¶ 4-5).

Similarly, Mr. Duchardt, who acted as appellate counsel for Mr. Sinisterra, failed to challenge

72

the prosecutor's improper remarks on appeal because he was unaware – and, it seems is *still* unaware – of the extant caselaw that establishes that such remarks constitute reversible error.  (Doc. 50, Duchardt Stmt. ¶ 16).  Trial and appellate counsel's failure to be knowledgeable about the law and make appropriate challenges to improper remarks that have long been considered by this Court to be error constitutes deficient performance.  And, as will be discussed below, given that such remarks have consistently been held to be ***reversible*** error, there is a reasonable probability that the outcome of the trial, and the appeal, would have been different had counsel challenged these remarks.  As noted previously, however, Mr. Sinisterra needs to establish at this stage that he is entitled to relief on the merits, but only that this claim is debatable among jurists of reason.

### 1.      The Prosecutor's Remarks Were Unquestionably Improper.

The district court concluded that the prosecutor's remarks did not amount to an impermissible emotional appeal, Order at 22, despite contrary authority from this Court which has found virtually identical remarks to constitute reversible error.  *See, e.g., United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992); *United States v. Lee*, 743 F.2d 1240 (8th Cir. 1984).  *See also United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United States v. Arrieta-Agressot*, 3 F.3d 525 (1st Cir. 1993).

In *Johnson*, the defendant was convicted of various narcotics offenses. During rebuttal closing argument, the prosecutor stated:

> [The defense attorney] says your decision to uphold the law is very important to his client. Your decision to uphold the law is very important to society. You're the people that stand as a bulwark against the continuation of what Mr. Johnson is doing on the street, putting this poison on the street.

*Johnson*, 968 F.2d at 769.  Defense counsel objected, but the trial court overruled the objection.  The trial court also denied the defense motions for a mistrial, judgment of acquittal and a new trial.  This

Appellate Case: 08-1925     Page: 78     Date Filed: 07/17/2008 Entry ID: 3452810

Court reversed the conviction, stating:

> [T]he pressing nature of the [drug] problem does not give prosecutors license to encumber certain defendants with responsibility for the larger societal problem in addition to their own misdeeds. We conclude that by urging the jury to act as a 'bulwark against ... putting this poison on the streets,' the prosecutor in this case appealed to the jurors to be the conscience of the community in an improper and inflammatory manner.

968 F.2d at 771.  Notably, the misconduct in question in *Johnson* constituted a single remark made in closing.  Citing to *Solivan*, discussed *infra*, this Court noted that "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated."  968 F.2d at 771 (quoting *Solivan*, 937 F.2d at 1150).  In analyzing the impact that the prosecutor's remarks likely had on the jury, this Court stated: "Given the fear and concern engendered by the national drug epidemic, we conclude it is likely that the prosecutor's comment urging the jury to strike a blow against the problem and the emotion it stirred 'influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision.'" 968 F.2d at 772 (quoting *Solivan*, 937 F.2d at 1153).[18]

In *Lee*, this Court reversed a conviction based on the following improper remarks made by the prosecutor in closing:

> Smuggling in 640 pounds of marijuana is definitely wrong. It is a crime and they should be convicted. All the drug smugglers around should be told by your actions that bringing in marijuana is wrong.
> ...

---

[18] This Court also that noted that no curative instruction was given by the trial court, and rejected the argument that the standard jury instructions -- that arguments by counsel are not evidence – were sufficient to cure the error: "Such a broadly sweeping rule would permit *any* closing argument, no matter how egregious." 968 F.2d at 772 (emphasis in original) (quoting *Newlon v. Armontrout*, 885 F.2d 1328, 1337 (8th Cir. 1989), *cert. denied*, 110 S. Ct. 3301 (1990)).

Here, Mr. Sinisterra never had the benefit of a curative instruction, as trial counsel failed to object to the improper remarks and make such a request.

74

Appellate Case: 08-1925     Page: 79     Date Filed: 07/17/2008 Entry ID: 3452810

> What you do as jurors is going to be watched here. You can better believe that each and every drug smuggler is watching what happens here today.

*Lee*, 743 F.2d at 1252-1253. In reversing, this Court noted that "this argument was an emotional appeal calculated to persuade the jury to decide the case on other than the facts before it." 743 F.2d at 1253.

In *Solivan*, the defendant was convicted of seven counts related to a conspiracy to distribute narcotics. During the course of closing arguments, the prosecutor stated:

> What you're listening to is a wholesale distributor of narcotics, cocaine, discuss her business affairs and complain about her busy schedule, the lack of good product and the trouble she's having getting this stuff up here now. And I'd submit to you, folks, that she's been caught now. And I'm asking you to tell her and all of the other drug dealers like her that we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky and...

*Solivan*, 937 F.2d at 1148. Defense counsel interrupted and objected, and the trial court declared a recess and heard argument outside the presence of the jury. The court sustained the objection, but denied the motion for mistrial. When the jury returned, the court issued a strongly worded curative instruction, admonishing the jury to ignore the prosecutor's remarks regarding sending a message to the community and instructing the jury to try the case based solely on the evidence related to the defendant on trial. 937 F.2d at 1149. Despite the fact that the prosecutorial misconduct consisted of only this one instance, and despite the trial court's curative instruction, the Sixth Circuit held that the misconduct was "so destructive to defendant's right to a fair trial that it constitutes reversible error." 937 F.2d at 1150.

The *Solivan* court found that the defendant's right to a fair trial was violated because the prosecutor's remarks were designed to arouse the passion and prejudice of the jury by invoking the fear surrounding the highly publicized and pervasive social problem of the illegal drug trade. 937

75

Appellate Case: 08-1925     Page: 80     Date Filed: 07/17/2008 Entry ID: 3452810

F.2d at 1153. Invoking that fear improperly diverted the jury's attention away from its task of a reasoned deliberation of the evidence of guilt against a specific defendant, and instead encouraged the jury to view its verdict as a way to strike back against drug dealers and to protect its community. *Id.* The effect of these comments "was to suggest to the jury that, because of defendant's participation in the drug trade in northern Kentucky, the drug problem facing the jurors' community would continue if they did not convict her. It is error for a prosecutor to direct the jurors' desires to end a social problem toward convicting a particular defendant." *Id.* As the Court concluded, "the prosecutor's appeal to the jury to convict a defendant as a blow to the drug problem or to send messages to drug dealers cannot be other than highly prejudicial given the specific context of the case in the current social-political environment." *Id.* at 1154. Additionally, the Court was not persuaded that the remarks in question were too limited to have prejudiced the trial. Rather, the Court stated that "a single instance of error may be so destructive of a defendant's right to a fair trial that reversal must follow." *Id.* at 1156. Furthermore, the Court found the prosecutor's remarks "to have been so gross as to probably prejudice defendant." *Id.* at 1157.[19] *See also United States v.*

_____

[19] The Sixth Circuit noted that in some instances, "an error may be so prejudicial that no cautionary instruction, however swiftly and forcibly given, can safely eradicate its effect." *Id.* at 1156. The *Solivan* Court found that the trial court's admonition to the jury was insufficient to neutralize the harmfulness of the prosecutor's remarks. As the Court noted:

> The admonition in this case was neither swiftly given nor did it sufficiently convey to the jury a sense of judicial disapproval of the remarks to dispel the harmful content and impact of the prosecutor's egregious statements. Even were the district court to have immediately and appropriately admonished the jury to disregard the remarks, we doubt seriously that any cautionary instruction could have safely eradicated the highly prejudicial effect of the prosecutor's statements in this case. The statements were deliberately injected into the proceedings to inflame the jurors' emotions and fears associated with the current drug epidemic that is reported daily in our newspapers and which threatens the very fabric of our society. . . . The statements were so inflammatory in the context of the ongoing drug war that no charge could

76

Appellate Case: 08-1925    Page: 81    Date Filed: 07/17/2008 Entry ID: 3452810

*Arrieta-Agressot*, 3 F.3d 525, 527-29 (1st Cir. 1993) (finding plain error and reversing where prosecutor made improper remarks encouraging the jury to view its verdict as a weapon in the "war on drugs" and as a way to "say no to drugs").

  **a.**   **The Fact That The Improper Remarks Were Made In The Penalty Phase Does Not Excuse Counsel's Failure To Make Proper Challenges, As The Eighth Amendment Requires A More Searching Review Of The Impact Of Improper Remarks Made In The Penalty Phase.**

The district court's Order did not address the rationale of any of the aforementioned cases, but rather stated that: "The cases cited by Sinisterra in support of his emotional appeal argument were guilt-phase closing arguments which the Eighth Circuit found to be reversible error, and therefore, are not apposite here." (Doc. 69 at 22) Once again, the district court merely lifted a statement verbatim from the government's reply, *see* Doc. 53 at 47 ("The cases cited by Sinisterra were guilt-phase closing arguments which the Eighth Circuit found to be reversible error and, therefore, are not apposite here."), rather than address the substance of the pleadings and record before it.

As was extensively briefed in Mr. Sinisterra's Traverse, *see* Doc. 68 at 30-34, there is a wealth of caselaw that establishes that improper arguments, both in general and of the specific variety made at Mr. Sinisterra's trial, made during the penalty-phase proceedings are legally cognizable claims that warrant reversal and relief. Indeed, as this Court recognized in *Copeland v. Washington*, 232 F.3d 969, 974 n. 2 (8th Cir. 2000), "***if there is any distinction between guilt and penalty phase arguments, it would seem that there should be a more searching review of the***

---

have sufficiently cured the prejudice.

*Id*. at 1157.

Appellate Case: 08-1925  Page: 82  Date Filed: 07/17/2008 Entry ID: 3452810

*__penalty phase as the Eighth Amendment is implicated.__*" (emphasis added) (citing *California v. Ramos*, 463 U.S. 992, 998-99 (1983): "The Court ... has recognized the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination").[20]

Moreover, in his pleadings below, Mr. Sinisterra specifically brought to the district court's attention the case of *Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006), *cert. granted*, 127 S. Ct. 763 (2006), *cert. dismissed*, 2007 U.S. LEXIS 6082 (U.S. May 21, 2007), where this Court held that "send a message"-type remarks are particularly prejudicial when made in the penalty phase of a capital case because they violate the defendant's Eighth Amendment right to an individualized sentencing determination. There, the petitioner was convicted of being paid to kill a witness that was set to testify against a drug dealer.[21] In the penalty phase, the prosecutor urged the jury to sentence the petitioner to death in order to send a message to other drug dealers:

> And I'm going to beg you for the entire community and for society not to spare his life. I'm going to beg you for the right message instead of the wrong message. The

---

[20] Indeed, the United States Supreme Court has long recognized that prosecutorial misconduct claims are equally applicable to closing arguments in the penalty phase. *See Caldwell v. Mississippi*, 472 U.S. 340 n.7 (1985) (death sentence vacated because prosecutor's improper closing argument during penalty phase made it appear to jury that responsibility for the death penalty would be borne by appellate court rather than by jury itself); *Romano v. Oklahoma*, 512 U.S. 1, 3 (1994) (considering petitioner's assertion that closing argument in penalty phase violated petitioner's due process rights, although concluding on the facts that no rights were violated).

[21] The *Weaver* case is remarkably similar to Mr. Sinisterra's case. In both instances: (1) the defendants were convicted of an alleged murder-for-hire scheme initiated at the behest of a drug dealer; (2) the prosecutor urged the jury to sentence the defendant to death in order to send a message to other drug dealers; and (3) trial counsel failed to object to these particular remarks. In Weaver, there were additional remarks to which the defense did object, including: (1) analogizing the role of the juror to that of a soldier with the duty to kill; (2) the prosecutor's personal belief in the death penalty; (3) informing the jury that he had a special position of authority and decided when to seek death; and (4) emotional appeals to the jury to "kill [the petitioner] now." 438 F.3d at 840.

78

right message is life?  For an execution?  That's the right message?  That's the message you want to send to the drug dealers, the dope peddlers and the hit men they hire to do their dirty deeds: Life in prison is what you get when we catch you and convict you.  Life in prison?  That's the message you want to send to the scum of the world?  That when we catch you and we're convinced you're guilty, we're going to give you life in prison?  That's not the right message.

. . .

The message has to be death for these types of people.  That's the only message they are going to understand.  The one thing you've got to get into your head, this is far more important than William Weaver.  This case goes far beyond William Weaver.  This touches all the dope peddlers and the murderers in the world.  That's the message you have to send.  It doesn't just pertain to William Weaver.  It pertains to all of us, the community.  They are our streets, our neighborhoods, our family.  The message is death, not life.  And you've just got to geer [sic] yourself to that.

438 F.3d at 837.

Citing to a host of Supreme Court cases, this Court began its analysis by noting that there is longstanding and well-settled precedent that "the Eighth Amendment requires capital sentencing to be an individualized decision-making process." 438 F.3d at 841 (citations omitted).  As this Court explained, the "send a message" arguments by the prosecutor violated the petitioner's Eighth Amendment right:

The argument that a signal must be sent from one case to affect other cases puts a [sic] improper burden on the defendant because it prevents an individual determination of the appropriateness of capital punishment.  Further, invoking a jury's general fear of crime to encourage the application of the death penalty in a particular case is unfairly inflammatory.  Using the conscience of the community as a guiding principle for punishment puts too significant a burden on a single defendant.

Id. at 841 (internal citations omitted).[22]  Notably, it appears that the *Weaver* Court decided  that such

---

[22] *Weaver* was a case decided under § 2254.  Unlike § 2255 cases, petitioners in § 2254 proceedings must, in addition to demonstrating that the legal claim is meritorious, prove that the state court's ruling against the petitioner involved an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.  *See* 28 U.S.C. § 2254 (d)(1).  That is, a

79

arguments are unquestionably prejudicial because they inherently divert the capital jury's attention away from an individual determination of the appropriateness of a death sentence for a given defendant.

This Court has also had occasion to consider several other cases in which a claim of prosecutorial misconduct in the penalty phase closing arguments was raised. For example, in *Copeland v. Washington*, 232 F.3d 969 (8th Cir. 2000), this Court affirmed the granting of habeas relief based on claims that the prosecutor's penalty phase closing argument was improper, and that counsel was ineffective for failing to object to the improper argument. There, the prosecutor compared the defendant's case to gang shootings in Los Angeles and said the same thing was happening "right here in our backyards." 232 F.3d at 972. The prosecutor also told the jury that this was the worst crime ever committed in their state, and that if this case did not deserve a death sentence, then no case did. This Court held that this "was the sort of argument that would result in 'mob justice' rather than result in reasoned deliberation," 232 F.3d at 975, and that the "improper

---

federal court cannot disturb a state court's ruling on the basis that it might have decided the claim differently, but rather, the petitioner must show that the state court's application of applicable federal law was objectively unreasonable. This is a significant limitation on the federal court's review.

In the § 2255 context, there is no similar threshold that must be met before a petitioner can receive relief on a claim. The *Weaver* Court's statement, therefore, that "[t]here is little doubt that the prosecutor's statements are such that we would certainly grant relief without applying AEPDA," 438 F.3d at 841, is strong evidence that had counsel raised this claim, there is a reasonable probability Mr. Sinisterra would have prevailed on appeal. Indeed, the *Weaver* Court easily found that "there can be no interpretation of the inflammatory remarks by the prosecutor that is reasonable under the various applicable United States Supreme Court precedents," and found that the Missouri Supreme Court's conclusion to the contrary was "unreasonable under existing United States Supreme Court precedents." *Id*. at 842. The fact that the *Weaver* Court found that the prosecutorial misconduct claim easily satisfied the more stringent § 2254 requirements demonstrates both: (1) the strength of the claim, and (2) counsel's incompetence -- i.e., given existing Supreme Court precedent, this claim should have been obvious to counsel from the trial court record.

Appellate Case: 08-1925     Page: 85     Date Filed: 07/17/2008 Entry ID: 3452810

argument would have had a significant prejudicial effect on the jurors[.]" *Id. See also Newlon v. Armantrout*, 885 F.2d 1328, 1340-42 (8th Cir. 1989) (affirming grant of habeas petition on the ground that prosecutor's arguments in penalty phase – that the petitioner deserved to be sentenced to death not only for what he had done, but in order to send a message to others that if they committed the same crime in their county, they would be executed, too -- violated due process). If anything the government's remarks at Mr. Sinisterra's trial were more egregious than those found improper in *Copeland*, as the prosecution in Mr. Sinisterra's case not only sought to arouse the passions of the jury by raising the specter of drug violence happening in Kansas City, but went the next step and explicitly encouraged the jury to think of its verdict as a *solution* to that problem. The jury, therefore, was being directed by the prosecution to forego its responsibility to make an individualized sentencing determination with respect to Mr. Sinisterra, and instead cast its verdict for the purpose of combating the larger societal problem of drug traffickers and to keep Kansas City safe from future unidentified drug traffickers lying in wait.

Every one of the foregoing cases above – each of which address reversible error based on improper arguments in the penalty phase closing arguments – was briefed for the district court. The district court is therefore simply incorrect when it states that the only caselaw cited by Mr. Sinisterra concerns improper remarks in the guilt-phase closing arguments. However, even on its own terms, the district court's opinion is not persuasive, as it fails to articulate any reasoned legal basis for why cases dealing with guilt-phase improprieties are "not apposite." As recognized in *Johnson* and *Lee*, the reason why "send a message"-type remarks are prejudicial in the context of drug cases is because they are unduly inflammatory and divert the jury's attention from a reasoned deliberation of the evidence. The district court's observation that these cases address improper remarks made in the

81

guilt phase, as opposed to the penalty phase, highlights a distinction without a difference. Given that the district court's opinion does not refute that such remarks have been found to be reversible error when asking the jury to convict a defendant, the opinion fails to explain why, then, it would be proper for it to inflame the passions of the jury and divert its attention when asking it to sentence someone to death. As this Court recognized in *Copeland v. Washington*, 232 F.3d 969, 974 n.2 (8th Cir. 2000), if anything, greater scrutiny must be applied to the penalty phase arguments given the nature of the proceeding and the severity of the consequences resulting from an improper argument. In light of all the foregoing legal authority establishing the impropriety of "send a message"-type remarks in closing argument, as well as the abundance of law holding that prosecutorial misconduct in closing is just as, if not more so, prejudicial when it occurs in the penalty phase proceedings, it is clear that counsel's failure to make the appropriate challenges at trial and on appeal to the government's improper remarks is an issue that is debatable by jurists of reason.

> **b.  Viewed in context of the entirety of the prosecutor's closing argument, the improper remarks were not mere "references to the evidence the jury heard," but rather part of larger argument designed to distract the jury's attention from making an individualized determination about Mr. Sinisterra's sentence.**

The district court also stated in its opinion that the prosecution's improper remarks were merely an attempt to "put the facts presented to the jury in context and referred to the actual evidence the jury heard." (Doc. 69 at 22) The record, however, plainly proves that the government's remarks went far beyond "the actual evidence the jury heard," but rather urged the jury to look beyond the facts of the case before it and make its decision based on the effect that its verdict might have in deterring future drug crimes in Kansas City. The government improperly invoked the threat of "other drug traffickers of the world" bringing drug-related violence to the jury's community to arouse its

82

Appellate Case: 08-1925    Page: 87    Date Filed: 07/17/2008 Entry ID: 3452810

fear and passion, thereby improperly appealing to the emotions of the jury. This was part and parcel of a larger rhetorical strategy by the government to improperly encourage the jury to make its sentencing decision based on facts other than those before it, rather than on the individual characteristics of Mr. Sinisterra and the facts and circumstances of his case, as required by the Eighth Amendment.

For example, in its rebuttal closing, the government explicitly minimized the importance of any of Mr. Sinisterra's individual characteristics that weighed against death, and instead asked the jury to look beyond this particular defendant and weigh the impact that a death sentence would have on deterring other drug dealers from coming into their community:

> The octopus when in danger shoots out a dark ink into the water so it can escape. If it doesn't get out of that, it shoots, it's fatal, the octopus dies. *And that's what mitigation evidence is in this case. Ladies and gentlemen, it's a smoke screen. It's that ink.* He's the octopus. What he wants is to escape in this case, he wants to escape justice.
>
> *This case, ladies and gentlemen, is not about this. Has nothing to do about that.* What this case has to do is, *this is what this case is about. It's taking a thousand dollars to put a gun to somebody's head to blow their brains out. They don't want you to think about that but that's what it is.*

(Tr. 2906-2907) (emphasis added). Apart from the fact that these remarks improperly impugned the integrity of defense counsel[23], the government's argument also violated Mr. Sinisterra's Eighth

---

[23] "Attacks on the sincerity and dishonesty of defense counsel are inappropriate." *United States v. Sblendorio*, 830 F.3d 1382, 1395 (7th Cir. 1987). Indeed, numerous courts have stated that arguments accusing defense counsel of putting up a "smoke screen" to confuse the jury are improper. *See, e.g., Sblendorio*, 830 F.3d at 1396 (comments, such as "smoke screen" rhetoric, are "inappropriate and beneath the prosecutor); *United States v. Procopio*, 88 F.3d 21, 32 (1st Cir. 1996) (prosecutor's use of term "smoke screen" in argument was inappropriate); *United State v. Millar,* 79 F.3d 338, 343-344 (2d Cir. 1996) (same); *United States v. Matthews*, 240 F.3d 806, 819 (9th Cir. 2000) (in non-capital case where prosecutor characterized the defense argument as an "octopus squirting ink," and asserting, somewhat ambiguously, that "they're trying to get away, so they gotta hide what they're doing, they gotta hide all the facts, cloud the facts, throw up all kinds of dirt, squirt

83

Appellate Case: 08-1925     Page: 88     Date Filed: 07/17/2008 Entry ID: 3452810

Amendment right to an individualized sentencing determination. As the Supreme Court has made clear in *Lockett v. Ohio*, 438 U.S. 586 (1978), "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604 (emphasis in original).

The Court noted that "an individualized decision is essential in capital cases" because a death sentence is such an extreme penalty without the corrective mechanisms that are available with other forms of punishment. *Id*. at 605. Moreover, the Court has made it clear in subsequent cases that "the jury *must be allowed to consider and give effect to* mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989) (emphasis added).

---

the ink," the court held that "In this case, the Government walked – and may have overstepped – the line by insinuating that defense counsel was trying to hide the truth. ... The statements made in this case are unworthy of a representative of our government").

The use of the octopus metaphor was not the only instance in which the prosecutor attacked defense counsel. Moments after making that argument, the prosecutor stated of defense counsel: "They don't want you to think about that but that's what it is." Tr. 2907. The context of the remark was that what this case was really about was "putting a gun to somebody's head to blow their brains out," not mitigation. Here, the prosecutor purported to be revealing to the jury the secret intentions and motivations of defense counsel, i.e., that their agenda was to divert the jury's attention away from the facts of the crime. This same kind of argument was repeated later in the rebuttal when the prosecutor addressed the execution impact evidence: "Counsel talked to you about the children of German Sinisterra. *And regardless of what she said she wants sympathy from you*." Tr. 2908. (emphasis added). Once again, the prosecutor was claiming to reveal the defense counsel's internal thoughts, i.e., a secret agenda to "manipulate" the jury through improper emotional appeals related to Mr. Sinisterra's children.

In fact, such execution impact evidence is relevant and legitimate mitigation evidence. The effect of such improper argument, though, was not merely to only impugn the integrity of defense counsel; it also served to disparage the mitigation evidence itself, as it encouraged the jury to view such mitigation evidence as an emotional ploy, rather than as a legitimate basis for returning a life verdict. Notably, counsel failed to object to any of these remarks at the time of trial or on appeal.

84

Appellate Case: 08-1925     Page: 89     Date Filed: 07/17/2008 Entry ID: 3452810

Here, the government's argument was improper because it characterized mitigation evidence as irrelevant to the jury's sentencing deliberation and encouraged the jury to simply ignore the proffered mitigation evidence. *See Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1672 n. 21 (2007) (jury may be precluded from giving meaningful consideration to relevant mitigation evidence "not only as a result of the instructions it is given, but also as a result of prosecutorial argument dictating that such consideration is forbidden"). The thrust of the government's comments in Mr. Sinisterra's case was to denigrate not only the proffered mitigation evidence, but the very concept of mitigation itself. Such disparagement of mitigation is improper, as the Supreme Court has repeatedly held that the sentencer must give due consideration to all relevant mitigating evidence in order to insure that a reliable verdict is imposed. *See, e.g., Boyde v. California*, 494 U.S. 370, 377-78 (1990) (once the threshold for relevance has been met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence) (emphasis added); *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration").[24]

---

[24] To the extent that the government was arguing in closing that mitigation evidence must bear some nexus to the offense itself before it may be considered by the sentencer, that claim is legally incorrect. In *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court set forth the relevance standard applicable to mitigating evidence in capital trials: the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard– "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"--applies. 494 U.S. at 440 (citation and internal quotation marks omitted). As the *McKoy* Court further noted: "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id.* This "relevance" standard set forth for mitigating evidence is extremely liberal. *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence'

85

It is clear that the thrust of the prosecutor's argument was not that the proffered mitigation should be given little weight, but rather that it would be "wrong" for the jury to rely on such evidence in determining the appropriate penalty. Indeed, the prosecutor explicitly made that argument to the jury with respect to Mr. Sinisterra's execution impact evidence:

> Counsel talked to you about the children of German Sinisterra. And regardless of what she said she wants sympathy from you. There is no doubt, there is no doubt those children are deserving of sympathy, they are victims but they are victims of what this defendant has done. It would be wrong, ladies and gentlemen, it would be wrong to base your verdict on how they feel. The defendant chose to live the life he did and he has shamed, he has devastated and he has hurt his family. You, as jurors, however are not hurting anybody by following the law and rendering a just verdict as Mr. Valenti told you. Don't be manipulated in that way.

(Trial Tr. at 2908).[25] Here, the government did not contest the existence of the factor itself – it conceded that Mr. Sinisterra's execution would negatively impact his children – but rather, it stated that it would be wrong for the jury to consider and give effect to that factor. What is particularly insidious about this form of argument is that it had the effect of camouflaging its impact on the jury's

---

that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances.") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). Indeed, the Court has repeatedly emphasized that almost any evidence that might tend to show the defendant should not be put to death is admissible, and has explicitly rejected any requirement that mitigating evidence bear a nexus to the crime before it can be considered by the jury. *See Tennard v. Dretke*, 542 U.S. 274, 284-87 (2004); *Smith v. Texas*, 543 U.S. 37, 43-45 (2004) (noting that nexus requirement was "never countenanced" by any of the Court's precedent pre-dating *Tennard*). This "low threshold for relevance," *Tennard* , 542 U.S. at 285, is consistent with the Supreme Court's jurisprudence since *Lockett* that the Eighth Amendment requires the sentencer to consider any mitigating factor that is the basis for a sentence less than death. As the Court explained, "an individualized decision is essential in capital cases" because a death sentence is such an extreme penalty without the corrective mechanisms that are available with other forms of punishment. *Lockett*, 438 at 605.

[25] Trial counsel did not make any contemporaneous objections to this comment, nor does it appear that trial counsel moved for a mistrial based on these comments. Appellate counsel also failed to challenge these remarks on appeal.

Appellate Case: 08-1925     Page: 91     Date Filed: 07/17/2008 Entry ID: 3452810

sentencing deliberations. That is, here, the jury unanimously found that Mr. Sinisterra's execution would negatively impact his family. *See* Verdict Form. However, in light of the government's argument, the fact that the jury found the existence of that factor is not at all a guarantee that each juror then gave consideration and effect to that factor as is required by the Eighth Amendment. As the Court made clear in *Brown v. Payton*, 544 U.S. 133, 162 (2005):

> The need for caution is plain: the constitutional concern with mitigating evidence is not satisfied by the mere ability of a defendant to present it. The sentencing body must have a genuine opportunity to consider it and give effect to it. *Penry v. Lynaugh*, 492 U.S., at 320, 106 L. Ed. 2d 256, 109 S. Ct. 2934. As the Court said in *Boyde*, "[p]resentation of mitigating evidence alone . . . does not guarantee that a jury will feel entitled to consider that evidence." 494 U.S., at 384, 108 L. Ed. 2d 316, 110 S. Ct. 1190. For this reason, the Court has found Eighth Amendment violations in circumstances precluding the sentencing body from considering the defendant's mitigating evidence, even where the evidence was extensive and where it accordingly might have been thought unnatural for the sentencer to disregard it. *See, e.g., Penry v. Johnson*, 532 U.S. 782, 788, 803-804, 150 L. Ed. 2d 9, 121 S. Ct. 1910 (2001); *Eddings v. Oklahoma*, 455 U.S., at 107, 113-114, 71 L. Ed. 2d 1, 102 S. Ct. 869.

The record demonstrably proves that the government's argument was not designed to "put the facts of the case in context," but rather the opposite: to encourage the jury to ignore the facts and evidence it received in the penalty phase regarding Mr. Sinisterra's character and background, and instead re-focus the jury's attention on facts other than those before it – namely, the potential effect that its verdict would have on drug crimes in Kansas City. Such argument was clearly improper and constituted a violation of Mr. Sinisterra's right to due process and a fair trial under the Fifth Amendment, and his right to an individualized sentencing determination under the Eighth Amendment. Under the COA standard, however, Mr. Sinisterra need not establish that he would necessarily win relief on the merits; at the very least, though, the foregoing demonstrates that the issue is debatable among jurists of reason.

87

## 2. A COA Should Issue On Trial And Appellate Counsel's Failure To Object To These Improper Remarks.

There is simply no question that Mr. Sinisterra has demonstrated that he is deserving of a COA on this claim. *Strickland*'s reference to counsel's "thorough investigation of law," 466 U.S. 668, 690 (1984), indicates that reasonably competent defense counsel must be aware of applicable legal principles.[26] Here, reasonably competent counsel should have been aware that the above-cited remarks by the government were improper. At the time of Mr. Sinisterra's trial, this legal principle was well-established, as this Circuit, as well as other circuits, had held that such remarks constitute reversible error. *See, e.g., United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992); *United States v. Lee*, 743 F.2d 1240 (8th Cir. 1984); *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United*

---

[26] Since *Strickland*, courts have held in a number of cases that failure to be aware of an applicable legal principle constitutes ineffective assistance. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 395 (2000) (trial counsel ineffective for failing to "conduct an investigation that would have uncovered extensive records graphically describing [petitioner's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (trial counsel's failure to make obvious and meritorious objection to tainted evidence was ineffective and "betray[ed] a startling ignorance of the law"); *Reagan v. Norris*, 365 F.3d 616, 621-22 (8th Cir. 2004) (trial counsel unreasonably failed to object to jury instruction that omitted essential mens rea element of charged offense); *Blackburn v. Foltz*, 828 F.2d 1177, 1182-83 (6th Cir. 1987) (dicta stating counsel's lack of knowledge as to the admissibility of defendant's prior convictions was unreasonable), cert. denied, 485 U.S. 970 (1988); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989) (finding that defense counsel's failure to object to jury instructions that misstated applicable law was deficient performance under *Strickland*); *Goodwin v. Balkcom*, 684 F.2d 794, 819-20 (11th Cir. 1982) (holding counsel was ineffective for not understanding the "fruit of the poisonous tree" doctrine and, as a result, not challenging the admissibility of defendant's confession), *cert. denied*, 460 U.S. 1098 (1983). Moreover, even before *Strickland*, it was established that "failure to object properly or to preserve fundamental errors at trial may constitute ineffective assistance of counsel." *Smith v. Black*, 904 F.2d 950, 980 (5th Cir. 1990). *See, e.g., Vela v. Estelle*, 708 F.2d 954 (5th Cir. 1983) (capital case holding counsel's failure to object to prosecutor's character witness on specific grounds so as to preserve the issue for appeal was ineffective assistance of counsel).

Appellate Case: 08-1925    Page: 93    Date Filed: 07/17/2008 Entry ID: 3452810

*States v. Arrieta- Agressot*, 3 F.3d 525 (1st Cir. 1993).[27] Thus, counsel's failure to make appropriate objections and move for a mistrial based on the government's improper remarks constitutes deficient performance under *Strickland*. Indeed, Ms. Herndon, who was lead counsel in the penalty phase of Mr. Sinisterra's trial and was responsible for making objections during closing arguments, has conceded that her failure to object to the improper remarks was not a tactical decision, but rather due to her lack of awareness and knowledge of the relevant caselaw. (Doc. 68, Ex. 1, Herndon Second Aff. ¶¶ 4-5.)

Additionally, Mr. Duchardt stated unequivocally that his failure to raise this claim on appeal was not for any strategic or tactical reason, but rather, he simply did not believe that the aforementioned remarks were improper. (Doc. 50, Duchardt Stmt. ¶ 16.) In other words, this is not a situation where counsel "winnowed out" a weaker claim in order to focus more effectively on claims more likely to prevail. Rather, counsel was simply unaware of the extensive case law in the Eighth Circuit in which similar prosecutorial remarks were held to be reversible error. Here, the prosecutorial misconduct claim was an issue that was obvious from the trial record and, given the pattern of reversals in this Court on this very issue, competent appellate counsel should have known

---

[27] *Cf. Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (trial counsel's failure to object to prosecutor's improper remarks in closing constituted ineffective assistance of counsel). *See also Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005) ("trial counsel's failure to object to any aspect of the prosecutor's egregiously improper closing argument was objectively unreasonable"); *Washington v. Hofbauer*, 228 F.3d 689, 709 (6th Cir. 2000) (trial counsel's failure to object to prosecutor's improper examination and closing arguments amounted to ineffective assistance of counsel; "One of defense counsel's most important roles is to ensure that the prosecutor does not transgress th[e] bounds [of proper conduct]."); *Martin v. Grosshans*, 424 F.3d 588, 591 (7th Cir. 2005) (defense counsel performed deficiently "for failing to move for a mistrial after the prosecution's [improper and prejudicial] closing argument"); *Cargle v. Mullins*, 317 F.3d 1196, 1217 (10th Cir. 2003) (trial counsel ineffective for, inter alia, failing to object to instances of prosecutorial misconduct in closing argument).

89

that, if raised, this claim would probably have resulted in a reversal on appeal. Failure to raise a claim under such circumstances is clearly deficient performance, as counsel must "research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998) (appellate counsel ineffective for failing to argue that the trial court erroneously blurred the distinction between first and second degree murder); *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (counsel rendered ineffective assistance in failing to brief and argue defendant's accountability as it related to his sentence); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (ineffective assistance when appellate counsel failed to raise issue of prosecutor's improper use of defendant's post-arrest silence in state's case-in-chief); *Ballard v. United States*, 400 F.3d 404 (6th Cir. 2005) (appellate counsel rendered ineffective assistance in failing to raise *Apprendi* error); *Mapes v. Tate*, 388 F.3d 187 (6th Cir. 2004) (appellate counsel rendered ineffective assistance in failing to argue that the trial court erred in refusing to let the jury consider mitigating factors related to an out-of-state conviction).

The deficient performance of both trial and appellate counsel was also demonstrably prejudicial to Mr. Sinisterra. As noted earlier, the extant law at the time of Mr. Sinisterra's trial established not only that the prosecutor's improper remarks constituted error, but that they were ***reversible*** error. Given the strength and the clarity of the law on this issue, there is a reasonable probability that had trial counsel made a timely objection and moved for a mistrial or new trial, such motion would have been granted. As this Court noted in *Johnson*, even a single improper remark by the government urging the jury to use its verdict to "send a message" can be "so destructive of the right to a fair trial that reversal is mandated." 968 F.2d at 771 (quotation marks omitted). *See also Solivan*, 937 F.2d at 1156 (stating that improper "send a message" remarks in closing may

90

constitute "an error . . . so prejudicial that no cautionary instruction, however swiftly and forcibly given, can safely eradicate its effect").

In the context of appellate ineffectiveness, *Strickland* prejudice is demonstrated by showing that but for counsel's failure to raise the claim, there is a reasonable probability that the petitioner "would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *see also Link v. Luebbers*, 469 F.3d 1197, 1205-06 (8th Cir. 2006) (same). What is significant here is that even though appellate counsel would have had to argue the claim as "plain error" given counsel's failure to preserve the issue at trial, it is quite clear that the Eighth Circuit considered this type of prosecutorial misconduct to be egregious and consistently held it to constitute reversible error.[28] Indeed, at the time that Mr. Sinisterra's case was on appeal, the Eighth Circuit had already reversed in a number of cases on a nearly identical claim. *See United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992); *United States v. Lee*, 743 F.2d 1240, 1252-1253 (8th Cir. 1984); *Copeland v. Washington*, 232 F.3d 969, 975 (8th Cir. 2000); *Newlon v. Armantrout*, 885 F.2d 1328, 1340-42 (8th Cir. 1989). Moreover, considering the result in *Weaver v. Bowersox*, discussed *supra*, it is clear that had appellate counsel raised the prosecutorial misconduct issue on appeal, there is a reasonable probability that this Court would have similarly vacated Mr. Sinisterra's death sentence and remanded for a new penalty phase hearing. Thus, appellate counsel delivered deficient performance

---

[28] Moreover, to the extent that appellate counsel was at all concerned about having to raise the claim as "plain error," he could have availed himself of the decision in *Arrieta-Agressot*, a First Circuit case in which the Court reversed for similar misconduct under the "plain error" rule. *See United States v. Arrieta-Agressot*, 3 F.3d 525, 529 (1st Cir. 1993). *Cf. Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998) (appellate counsel was ineffective in failing to request "plain error" review of error in first degree murder instruction that trial counsel failed to preserve for appeal); *Carter v. Bowersox*, 265 F.3d 705 (8th Cir. 2001), *cert. denied*, 535 U.S. 999 (2002) (ineffective assistance where direct appeal counsel failed to raise plain error resulting from trial court's omission of penalty phase instruction on effect of lack of unanimity on capital sentencing verdict).

Appellate Case: 08-1925    Page: 96    Date Filed: 07/17/2008 Entry ID: 3452810

which resulted in prejudice to Mr. Sinisterra on his appeal.[29]

There is no doubt that Mr. Sinisterra was prejudiced by trial counsel's failure to object to the prosecution's improper remarks and move for a mistrial and/or a new trial, and appellate counsel's failure to raise the prosecutorial misconduct claim on appeal. However, under the relevant standard for issuance of a COA, Mr. Sinisterra does not need to prove at this stage that he will win relief on the merits of this claim, only that his claim is debatable by jurists of reason. Given the admissions of counsel regarding their ignorance of the extant law on the impropriety of the government's remarks in closing, and the wealth of caselaw establishing that the prosecutors comments constituted reversible error, "jurists of reason could disagree with the district court's resolution" of this issue and, as well, such jurists "could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, *supra*, 537 U.S. at 336. Thus, a COA should issue on this claim.

/ /

/ /

---

[29] This was not a clear case for death – the jury rejected one of the non-statutory aggravating factors and found a variety of mitigating factors to balance against the aggravating factors that were found. Had the prosecutor not denigrated the mitigation evidence and distracted the jury from its duty to make an individualized decision about the appropriate penalty by feeding the jury's fears regarding drug violence in their community and encouraging the jury to use its verdict as a means to address this larger societal problem, there is a reasonable probability that the jury would not have voted to sentence Mr. Sinisterra to death. *See Antwine v. Delo*, 54 F.3d 1357, 1364 (8th Cir. 1995) (ruling that prosecutor's penalty phase comments regarding the "instantaneous" nature of death via gas chamber and the economic costs of life imprisonment violated petitioner's due process rights, and finding such comments prejudicial because "the two aggravating circumstances presented to the jury were balanced by some nonstatutory mitigating circumstances that could have led the jury to choose life imprisonment if the prosecutor had not fed their fears of economic burden while easing their conscience with the idea of a quick, humane death"). Thus, but for trial counsel's deficient performance, there is a reasonable probability that the outcome of the penalty phase proceeding would have been different.

Appellate Case: 08-1925     Page: 97     Date Filed: 07/17/2008 Entry ID: 3452810

**C. Reasonable Jurists Could Debate Whether the FDPA Unconstitutionally Relaxes Penalty Phase Evidentiary Standards and Trial and Appellate Counsel Were Ineffective for Failing to Object to the Relaxed Standards and to Inflammatory Hearsay in the Penalty Phase.**

**1. Introduction.**

Mr. Sinisterra claims in his § 2255 petition that the relaxed evidentiary rules in the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3593(c), violated the Eighth Amendment as it was applied to him because those rules permitted the Government to admit at the capital sentencing hearing, under the guise that the evidence supported the government's claim that Mr. Sinisterra would constitute a future danger if given life in prison, hearsay testimony from an FBI agent regarding murders, drug dealing and other offenses committed in federal prisons that had absolutely nothing to do with Mr. Sinisterra. (Doc. 41 at 4-6, Claim12.B) Mr. Sinisterra also alleged that trial counsel rendered ineffective assistance under the Sixth Amendment where they failed to move to declare the statute unconstitutional because of the provision permitting the introduction of hearsay evidence and for failing to object to the admission of Agent Conway's prejudicial hearsay accounts of generalized prison crime and violence unrelated to Mr. Sinisterra. (*Id*. at 51, Claims 12.E.10-11). Mr. Sinisterra also alleged that direct appellate counsel rendered ineffective assistance based on the failure to raise the above claims on direct appeal. (*Id*.)

The hearsay admitted through FBI Special Agent Dennis Conway (Trial Tr. at 2797-2812) allowed the Government to argue in closing argument at the penalty phase that the federal prisons would not constrain Mr. Sinisterra if he were given a life sentence, that he would be dangerous in the future, and that he would constitute a constant threat to kill again, this time in federal prison, if he were not sentenced to death. (*Id*. at 2888, 2892, 2913) Mr. Sinisterra's § 2255 motion alleged that the FDPA's relaxed rules of evidence denied him an individualized capital sentencing

93

Appellate Case: 08-1925    Page: 98    Date Filed: 07/17/2008 Entry ID: 3452810

determination. (Doc.. 41 at 4-5). Specifically, Mr. Sinisterra alleged:

> An abundance of inflammatory hearsay evidence, which had nothing to do with German Sinisterra and which could not be confronted or cross-examined, was introduced by the government during the penalty phase through the testimony of Dennis Conway, a Special Agent with the FBI . . . All of this hearsay was extremely powerful and prejudicial, in particular because by its nature it could not be challenged or confronted effectively. The admission of this evidence prejudiced Sinsterra by focusing the jury away from consideration of "full and complete information about the defendant" and away from "an individualized inquiry into the appropriate sentence for the offense ," instead arousing its passion and prejudice with anecdotal horror stories about prison gangs, prison drug traffickers, and prison violence, none of which had anything to do with the defendant.

*Id*.

The district court denied relief on these related claims, holding merely that the relaxed evidentiary rules found in the FDPA were not unconstitutional, and the court failed to consider the portion of Mr. Sinisterra's claim that Agent Conway's testimony of generalized prison violence had nothing to do with Sinisterra. (Doc. 69 at 3, 23-24) In fact, the court found that the statute rendered death sentences even more reliable because they permitted the admission of a broader range of evidence concerning a capital defendant and his crime. (*Id*.) The court cited this Court's decision in *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), in support of the decisions to deny relief on these claims. (*Id*.)

The COA should issue because reasonable jurists could debate whether the admission of inflammatory hearsay testimony, which is unrelated to the defendant or his crime, violates the Eighth Amendment's prohibition on cruel and unusual punishment because it fails to provide for an individualized sentencing determination. Reasonable jurists could also debate whether the Sixth Amendment's Confrontation Clause compels the production of prosecution witnesses for cross-examination with respect to non-statutory aggravating circumstances.

94

## 2. Admission of hearsay evidence unrelated to Mr. Sinisterra.

Ostensibly to rebut sentencing hearing evidence that Mr. Sinisterra would not pose a threat of violence if sentenced to life in federal prison, the Government called as a witness FBI Agent Dennis Conway. (Trial Tr. at 2797.) Agent Conway testified on direct examination that his present position with the FBI was to investigate crimes, including murders, assaults and drug dealing in the federal prison at Leavenworth, Kansas. (*Id.* at 2798.)

Conway testified to the following hearsay accounts of prison violence unrelated to Mr. Sinisterra: that, since Conway had been assigned to Leavenworth, there had been murders there, as well as approximately one serious assault per week. Recently, two Hispanic gangs, the Puerto Rican G27s and the Latin Kings fought with shanks (homemade knives) after a G27 leader was "disrespected." (*Id.* at 2799) Without specifying what he meant or how many inmates were involved, Conway testified that "everyone got into it." (*Id.*) Nine inmates were stabbed, three were hospitalized and one needed 100 stitches to close his wounds. (*Id.*) Inmates routinely test positive on drug tests, are found intoxicated, and are caught with drugs and shanks. (*Id.*) Without testifying to possessing any personal knowledge, Conway testified that Leonard Peltier "killed two FBI agents" at Wounded Knee, South Dakota, and has been housed at Leavenworth. (*Id.*)

Conway also testified that inmates have access to telephones at Leavenworth, and that they are used "all the time" for "illegal purposes," including "drug operations." (*Id.* at 2802) Conway testified that there are "ten thousand calls a week" at Leavenworth, and there are only two prison employees to monitor those calls, so not all calls can be monitored. (*Id.*) Conway further testified that heroin is the "drug of choice" among inmates, and that it is smuggled in through the visiting room. (*Id.* at 2803) Conway testified that unspecified visitors wrap heroin in balloons, place them

95

Appellate Case: 08-1925     Page: 100     Date Filed: 07/17/2008 Entry ID: 3452810

in their mouths, and pass them to inmates while kissing. The inmate ingests the balloon, then passes it later. Conway, although not identifying himself as a lawyer, testified that he "prosecutes" five such cases per year. (*Id*. at 2804)

Conway testified that "lifers," those serving life in prison, are the biggest problem at Leavenworth because they will not be prosecuted for crimes. (*Id.*) At worst, they are moved to maximum security facilities at Marion, Illinois, or Florence, Colorado. (*Id*.) Conway testified that people who go to Leavenworth "remain violent." (*Id*.)

On re-direct examination, Conway testified that the "majority" of the inmates at Leavenworth with whom he has had problems are gang members who are collecting drug debts incurred inside or outside the institution. (*Id*. at 2811) Many inmates will not report crimes, so there are few prosecutions. (*Id*.)

In both its initial closing argument and in rebuttal, the prosecution argued the aggravating effect of inmate misconduct in prison and that Mr. Sinisterra would constitute a future danger as a result of the lack of security within the federal prison system. Assistant United States Attorney Valenti made the following reference to the lack of prison security:

> We know that crime does not stop once people get into the penitentiary system. We know that phone access allows continuing criminal enterprises to go on. Murders can be ordered from the prison. We know drug conspiracies can continue to run as well.

(*Id*. at 2888) In rebuttal closing argument, Assistant United States Attorney Miller stated that "[p]utting [Mr. Sinisterra] will not protect society. It will only change the venue of his activities and the name of his victims." (*Id*. at 2913) Miller then quoted Agent Conway for the proposition that people can "come in and do crimes in prison." (*Id*.) Trial counsel failed to object to these improper arguments, and appellate counsel failed to raise the claim on direct appeal.

96

Appellate Case: 08-1925     Page: 101     Date Filed: 07/17/2008 Entry ID: 3452810

### 3. Constitutional requirements of individualized sentencing and reliability.

The Eighth Amendment ban on cruel and unusual punishment has been held to require an individualized capital sentencing determination. In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court read its decisions in *Furman v. Georgia*, 408 U.S. 238 (1972), and *Gregg v. Georgia*, 428 U.S. 153 (1976), as requiring a narrowing of the class of offenders eligible for the death penalty and "a reasoned, *individualized* sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Marsh*, 548 U.S. at 173-74 (emphasis added). *See Clemons v. Mississippi*, 494 U.S. 748, 748 (1990)("The primary concern in the Eighth Amendment context has been that the sentencing decision be based on facts and circumstances of the defendant, his background and his crime."). A capital sentencer's consideration of an invalid aggravating factor deprives the defendant of an individualized sentencing determination. *See Sochor v. Florida*, 514, U.S. 527, 532 (1992) (citations omitted).

As a matter of Eighth Amendment jurisprudence, the Court has also stated that "the qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Due process also requires that a capital defendant be provided with an opportunity to challenge the accuracy and materiality of the evidence in aggravation amassed against him. See *Gardner v. Florida*, 430 U.S. 349, 356 (1977) (plurality).

Highly inflammatory hearsay evidence concerning generalized violence and lawlessness at a federal prison did not speak to Mr. Sinisterra, his personal characteristics, or his crime. As such, it constituted invalid and inadmissible non-statutory aggravation that deprived Mr. Sinisterra of the individualized capital sentencing determination required by the Eighth Amendment. In addition, Mr.

97

Sinisterra's counsel had no ability to challenge the accuracy or materiality of the information to which Agent Conway testified.

### 4. Reasonable jurists could debate correctness of lower court ruling.

The COA should issue on these claims first because this Court's decision in *Lee* assumed the reliability of the evidence defense counsel stipulated could be admitted at capital sentencing. 374 F.3d at 648-50 ("Rather, the admission of more rather than less evidence during the penalty phase increases reliability by providing full and complete information *about the defendant and allowing for an individualized inquiry into the appropriate sentence.*")(emphasis added). Here, Mr. Sinisterra's objection is that the information to which Agent Conway testified had nothing to do with Mr. Sinisterra and thus violated his Eighth Amendment right to an individualized sentencing determination. Conway did not even testify that he knew Mr. Sinisterra. Thus, the information could not have apprised the sentencing jury as to Mr. Sinisterra's character or background, or allowed for it to tailor the sentence to him and his offense.

Jurists of reason have issued decisions rejecting the admission at a capital sentencing hearing of evidence of prison security as it impacts an individualized capital sentencing determination. This Court must grant the COA to bring its considered judgment to the question as to whether evidence of generalized violence unrelated to a federal capital defendant is admissible at a capital sentencing hearing.

In *United States v. Edelin*, 180 F.Supp.2d 73 (D.D.C. 2001), the court cited various of the Supreme Court's Eighth Amendment decisions for the proposition that evidence of the defendant's past character in jail was "relevant to the defendant's character and his probable future conduct, and was therefore admissible to prove mitigation." *Id*. at 76. The court ruled inadmissible Bureau of

98

Prisons information and expert testimony concerning "the Bureau of Prisons' ability to effectively protect society from any future criminal acts by [the defendant]. *Id*. In so holding, the district court noted that "the law in this area is not firmly settled" and that each party had marshaled case law in support of its position with respect to whether general prison information not related to the defendant was admissible at the capital sentencing hearing. *Id*. That acknowledgment supports Mr. Sinisterra's argument that reasonable jurists could debate the correctness of the district court's decision to admit evidence of generalized violence and lawlessness within the federal prison.

Also consistent with the Supreme Court's Eighth Amendment jurisprudence, the Virginia Supreme Court has recognized that in capital sentencing, the "focus must be on the particular facts of [the defendant's] history and background, and the circumstances of his offense." *Burns v. Commonwealth*, 541 S.E.2d 872, 893 (Va. 2001). An inquiry concerning a capital defendant's future dangerousness "revolves around an individual defendant and a specific crime." *Id*. As such, "[e]vidence regarding the general nature of prison life in a maximum security facility is not relevant to that inquiry. . ." *Id*. As the court succinctly put it, "the relevant inquiry is not whether [the defendant] *could* commit criminal acts of violence in the future but whether he *would*." *Id*. (emphasis in original).

Agent Conway's testimony that others have committed crimes at Leavenworth was simply not probative of whether Mr. Sinisterra would commit crimes within the federal prison system. That evidence did not constitute an accurate predictor of Mr. Sinisterra's future dangerousness if he were sentenced to life in prison. That Mr. Sinisterra might find himself in close proximity to an inmate like Leonard Peltier who, if he killed at all, did so on an Indian reservation and not within the confines of a federal prison, does not speak to any likelihood that Mr. Sinisterra would commit a

99

violent act in prison.  The evidence was wholly inadmissible, and counsel rendered ineffective assistance in failing to object to its admission at the capital sentencing hearing.

The COA should also issue because the legal landscape has changed with respect to the right to confrontation, including, as is demonstrated below, at the "selection stage" of a capital sentencing hearing, and the requirement that juries find facts upon which a death sentence can be predicated. See *Crawford v. Washington*, 541 U.S. 36 (2004); *Ring v. Arizona*, 536 U.S. 584 (2002).  While Mr. Sinisterra's conviction became final a month before the United States Supreme Court's decision in *Crawford*, reasonable jurists could debate whether the "indicia of reliability" test that preceded it, the one in place since the decision in *Ohio v. Roberts*, 448 U.S. 56 (1980), should have required that Mr. Sinisterra's prosecutors actually produce the witnesses against him rather than produce Agent Conway, who merely served as a conduit for the admission of hearsay evidence, the reliability of which Mr. Sinisterra's counsel had no way to challenge.

One federal court has recently acknowledged that while courts have ruled federal confrontation rights under *Crawford* available for the death eligibility stage of capital trials, recent changes in the Supreme Court's Sixth, Eighth, and Fourteenth Amendment jurisprudence now require that witnesses be produced at the "selection stage" as well.  See *United States v. Sablan*, No. 00-cr-00531-WYD, 2008 WL 700172, at 1-3 (D. Colo. March 13, 2008) ("The Supreme Court has made clear since *Williams* [*v. New York*, 337 U.S. 241 (1949)] that death is different, that there is a need for reliable information at a capital sentencing hearing, and that there is a need for confrontation when there is constitutionally significant factfinding on the part of the jury.").  Under the FDPA, there are "trial-like procedures that require specific findings by the jury," including with respect to non-statutory aggravating factors.  *Id*. at 2.

Appellate Case: 08-1925     Page: 105     Date Filed: 07/17/2008 Entry ID: 3452810

Because the district court erroneously believed that the relaxed evidentiary standards of the FDPA permitted the admission of the hearsay described above without regard to whether it was relevant to Mr. Sinisterra and an individualized sentencing determination, the statute was applied unconstitutionally in this case. In addition, the district court's decision to deny relief on the claim of ineffective assistance of trial counsel for failing to object was premised on the court's finding that Agent Conway's testimony of generalized violence and lawlessness within the federal prison at Leavenworth was admissible under the statute. Clearly it was not. Because reasonable jurists could debate the correctness of the trial court's decision to admit Agent Conway's testimony, they too could debate whether trial counsel rendered ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984). For the above reasons, Mr. Sinisterra respectfully requests that the COA issue as to Claims 12.B and 12.E.10 & 11.

**D. Jurists of Reason Could Debate Whether Failure to Charge Statutory Aggravating Factors in the Indictment Violates the Constitution. Failure To Charge Statutory Aggravating Factors In The Indictment.**

Mr. Sinisterra was charged, *inter alia*, with aiding and abetting the use of a firearm in relation to a drug trafficking crime and the commission of murder in the perpetration of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), (j)(1) & 18 U.S.C. § 2, and with interstate travel with intent to commit murder for hire, in violation of 18 U.S.C. § 1958 & 18 U.S.C. § 2. The second superceding indictment, however, failed to allege on either of these counts at least one statutory aggravating factor from 18 U.S.C. § 3592(c), an element essential required under the Fifth and Sixth Amendments where imposition of a sentence of death is sought. As a result, the indictment failed to charge a federal capital offense, and Mr. Sinisterra's sentence exceeded the maximum sentence authorized for the crimes with which he was charged. In his § 2255 Petition, Mr. Sinisterra alleged

101

Appellate Case: 08-1925    Page: 106    Date Filed: 07/17/2008 Entry ID: 3452810

that his death sentences therefore violated his constitutional rights, and that his trial and appellate counsel were ineffective in failing to preserve this issue at trial and raise it on direct appeal. (Doc. 41, Claims 12.A, 12.E.9)

As this Court noted in *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005): "The indictment must charge at least one of the statutory aggravating factors that is ultimately found by the petit jury because that is what is required to elevate the available statutory maximum sentence from life imprisonment to death. In other words, including that factor in the indictment is required to make the defendant *eligible* for the death penalty." (emphasis in original) (citations and internal quotation marks omitted). *See also United States v. Allen*, 406 F.3d 960, 940 (8th Cir. 2005) ("[T]he Fifth Amendment requires at least one statutory aggravator and the *mens rea* requirement to be found by the grand jury and charged in the indictment"). There is no question that the indictment against Mr. Sinisterra "suffers a Fifth Amendment defect." *Allen*, 406 F.3d at 943.

The district court rejected the notion that this defect was structural error. *See* Order at 2. However, whether this is a structural defect that requires reversal is a question over which reasonable jurists could debate. Indeed, in *Allen*, even though this Court found that similar error in that case was not structural, the Court acknowledged that it could be "wrong" as to whether the list of structural errors enunciated in *Arizona v. Fulminante*, 499 U.S. 279 (1991), and *Neder v. United States*, 527 U.S. 1 (1999), was exhaustive. The Court thereby implicitly recognized that the issue was subject to debate by jurists of reason. *Allen*, 406 F.3d at 944-45.

Moreover, even if the question of prejudice from this defect is subject to a harmless error analysis, as suggested by the district court, *see* Order at 2, such a determination requires an inquiry into the evidence presented to the grand jury in order to assess whether sufficient information was

Appellate Case: 08-1925     Page: 107     Date Filed: 07/17/2008 Entry ID: 3452810

presented to it such that it could have found probable cause to charge Mr. Sinisterra with at least one of these aggravating factors. *See Allen*, 406 F.3d at 947-48 (examining testimony presented at grand jury to determine whether there was sufficient probable cause to charge defendant with statutory aggravating factors found by petit jury). Such an analysis has never been performed in Mr. Sinisterra's case. Indeed, because this claim was denied without a hearing, there is no evidence in the extant record with respect to what evidence was presented to the grand jury, and therefore, no evidentiary support for the district court's claim regarding what evidence the grand jury did or did not consider before indicting Mr. Sinisterra. Thus, this issue "deserve[s] encouragement to proceed further." *Miller-El*, 537 U.S. at 336.

The district court stated in its order that "although statutory aggravating factors were not specifically alleged in the indictment, the charges in Counts Two and Three of the indictment were part of the aggravating factors used by the petit jury to impose the death penalty." Order at 2. However, the three statutory aggravators found by the petit jury (pecuniary gain; substantial planning and premeditation; attempt to kill more than one person in a criminal episode) are sufficiently analytically distinct from the elements of the charged offenses themselves that jurists of reason could debate about whether facts underlying the statutory aggravators were considered by the grand jury. Given all of the above, jurists of reason could also debate whether trial and appellate counsel were ineffective for failing to challenge the defective indictment against Mr. Sinisterra. Thus, it is respectfully submitted that a COA should issue on this claim.

Appellate Case: 08-1925     Page: 108     Date Filed: 07/17/2008 Entry ID: 3452810

## V. CONCLUSION

For all of the foregoing reasons, a COA should issue in this case as to each of the claims discussed above.

Respectfully submitted,

/s/John Jenab
John Jenab, #47452
JENAB & MCCAULEY LLP
110 S. Cherry Street, Suite 200
Olathe, KS 66061
(913) 390-5023
(913) 764-5539 Fax

ATTORNEY FOR MOVANT
GERMAN C. SINISTERRA

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July, 2008, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/John Jenab

Appellate Case: 08-1925     Page: 109     Date Filed: 07/17/2008 Entry ID: 3452810