# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

No. 08-1925

## GERMAN C. SINISTERRA,

Petitioner-Appellant,

v.

## UNITED STATES OF AMERICA,

Respondent-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE GARY A. FENNER, DISTRICT JUDGE

## BRIEF FOR THE UNITED STATES

MATT J. WHITWORTH
  Acting United States Attorney

LAJUANA M. COUNTS
  Assistant United States Attorney

JEFFREY VALENTI
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri  64106
Telephone: (816) 426-3122

*Attorneys for Respondent-Appellee*

<u>**SUMMARY OF THE CASE**</u>

This Court has granted appellant German C. Sinisterra's certificate of appealability on four issues: "(1) Whether trial counsel rendered ineffective assistance of counsel by failing to retain and utilize a qualified mitigation expert; (2) Whether trial counsel rendered ineffective assistance by failing to conduct a thorough mitigation investigation and present available mitigation evidence to the jury; (3) Whether trial counsel rendered ineffective assistance by failing to investigate and present mental health evidence; and (4) Whether trial and appellate counsel were ineffective by failing to object to prosecutorial misconduct during closing argument." Sinisterra has chosen to consolidate the first three issues into one argument with subsections, with the fourth issue being his second argument. The Government will follow that format.

The affidavit of Sinisterra's lead trial counsel shows that the trial team provided effective assistance of counsel in all aspects. In preparation for trial, counsel utilized an investigator who acted as the "mitigation specialist," and defense counsel Jennifer Brewer also investigated Sinisterra's background by traveling to Colombia to interview Sinisterra's family. Furthermore, lead defense counsel Frederick Duchardt knew, prior to trial, about mitigating background incidents regarding Sinisterra's upbringing and some of that information, in the videotaped witness testimony, detailing Sinisterra's

-i-

Appellate Case: 08-1925     Page: 2     Date Filed: 09/15/2009 Entry ID: 3586258

childhood experience in Colombia was presented during the death penalty phase. Prior to trial, counsel had Sinisterra evaluated by a mental health expert who found that Sinisterra had no mental problems, and trial counsel made the strategic decision to not call a mental health expert at trial because the Government then would have had the right to have Sinisterra evaluated by an expert of their choice. Further, counsel presented testimony of Sinisterra's relatives in their homes in Colombia portraying the deplorable living conditions via videotapes, since Sinisterra's family members could not obtain visas to travel to the United States. Sinisterra's mother, who had told defense counsel about incidents in Sinisterra's childhood, however, could not travel to the United States to testify because of her severe heart condition.

Additionally, trial counsel did not object to the Government's closing arguments because such arguments were proper and did not amount to prosecutorial misconduct. First, although appellate counsel raised prosecutorial misconduct to at least the portion of the Government's closing argument about "familial love" during the penalty phase on appeal, this Court, although under plain error review, found that the Government's argument was not prejudicial enough to deprive Sinisterra of his constitutional rights to a fair penalty phase hearing and did not seriously affect the fairness, integrity or public reputation of the penalty phase hearing. In reviewing counsel's failure to object, this

-ii-

Appellate Case: 08-1925    Page: 3    Date Filed: 09/15/2009 Entry ID: 3586258

Court would have reached the same conclusion under an abuse of discretion standard of review, if these closing arguments had been objected to and overruled by the district court. Second, the Government's argument that the jurors should not *solely* base their verdict on the mitigating factor of Sinisterra's children's love for him, that is, to find that this love outweighs the aggravating factors, was not improper. Third, defense counsel Duchardt did not believe, and rightfully so, that the argument relating to the "conscience of the community" was objectionable because the rebuttal argument was targeted to this specific defendant and his vile acts.

Sinisterra asks for 90 minutes for oral argument, however, the Government believes that 30 minutes would be sufficient time for both parties to sufficiently address the issues raised.

Appellate Case: 08-1925     Page: 4     Date Filed: 09/15/2009 Entry ID: 3586258

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

SUMMARY OF THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ARGUMENTS

    I.    The district court properly denied Sinisterra's § 2255 motion, without having an evidentiary hearing, since the district judge presided over both the trial and § 2255 motion and had firsthand observations of the trial proceedings, Sinisterra's demeanor and trial counsels' actions, and affidavits established that Sinisterra's trial counsel provided effective assistance when they (a) knew of the violent incidents in Sinisterra's background that could be used as mitigating evidence, (b) hired an investigator who acted as a "mitigation specialist" and who investigated Sinisterra's family and friends in Houston, (c) presented some mitigating evidence through both live and videotaped testimony from Sinisterra's family members to the jury, and (d) conducted a reasonable investigation into Sinisterra's mental health, had him evaluated, with the conclusion that Sinisterra did not have any mental health issues . . . . . . . . . . 48

    II.    The district court also properly found that Sinisterra's trial counsel's representation was reasonable and effective

Appellate Case: 08-1925    Page: 5    Date Filed: 09/15/2009 Entry ID: 3586258

because (a) the Government's comments during closing arguments about "familial love" was proper and that portion of the closing argument was reviewed for plain error on appeal and affirmed by this Court and would pass muster even if it had been reviewed for an abuse of discretion, (b) the Government's argument that the jurors should not solely base their verdict on the mitigating factor of Sinisterra's children's love for him, that is, to find that this love outweighs the aggravating factors, was not improper; and (c) the Government's rebuttal closing argument about being the "conscience of the community" was directed to the specific evidence in Sinisterra's case, and was not a general emotional appeal to the jury, and thus, neither trial counsel nor appellate counsel, in not objecting to or raising this closing argument on appeal, provided ineffective assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Appellate Case: 08-1925     Page: 6     Date Filed: 09/15/2009 Entry ID: 3586258

# **TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Blackledge v. Allison*, 431 U.S. 63 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Copeland v. Washington*, 232 F.3d 969 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Copenhaver v. Bennett*, 355 F.2d 417 (8th Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Eddings v. Oklahoma*, 455 U.S.104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Forsyth v. Ault*, 537 F.3d 887 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 70

*Graham v. Dormine*, 212 F.3d 437 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 7, 79, 81

*Gregg v. Georgia*, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Holloway v. United States*, 960 F.2d 1348 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 51, 77

*Kingsberry v. United States*, 202 F.3d 1030 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 55

*Latorre v. United States*, 193 F.3d 1035 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 52, 78

*Lindhorst v. United States*, 585 F.2d 361 (8th Cir. 1978) . . . . . . . . . . . . . . . 54, 55, 56, 57

*Lockett v. Ohio*, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Marcrum v. Luebbers*, 509 F.3d 489 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Never Misses A Shot v. United States*, 413 F.3d 781 (8th Cir. 2005) . . . . . . . . . . . . 51, 77

*Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 88, 89

*Penry v. Lynaugh*, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Roll v. Bowersox*, 177 F.3d 697 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 84

*Rompilla v.* Beard, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . 52, 53, 58, 61, 62, 65

Appellate Case: 08-1925    Page: 7    Date Filed: 09/15/2009 Entry ID: 3586258

*Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 66, 69

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . 52, 58, 59, 60, 88

*Taylor v. United States*, 487 F.2d 307 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Aiello*, 814 F.2d 109 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Arvizu*, 270 F.3d 605 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 6, 54

*United States v. Beckman*, 222 F.3d 512 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . 7, 78, 94

*United States v. Davis*, 406 F.3d 505 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 52, 77

*United States v. Hernandez*, 436 F.3d 851 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 51, 77

*United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Lee*, 743 F.2d 1240 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*United States v. Nelson*, 297 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 77

*United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002) . . . . . . . . . . . 7, 26, 31, 44, 76, 81, 91

*United States v. Regenos*, 405 F.3d 691 (8th Cir. 2005) . . . . . . . . . . . . . . . . 53, 64, 71, 72

*Wadlington v. United States*, 428 F.3d 779 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 5, 57

*Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . 86, 87, 88, 93

*West v. Bell*, 550 F.3d 542 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 66

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 62, 66, 67, 69

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Winfield v. Roper*, 460 F.3d 1026 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Appellate Case: 08-1925     Page: 8     Date Filed: 09/15/2009 Entry ID: 3586258

# FEDERAL STATUTES

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21 U.S.C. § 853 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 1958 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 53, 54

18 U.S.C. § 924(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Pub. L. No. 94-426, § 1, 90 Stat. 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

# MISCELLANEOUS

31 Hofstra L. Rev. 913, 952 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Appellate Case: 08-1925    Page: 9    Date Filed: 09/15/2009 Entry ID: 3586258

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

No. 08-1925

## GERMAN C. SINISTERRA,

Petitioner-Appellant,

v.

## UNITED STATES OF AMERICA,

Respondent-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE GARY A. FENNER, DISTRICT JUDGE

## STATEMENT OF THE ISSUES

I.

Whether the district court properly denied Sinisterra's § 2255 motion, without having an evidentiary hearing, when the district judge presided over both the trial and § 2255 motion and had firsthand observations of the trial proceedings, Sinisterra's demeanor and trial counsels' actions, and the affidavit from Sinisterra's lead defense counsel stated that counsel (a) knew

-5-

Appellate Case: 08-1925     Page: 10     Date Filed: 09/15/2009 Entry ID: 3586258

of the violent incidents in Sinisterra's background that could be used as mitigating evidence, (b) hired an investigator who acted as a "mitigation specialist" and who investigated Sinisterra's family and friends in Houston, (c) presented some mitigating evidence through both live and videotaped testimony from Sinisterra's family members to the jury, and (d) conducted a reasonable investigation into Sinisterra's mental health, had him evaluated, with the conclusion that Sinisterra did not have any mental health issues.

### Cases

*United States v. Arvizu*, 270 F.3d 605 (8th Cir. 2001)

*Wadlington v. United States*, 428 F.3d 779 (8th Cir. 2005)

*Forsyth v. Ault*, 537 F.3d 887 (8th Cir. 2008)

*West v. Bell*, 550 F.3d 542 (6th Cir. 2008)

*Wiggins v. Smith*, 539 U.S. 510 (2003)

### II.

Whether the district court properly found that Sinisterra's trial counsel's representation was reasonable and effective when there was no objection to (a) the Government's comments during closing arguments about "familial love" and that portion of the closing argument was reviewed for plain error on appeal and affirmed by this Court and would pass muster even if it had been reviewed for an abuse of discretion, (b) the Government's

Appellate Case: 08-1925     Page: 11     Date Filed: 09/15/2009 Entry ID: 3586258

argument that the jurors should not solely base their verdict on the mitigating factor of Sinisterra's children's love for him – that is, to find that this love outweighs the aggravating factors; and (c) the Government's rebuttal closing argument about being the "conscience of the community" which was directed to the specific evidence in Sinisterra's case, and not a general emotional appeal to the jury.

## Cases

*United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002)

*United States v. Beckman*, 222 F.3d 512 (8th Cir. 2000)

*Roll v. Bowersox*, 177 F.3d 697 (8th Cir. 1999)

*Graham v. Dormine*, 212 F.3d 437 (8th Cir. 2000)

Appellate Case: 08-1925    Page: 12    Date Filed: 09/15/2009 Entry ID: 3586258

## STATEMENT OF THE CASE

On December 16, 1998, an indictment was returned charging defendants Plutarco Tello, German Sinisterra, Arboleda Ortiz, and Edwin Hinestroza with killing Julian Colon in connection with a cocaine conspiracy. Subsequently, a superseding indictment was returned on August 9, 1999, charging the defendants with: (1) conspiracy to distribute cocaine, a Schedule II controlled substance, in an amount of five kilograms or more, contrary to the provisions of 21 U.S.C. § 841(a)(1) and (b)(1)(A), all in violation of 21 U.S.C. § 846; (2) aiding and abetting the use of a firearm in relation to a drug trafficking crime and committing a murder in the perpetration of a drug trafficking crime, contrary to the provisions of 18 U.S.C. §§ 924(c)(1), 924(j)(1) and (2); and (3) knowingly traveling in interstate commerce with the intent that a murder for hire be committed, contrary to the provisions of 18 U.S.C. §§ 1958 and 2. Additionally, Sinisterra was charged with one count of criminal forfeiture, contrary to the provisions of 21 U.S.C. § 853.

Sinisterra, Ortiz, and Tello proceeded to trial by jury before the Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, on April 11, 2000. Hinestroza was a fugitive from justice and was not apprehended until February 2004. On April 27, 2000,

-8-

Appellate Case: 08-1925    Page: 13    Date Filed: 09/15/2009 Entry ID: 3586258

the jury returned guilty verdicts against Sinisterra, Ortiz and Tello on all the above charges.

The penalty phase against Sinisterra began on April 28, 2000, during which the Government requested imposition of the death penalty. On May 3, 2000, the jury returned the verdict that Sinisterra should receive sentences of death under Counts Two and Three of the second superseding indictment. Sinisterra was sentenced by this Court on December 18, 2000, to death on Counts Two and Three, and to 324 months in prison on Count One.

On May 4, 2000, Ortiz's penalty phase began, with the Government again requesting imposition of the death penalty. The Court read the initial jury instructions, explaining and describing the aggravating and mitigating factors the jury were to consider. Later that same day, the jury returned the verdict that Ortiz should also receive a sentence of death. On December 19, 2000, the court conducted a sentencing hearing for Ortiz. After argument, the Court ordered sentences of death on Counts Two and Three, and a sentence of 235 months in prison on Count One.

On May 8, 2000, Tello's penalty phase began, with the Government again asking for imposition of the death penalty. On May 10, 2000, the jury was unable to reach a unanimous sentencing decision and acknowledged that the Court should impose a sentence of life imprisonment without possibility

-9-

Appellate Case: 08-1925     Page: 14     Date Filed: 09/15/2009 Entry ID: 3586258

of release.  The Court sentenced Tello to life imprisonment on December 20, 2000, on Counts Two and Three, and to 235 months in prison on Count One.

Hinestroza's trial did not occur until October 31, 2005, with that jury returning guilty verdicts on Counts One, Two and Three from the fourth superseding indictment on November 14, 2005.  The jury, however, deadlocked during the death penalty phase, thereby making Hinestroza ineligible for a death sentence.  Hinestroza's sentencing hearing occurred on April 17, 2006.  He was sentenced to life imprisonment on Counts Two and Three, and to 400 months in prison on Count One.

## A.    *Trial Evidence*

In 1997, Heberth Andres Borja-Molina (hereinafter referred to as Borja) became actively involved in the cocaine trafficking activities of Edwin Hinestroza in Houston, Texas.  At that time, Borja was 16 years of age.  (T. Vol. VI at 1177.)[1]  Hinestroza's activities grew to include cocaine distribution in the Kansas City metropolitan area, where Borja distributed cocaine on his behalf for about one year to approximately five different individuals in the Kansas City area.  (T. Vol. VI at 1192-94.)  Borja collected proceeds from the sale of cocaine from the Kansas City area customers and

---

[1]"T. Vol." refers to the trial transcripts of both the guilt and death penalty phases.

Appellate Case: 08-1925     Page: 15     Date Filed: 09/15/2009 Entry ID: 3586258

provided these proceeds to Hinestroza.  (T. Vol. VI at 1192-93.)  Borja was assisted in these activities by his uncle, Julian Colon.  (T. Vol. VI at 1194.)  Borja stated that Hinestroza received shipments of approximately 5 to 50 kilograms of cocaine on a monthly basis.  (T. Vol. VI at 1194.)  According to Borja, cocaine shipments came from La Oficina, or the Office, located in Colombia, South America.  The Office shipped the cocaine to Jaime Hurtado, via Mexico.  (T. Vol. VI at 1181.)  Hurtado was Hinestroza's partner in Houston, Texas.  (T. Vol. VI at 1180.)  Once Hurtado received the cocaine in Houston, he gave it to Hinestroza to distribute.  (T. Vol. VI at 1183.)  Initially, Hinestroza distributed cocaine in the Houston Metropolitan Area.  (T. Vol. VI at 1188.)  However, Hinestroza became a target of various investigations in that area, so he decided to branch out his activities to include the Kansas City Metropolitan Area.  (T. Vol. VI at 1179.)

Hinestroza began, therefore, transporting cocaine from Houston to Kansas City.  (T. Vol. VI at 1188.)  This was done by utilizing several people, including: Airton Mosquera (a/k/a Botija); Shelly Anderson; Borja; Colon; and German Sinisterra.  (T. Vol. VI at 1189-90.)  These individuals used several vehicles to "mule" the cocaine to Kansas City.  (T. Vol. VI at 1203.)  Each of these vehicles contained false compartments.  (T. Vol. VI at 1182.)  Some of the compartments were located in door panels or behind

-11-

Appellate Case: 08-1925     Page: 16     Date Filed: 09/15/2009 Entry ID: 3586258

stereo speakers, but most were false compartments located within the vehicle's gas tank. (T. Vol. VI at 1182.) Once the cocaine was hidden in a vehicle, the vehicle was driven to Kansas City, usually by Shelly Anderson. (T. Vol. VI at 1188-89.) In Kansas City, the cocaine was distributed to one of Hinestroza's five major customers on a "front," or, in other words, the cocaine was provided on consignment. (T. Vol. VI at 1185-86.) The recipient of the cocaine was allowed several days to repay the fronted drug debt. (T. Vol. VI at 1185-86.) Borja indicated that fronted cocaine cost customers between $17,000 and $21,000 per kilogram. (T. Vol. VI at 1183.) When the fronted debt was repaid, all the money was collected and sent to Houston in one of the vehicles with false compartments. (T. Vol. VI at 1187-88.) Hinestroza maintained two stash houses in Kansas City, one was for money, the other for cocaine. (T. Vol. VI at 1199.)

As previously stated, this drug organization had five major cocaine customers. (T. Vol. VI at 1331.) The largest customer was Brian Thompson. (T. Vol. VI at 1184.) Thompson bought as many kilograms of cocaine as Hinestroza's organization could deliver. (T. Vol. VI at 1185.) Thompson usually paid $17,000 per kilogram because he was a good customer who repaid his debt quickly. (T. Vol. VI at 1184.) In December 1997, Thompson was arrested by the Federal Bureau of Investigation (FBI). ( T. Vol. VI at

-12-

Appellate Case: 08-1925    Page: 17    Date Filed: 09/15/2009 Entry ID: 3586258

1195.)  After serving numerous search warrants, Thompson was found in possession of 15 kilograms of cocaine, approximately $710,000, and numerous vehicles.  (T. Vol. VIII at 1811, 1818.)  The cocaine in Thompson's possession was all supplied by Hinestroza's organization.  (T. Vol. VIII at 1810.)

After Thompson was arrested, Hinestroza continued to supply cocaine to different customers within the Kansas City area.  (T. Vol. VI at 1329.)  The two major customers then became Percy Smith (a/k/a "Y.C.") and Fabio Montano (a/k/a Fernando or Fercho).  (T. Vol. VI at 1329-31.)  At this time, Hinestroza received for distribution approximately 10 to 50 kilograms of cocaine in a month.  (T. Vol. VI at 1191.)

Edwin Hinestroza lived in Kansas City with Monica Osma, who is the sister of Julian Colon and the maternal aunt of Borja.  (T. Vol. VI at 1200.)  On November 19, 1998, the apartment Hinestroza and Osma shared was robbed.  (T. Vol. VI at 1200.)  Reportedly, the apartment was robbed by two unknown males who tied and beat Monica Osma and demanded to know where she kept the money.  (T. Vol. VIII at 1758.)  After being beaten, Osma told the intruders that the third stair on the staircase contained a false compartment in which money could be found.   (T. Vol. VIII at 1758.)  The apartment was ransacked, with approximately $240,000 being stolen.  (T.

-13-

Appellate Case: 08-1925     Page: 18     Date Filed: 09/15/2009 Entry ID: 3586258

Vol. VI at 1201.) Osma was found bound within the apartment. (T. Vol. VI at 1196.) She was sent to Houston to recover from her injuries, which required hospital attention. (T. Vol. VI at 1202.)

Amparo Molina, Monica's sister, picked Osma up from the airport in Houston. (T. Vol. VIII at 1689.) On Thanksgiving Day, November 26, 1998, Osma was visited at her sister's apartment by Edwin Hinestroza, Jaime Hurtado and two Colombian males. (T. Vol. VIII at 1693, 1754.) One of the Colombian males was identified as Arboleda Ortiz by Amparo Molina (T. Vol. VIII at 1700-01), while the other was identified as Plutarco Tello by Edward Ortiz. (T. Vol. VIII at 1694.) During this meeting, the Colombians, who purported to represent "La Oficina," or the drug cartel, began questioning Osma regarding how the money in the apartment robbery had been taken. The man identified as defendant Tello asked numerous questions. Questioning continued and the Colombians asked to see photographs and hospital reports detailing Osma's injuries. (T. Vol. VIII at 1693-94.) Apparently not satisfied with Osma's story or injuries, the Colombians stated "Muracco." (T. Vol. VIII at 1695.) Roughly translated, this is a death threat which means that if a dead body does not appear, the people at the office are not going to be satisfied. (T. Vol. VIII at 1695.) The Colombians continued by claiming that they were going to be required to

-14-

Appellate Case: 08-1925    Page: 19    Date Filed: 09/15/2009 Entry ID: 3586258

come to Kansas City to tie someone up and find the money.   (T. Vol. VIII at 1759.)  As everyone left Amparo Molina's apartment, Edward Ortiz saw German Sinisterra on the street outside the apartment.   (T. Vol. VIII at 1761.)  Sinisterra was known by Edward Ortiz as someone who would "smoke somebody."   (T. Vol. VIII at 1774.)

Back in Kansas City on November 28, 1998, Edwin Hinestroza asked Borja and Colon to accompany him to the Drury Inn, at I-435 and Metcalf Avenue, Overland Park, Kansas, where they were to meet with three Colombian males.  (T. Vol. VI at 1217.)  Borja identified these individuals as German Sinisterra, Arboleda Ortiz, and Plutarco Tello, when he was shown photo spreads by Kansas City, Missouri Police Department detectives.  (T. Vol. VI at 1299-1302.)  Borja related that he previously met Sinisterra and Ortiz in Houston and knew them as associates of Hinestroza.  (T. Vol. VI at 1216-17.)  In particular, Sinisterra was known by Borja as a killer, because Sinisterra had told Borja in the past that he would kill someone cheaply.  (T. Vol. VI at 1218-20.)  Borja testified that Sinisterra served as Jaime Hurtado's right hand man and Ortiz served in the same capacity for Fabio Montano.  (T. Vol. VI at 1190,  1216.)  Hinestroza told Borja that the three Colombians would accompany them to meet with one of Hinestroza's local distributors, a male known as Percy Smith or "Y.C." for the purpose of selling him over one

-15-

Appellate Case: 08-1925     Page: 20     Date Filed: 09/15/2009 Entry ID: 3586258

kilogram of fake cocaine.  (T. Vol. VI at 1222-23.)  This deal was a sham that was devised because Hinestroza told Borja that he believed "Y.C." was responsible for the theft of approximately $240,000 in drug proceeds from his apartment.  (T. Vol. VI at 1211-13.)  Hinestroza told Borja that the Colombians they were meeting had been hired to help collect the debt.  (T. Vol. VI at 1212.)  When speaking about the three Colombian males, Hinestroza said "they always send people that hurt people for a living."  (T. Vol. VI at 1212.)  Borja, Colon, Hinestroza, and the Colombians met at and departed from the Drury Inn.  (T. Vol. VI at 1221-22.)

After meeting with "Y.C." at an unknown location in Kansas City, Missouri, the makeshift group followed "Y.C." to a second house, also in Kansas City, Missouri, which was approximately five minutes away.  (T. Vol. VI at 1222-24.)  At this house, "Y.C." immediately departed while Hinestroza and the three Colombian males went into the residence.  (T. Vol. VI at 1224-25.)  Once inside, Hinestroza and the Colombian males put handguns to both Borja's and Colon's heads.  (T. Vol. VIII at 1225.)  Borja and Colon were then bound with duct tape and physically assaulted by all four individuals.  (T. Vol. VI at 1226-28.)  As the Colombians continued beating Borja and Colon, they demanded to know where the money was, referencing the lost drug proceeds of approximately $240,000.  (T. Vol. VI at

-16-

Appellate Case: 08-1925     Page: 21     Date Filed: 09/15/2009 Entry ID: 3586258

1226-27.)  The Colombian identified as Tello demanded, "Where's my $300,000, where?"  (T. Vol. VI at 1226-27.)  As the beatings continued, so did the demands, taunts, and threats of death.  (T. Vol. VI at 1227.)  Borja was dragged to the basement of the residence by one of the Colombian males and could hear his uncle, Julian Colon, screaming upstairs from his location in the bathroom.  (T. Vol. VI at 1228.)  Borja overheard Hinestroza order the Colombian males to "shoot him in the head," and then heard, "shoot the other one, too."  Shortly thereafter, Borja heard a single gunshot and Colon stopped screaming.  (T. Vol. VI at 1229.)

As Borja laid in the basement, he heard footsteps come down the stairs, followed by the sound of a gunshot and loud ringing in his ears.  (T. Vol. VI at 1229.)  Initially, Borja believed he was dead, but realized that in fact he was not; whereupon he pretended to be dead in order to survive.  (T. Vol. VI at 1230-31.)  Hinestroza and the other Colombians then carried Borja to the trunk of a vehicle where they deposited his body alongside Colon's.  (T. Vol. VI at 1231.)  The vehicle was driven to Swope Park, where it and the bodies were abandoned.  (T. Vol. VI at 1230-32.)

By kicking the inside of the trunk and fidgeting with the lock, Borja managed to escape the vehicle and observed Colon still in the trunk of the car surrounded by a large amount of blood.  (T. Vol. VI at 1231, 1233.)  Borja

-17-

Appellate Case: 08-1925     Page: 22     Date Filed: 09/15/2009 Entry ID: 3586258

retrieved a shotgun and ran to the street in an attempt to get to a phone. (T. Vol. VI at 1234.) After abandoning the shotgun, Borja was picked up by a van driven by Bernie Hiller. (T. Vol. VI at 1234.) Borja was taken to the Metro Plaza Shopping Mall where he called Savannah Colon, wife of Julian Colon. (T. Vol. VI at 1235.) Savannah Colon responded to Borja's location and helped transport Julian Colon to Menorah Medical Center where she and Borja were contacted by police. (T. Vol. VI at 1237-38.) Police noted that the victim was lying in the back seat; that there was a lot of blood around him; and that his hands, feet, mouth, and eyes were bound with duct tape. (T. Vol. VII at 1502.) The victim was pronounced dead at the hospital. (T. Vol. VII at 1501-02.)

Borja told police what had occurred and further related that earlier that evening he and Colon had met their attackers at the Drury Inn, located at I-435 and Metcalf Avenue. (T. Vol. VI at 1217.) Borja also stated that their attackers were driving a black Mazda pickup truck. (T. Vol. VI at 1218.) Savannah Colon informed police that her now deceased husband had called her earlier in the evening and asked her to take down a Texas license plate number. (T. Vol. VII at 1620-22.) Savannah testified that Colon had called with the license plate and told her if anything happens to me you know what happened. This license plate number was identified as belonging to suspect

-18-

Appellate Case: 08-1925     Page: 23     Date Filed: 09/15/2009 Entry ID: 3586258

German Sinisterra. (T. Vol. VII at 1607-08.) Police went to the Drury Inn and found a vehicle that matched Borja's description. (T. Vol. VII at 1478-79.) As police maintained surveillance on the Mazda pickup, a Lexus pulled in behind it. (T. Vol. VII at 1479.) Three black males got out of the Lexus, with two of these individuals getting into the Mazda pickup, and the other going into the hotel. (T. Vol. VII at 1480.) The Lexus drove out of the Drury Inn parking lot, followed by the black males who had entered the Mazda pickup. A short time later, the Mazda pickup returned and parked in the exact same spot. Officers approached and took two suspects into custody, each without incident. (T. Vol. VII at 1480.) The two suspects were identified as German Sinisterra and Arboleda Ortiz. (T. Vol. VII at 1482-83.) The third suspect, Plutarco Tello, was taken into custody without incident a few hours later inside the hotel. (T. Vol. VII at 1485-86.) A subsequent search of Tello's room, Room #433, revealed a Stallard 9mm handgun and rubber gloves. (T. Vol. VII at 1583-86.)

On November 29, 1998, Special Agent (SA) Amy Hess (FBI) accompanied Borja to his apartment in Overland Park, Kansas, where he provided SA Hess with several notebooks and pieces of paper containing names and telephone numbers of individuals Borja identified as drug customers. (T. Vol. IX at 2041-44.) Additionally, Borja identified three

-19-

sheets of paper as drug ledgers which depicted the quantity of drugs delivered to, and money received from, several local customers.  (T. Vol. VIII at 1282-84.)  Later that day, SA Hess accompanied Borja to the Hawthorne On The Lake Apartments, located in Overland Park, Kansas.  (T. Vol. IX at 2032.)  At this apartment complex, Borja pointed out one apartment as Fabio Montano, a/k/a Fernando's, primary residence.  (T. Vol. IX at 2033.)  This apartment was identified as 5219 West 119th Terrace, Apt. 114, Overland Park, Kansas.  (T. Vol. IX at 2036.)  Parked in front of the apartment was a newer model, dark-colored Lexus bearing Kansas license plate MVH-811, which Borja identified as Fabio Montano's car.  (T. Vol. IX at 2033.)

On November 29, 1998, Sinisterra, Ortiz and Tello were located and arrested.  (T. Vol. VII at 1505-09.)  Sinisterra and Ortiz were advised of their rights under the Vienna Convention by Chief John Douglas of the Overland Park, Kansas Police Department.  (T. Vol. VII at 1496.)  Sinisterra was interviewed first and advised of his constitutional rights per *Miranda*.  (T. Vol. VII at 1518.)  He waived his rights and provided a videotaped statement. In that statement, Sinisterra admitted that he shot Julian Colon.   (T. Vol. IX at 2077.)

Interviews were also conducted with Ortiz and Tello.  (T. Vol. IX at 2077.)  Each was advised of his constitutional rights per *Miranda*, then

-20-

Appellate Case: 08-1925     Page: 25     Date Filed: 09/15/2009 Entry ID: 3586258

waived those rights.  (T. Vol. VII at 1529, 2115-16.)  Both suspects admitted coming to Kansas City to do a job and each admitted his presence during the beating and taping of Colon and Borja.  (T. Vol. IX at 2082-84, 2123, 2134-37.)  Moreover, each suspect admitted being present during the shooting of Colon and Borja, but denied being the actual shooter.  (T. Vol. IX at 2082, 2084, 2123, 2134-37.)  Notably, each of the three suspects believed Borja to be dead at the time their statements were given to police.  (T. Vol. IX at 2077, 2084, 2136.)  Sinisterra, Ortiz, and Tello each confirmed that Hinestroza had employed them to participate in the beating and shooting, with a promise of paying them $3,000 to split three ways.  (T. Vol. IX at 2082, 2097, 2134.)

On November 30, 1998, Borja contacted Detective Kevin Kilkenny with the Kansas City Police Department.  (T. Vol. VI at 1240.)  Borja related that he had driven around the Swope Park and Prospect areas in an attempt to find the house where he had been beaten and his uncle killed.  (T. Vol. VI at 1239-40.)  Borja indicated that he found the house, which was 5823 Prospect. A State of Missouri search warrant was obtained for this residence.  (T. Vol. V at 1086.)  Borja had earlier told Detective Kilkenny that on the night of the murder, he had been wearing a Georgetown baseball hat.  (T. Vol. V at 1093.)  A subsequent search of 5823 Prospect revealed Borja's Georgetown

-21-

Appellate Case: 08-1925     Page: 26     Date Filed: 09/15/2009 Entry ID: 3586258

ball cap and several other items of evidence, to include: carpet with blood; linoleum with blood; duct tape with hair and blood; duct tape wrappers, rubber gloves; and a bullet fragment from the basement where Borja was shot at. (T. Vol. V at 1091-96, 1102.)  Subsequent to these findings, Luminol was sprayed throughout the house. (T. Vol. V at 1101.)  The Luminol displayed a bright luminescence throughout the house, exhibiting special brightness in the bathroom. (T. Vol. VI at 1151-52.)  The Luminol reaction indicated that Colon had been executed in the bathroom, then dragged out of the house. (T. Vol. VI at 1148-49.)  It also appeared that an attempt to clean the blood had been made. (T. Vol. IX at 2022.)  By examining tax records, 5823 Prospect has been determined to be owned by Percy Smith (a/k/a "Y.C."). (T. Vol. VII at 1598-99.)

An autopsy revealed that Colon died from a single gunshot wound to the head. (T. Vol. IX at 1973.)  DNA testing revealed that blood matching the genetic profile of the victim, Julian Colon, was found on the shirt of German Sinisterra and the blue jeans of Arboleda Ortiz. (T. Vol. IX at 2005-08.)  Additionally, carpet samples recovered from 5823 Prospect contained blood matching the genetic profile of Julian Colon. (T. Vol. IX at 2007.)

**B.**   ***Sentencing Hearings***

-22-

On December 18, 2000, the court conducted a sentencing hearing for Sinisterra. The district court took into account the evidence offered at trial and also heard the testimony of Jose Gomez, Consul General from the office of the Colombian Consulate, located in Chicago, Illinois, on a perceived violation of the Vienna Convention on Consular Relations. (S.T. 2-11.)[2] After hearing argument, the court ordered sentences of death on Counts Two and Three and a custodial sentence of 324 months' imprisonment on Count One. (S.T. 8-22.)

On December 19, 2000, the court conducted a sentencing hearing for Ortiz. The district court took into account the evidence offered at trial and overruled Ortiz's objection to drug quantity calculations attributable to him and also to Ortiz's objection of not getting a reduction for minimal participation. (S.T. 5-7.) Additionally, the court took notice of Jose Gomez's testimony from the day earlier to make Ortiz's alleged Vienna Convention violation a matter of record. (S.T. 17-18.) After hearing argument, the court ordered sentences of death on Counts Two and Three and a custodial sentence of 235 months' imprisonment on Count One. (S.T. 21-24.)

---

[2]"S.T." refers to the sentencing hearing transcripts.

-23-

Appellate Case: 08-1925    Page: 28    Date Filed: 09/15/2009 Entry ID: 3586258

On December 20, 2000, the court conducted a sentencing hearing on Tello. Once again, the court took into account the evidence offered at trial and overruled Tello's objection to drug quantity calculation. (S.T. at 3-5.) Tello sought a downward departure for aberrant behavior, which likewise was denied. (S.T. at 6.) After argument, the Court ordered sentences of life on Counts Two and Three, and a sentence of 235 months' imprisonment on Count One. (S.T. at 7-8.)

On April 17, 2006, conducted a sentencing hearing on Hinestroza, who had a separate jury trial, which occurred in 2005. The court conducted a sentencing hearing for German Hinestroza and since the jury did not recommend the death penalty for Hinestroza, the district court imposed a life sentence on Counts Two and Three, and a sentence of 400 months' imprisonment on Count One.

## C.  *Direct Appeals*

Tello filed a notice of appeal in a timely manner, which was consolidated by order of the Eighth Circuit with co-defendants Sinisterra and Ortiz's appeals. The various appeals raised a multitude of issues, that when grouped together are summarized as follows: (1) the district court conducted a constitutionally insufficient examination of jurors during jury selection; (2) the district court failed to suppress statement taken in violation of the rule in

-24-

*Miranda*, and/or in violation of the Vienna Convention on Consular Relations; (3) the district court failed to grant severance; (4) the district court improperly instructed the jury on the applicable law; (5) the district court failed to *sua sponte* order a mistrial based on government arguments made during closing argument; (6) the district court failed to grant a motion for directed verdict; and (7) the district court erred in allowing the Government to use gruesome photographs.

On November 5, 2002, this Court issued its opinion, wherein the district court was affirmed in all respects. *United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002). The Supreme Court denied the petition for certiorari.

### D. *Section 2255 Motion Proceedings*

On December 7, 2004, Sinisterra filed a § 2255 motion, and on March 1, 2006, filed an amended § 2255 motion in which he alleged a total of 18 grounds for relief. (Civ. D.E. 11, 41.)[3] There were seven individual substantive claims and eleven ineffective assistance of counsel claims. The Government filed its response on December 8, 2006. (Civ. D.E.53.) Sinisterra filed a reply on October 31, 2007, but the district court denied

---

[3]"Civ. D.E." refers to the docket entry report number in Sinisterra's civil matter.

-25-

Sinisterra's § 2255 motion, without having an evidentiary hearing, in an order dated December 14, 2007.  (Civ. D.E. 68, 60.)

Sinisterra then filed a motion to alter judgment pursuant to Rule 59(e) on December 31, 2007.  (Civ. D.E. 71.)  After the Government filed its suggestions in opposition (Civ. D.E. 74), the court denied Sinisterra's motion on February 20, 2008.  (Civ. D.E. 75.)  Sinisterra filed a timely notice of appeal, and motion for a certificate of appealability on April 18, 2008.  (Civ. D.E. 76, 78.)  The district court denied Sinisterra's motion for a certificate of appealability on the same day.  (Civ. D.E. 80.)

This Court, however, issued an order on July 24, 2008, granting Sinisterra's certificate of appealability on four issues: (1) whether trial counsel rendered ineffective assistance of counsel by failing to retain and utilize a qualified mitigation expert; (2) whether trial counsel rendered ineffective assistance by failing to conduct a thorough mitigation investigation and present available mitigation evidence to the jury; (3) whether trial counsel rendered ineffective assistance by failing to investigate and present mental health evidence; and whether trial and appellate counsel were ineffective by failing to object to prosecutorial misconduct during closing argument.

Appellate Case: 08-1925     Page: 31     Date Filed: 09/15/2009 Entry ID: 3586258

## STATEMENT OF THE FACTS

On November 28, 1998, German Sinisterra shot and killed Julian Colon as part of a drug related dispute. Shortly after the crime, he was arrested by police officers and confessed. (Appx. 246.)[4] He was indicted on three federal counts, and the Government decided to seek the death penalty. (Appx. 236.) The court appointed Frederick Duchardt to serve as Sinisterra's lead trial counsel, and Duchardt asked Jennifer Brewer[5] to serve as co-counsel. (Appx. 209-10.) Duchardt had previously handled one federal capital case and four state capital cases, while Brewer had previously tried state capital cases as a Missouri Public Defender, served as co-counsel on a federal capital case, and handled federal capital habeas actions. (Appx. 209-10.)

### A. *Mitigation Investigation and Mental Health Expert*

#### 1. Mitigation Specialist

Duchardt hired Daniel J. Grothaus to act as a mitigation specialist and investigate issues related to both the guilt and penalty phases of Sinisterra's trial and to assist with work typically performed by a mitigation specialist.

---

[4]"Appx." refers to the Appendix to Sinisterra's brief.

[5]Jennifer Brewer is now Jennifer Herndon, and she will be referred to as "Brewer" in this brief.

-27-

Appellate Case: 08-1925     Page: 32     Date Filed: 09/15/2009 Entry ID: 3586258

(Appx. 210.) Duchardt believed that Grothaus was "qualified, even more than those who often act as 'mitigation specialists' to take on the multi-faceted tasks that confronted [Sinisterra's counsel] as concerned investigation of both phases of the trial." (Appx. 211.) Grothaus had worked as a private investigator and had been an investigative journalist with the Houston Chronicle. (Appx. 210.) He was trained in human relations and had extensive connections with and knowledge about the Houston area, where Sinisterra lived. (Appx. 210.)

Grothaus interviewed Sinisterra's friends and family members in Houston, who provided him with a sense of Sinisterra's life and family relationships. (Appx. 313.) He was paid $13,836.36 for his work on the mitigation phase, at a rate of $45 per hour. (Appx. 119, 211.) Duchardt "took the lead on developing mitigation evidence from the Houston, Texas area, particularly with the Sinisterra extended family there" and worked with these witnesses to develop their testimony. (Appx. 215, 218.) He also obtained mitigation testimony from Joe Brandenburg, an expert on prison issues. (Appx. 184.) Sinisterra's counsel attempted to obtain records from his childhood in Colombia, but *no records were available*. (Appx. 219.)

Plans were made to bring these witnesses to the United States (Appx. 218), and Sinisterra's counsel "took all appropriate steps to assist the

-28-

Appellate Case: 08-1925   Page: 33   Date Filed: 09/15/2009   Entry ID: 3586258

witnesses in timely applying for entry visas." (Appx. 219.)  They believed either that these visas would be granted or that Sinisterra would have a strong issue for appeal.  (Appx. 219.)  However, Sinisterra's mother would have been unable to travel to the United States because of her "severe heart condition" even if visas had been granted.  (Appx. 219.)

Approximately two months before Sinisterra's trial, his counsel was advised that the mitigation witnesses from Colombia would not be allowed to enter the United States and counsel decided to replace their live testimony during the penalty phase with videotaped interviews which Brewer made when she traveled to Buenaventura, Colombia, in March 2000.  (Appx. 220.)  When the videotapes were transferred  to VHS format, the quality of the videotapes lessened.  (T. Vol. XIV at 2671, 2743.)  Nevertheless, Brewer used these videotapes to show the jury that Sinisterra had lived in deplorable and horrendous poverty and lacked an education.  (T. Vol XV at 2895-97.)  As this Court stated in its opinion from Sinisterra's direct appeal, the videotapes were sufficient to allow Sinisterra to inform the jury of his family background and "[t]he video testimony also had certain advantages over live testimony; defendants were able to edit the tapes, and the tapes showed visually the poverty of defendants' village and family background." *United States v. Ortiz*, 315 F.3d 873, 904 (8th Cir. 2002).

-29-

Duchardt did not hire a "mitigation specialist" to travel to Colombia and to act as a forensic social worker to testify at Sinisterra's trial. (Appx. 221-22.) Duchardt's trial strategy was based on his belief that it would be more effective to present information from Sinisterra's family members directly rather than rely on a forensic social worker. (Appx. 222.) Nevertheless, he searched for a forensic social worker who was familiar with Colombia but was unable to identify such a person. (Appx. 222.)

### 2. **Mental Health Expert**

Sinisterra's counsel had Sinisterra evaluated by Dr. Warren Wheelock, a professor of education at the University of Missouri-Kansas City, to determine whether Sinisterra had the ability to understand his *Miranda* waiver. (Appx. 165-66.) Dr. Wheelock determined that Sinisterra had an IQ of 75, which is borderline deficient in written report six months prior to trial. (Appx. 165.) Dr. Wheelock testified at a pretrial hearing, but not during either the guilt or penalty phases of Sinisterra's trial, about Sinisterra's low IQ. (Appx. 165.) During the guilt phase of trial, Dr. Wheelock testified about his findings of Sinisterra's intellectual capacity and his language and literacy levels. (T. Vol. X at 2251-73.)

Prior to trial, Duchardt had Sinisterra evaluated for mental health problems by Dr. Enrique Dos Santos, a Spanish-speaking psychiatrist who

-30-

Appellate Case: 08-1925    Page: 35    Date Filed: 09/15/2009 Entry ID: 3586258

was Clinical Director of the Fulton State Hospital.  (Appx. 225.)  Dr. Dos Santos, in an oral report, told Duchardt that Sinisterra had no mental problems, and in light of that finding Duchardt stated in his affidavit that, "I did not pursue the matter further."  (Appx. 225.)  Even after reading the report of Dr. Llorente, the neuro-psychologist hired by post-conviction counsel, which was appended to Sinisterra's amended § 2255 pleading, Duchardt stated that he was not sure whether he would have used that report because of "its lack of strength."  (Appx. 225.)  Further, Duchardt explained that "[h]ad we relied on such an expert, it would have permitted evaluation of Mr. Sinisterra by a mental health expert of the government's choosing. Being familiar with the sorts of experts regularly relied upon by the government, I believe that the evidence from such an expert would likely be quite damaging, so as to counterbalance whatever benefit would be gained by Dr. Llorente's opinions."  (Appx. 225-26.)

**B.** *Government's  Closing Arguments*

The jury found Sinisterra guilty on all counts.  (T. Vol. XII at 2550.) During the penalty phase, Sinisterra's counsel presented ten mitigation witnesses, some via videotape filmed in Colombia, including two correctional officers, a probation officer, Sinisterra's wife, his mother, one of his daughters, the mother of this daughter, two friends of the family, and a

-31-

former employer.  (Sinisterra Brf. 16-18.)  The jury also viewed another videotape of another one of Sinisterra's daughters.  (Sinisterra Brf. 17.)

During closing argument in the death penalty phase, the prosecutor noted, in talking generally about the mitigating and aggravating factors, that "people are defined by their actions" of good work, such as Ghandi, and bad work, such as Hitler.  (T.Vol. XV at 2882.)  After talking about the "victim impact" on Julian Colon's family and the Molina family, the prosecutor talks about the jury weighing the mitigating and aggravating factors – saying you need to assess that value and assign a value and weight to these aggravating circumstances, these six aggravating circumstances outweigh this man's family's love.  The prosecutor argued that in Sinisterra's case a family's love does not outweigh his vile acts, just as the families of people like Jeffrey Dahmer, Charles Manson and Adolph Hitler loved them, Sinisterra's family's love "alone does not outweigh the vile act, the premeditation, the fact that he was willing for monetary purposes to kill another human being, those things will never outweigh his action of November 28, 1998."  (T. Vol. XV at 2891.)

After Sinisterra's counsel's closing statement, the prosecutor, on rebuttal argued:

-32-

Appellate Case: 08-1925      Page: 37      Date Filed: 09/15/2009 Entry ID: 3586258

The octopus when in danger shoots out a dark ink into the water; shoots it out into the water so it can escape. If it doesn't get out of that, it shoots, it's fatal, the octopus dies. And that's what mitigation evidence is in this case. Ladies and gentlemen, it's a smoke screen. It's that ink. He's the octopus. What he wants is to escape in this case, he wants to escape justice.

This case, ladies and gentlemen, is not about this. Has nothing to do about that. *What this case has to do is, this is what this case is about. It's taking a thousand dollars to put a gun to somebody's head to blow their brains out. They don't want you to think about that but that's what it is.*

Sometimes, ladies and gentlemen, we have come to points in our lives that define you. November 28, 1998, defines German Sinisterra, when he could have walked away, he didn't have to come from Houston to Kansas City. He made a choice. And when he got here he still had the choice to leave. He still had the choice to go somewhere else. *No, his lust for a thousand dollars was more important than the life of another human being.*

*Ladies and gentlemen, this case is about this. That's what this case is about.* Ladies and gentlemen, remember this. This was worn by another human being, this red stained, this is blood. That duct tape, that was the duct tape that was around Julian Colon, that's what this case is about. This is what defines German Sinisterra.

\* \* \* \*

Ladies and gentlemen, this case is about cold premeditated murder. Counsel talked to you about the children of German Sinisterra. *And regardless of what she said she wants sympathy from you. There is no doubt, there is no doubt those children are deserving of sympathy, they are victims but they are victims of what this defendant has done. It would be wrong, ladies and gentlemen, it would be wrong to base your verdict on how they feel.*

-33-

Appellate Case: 08-1925   Page: 38   Date Filed: 09/15/2009 Entry ID: 3586258

* * * *

> You, as jurors, however are not hurting anybody by *following the law and rendering a just verdict* as Mr. Valenti told you. Don't be manipulated in that way.

(T. Vol. XV at 2906-08.) (Emphasis added.)

Neither Brewer nor Duchardt objected to these statements. (Appx. 223.)

Sinisterra argues that several other statements made by prosecutors were improper. Early in his closing argument during Sinisterra's penalty phase, the prosecutor told the jury:

> *[Sinisterra's] actions necessitated a reaction* and that reaction is a court of law having a trial where issues are talked about and argued about and *where you twelve people, the conscience of this community come together and make a decision of what is just.*

(T. Vol. XV at 2881.) (Emphasis added.)

In ending his penalty phase closing argument, the prosecutor stated,

> You can have the courage to act *as the conscience of the community, to weigh the fact, to apply the law and to determine no matter how much [Sinisterra's] family may love him what he did on November 28, 1998 shall never be repeated* and send a message to all other drug dealers that this community will not tolerate it.

(T. Vol. XV at 2892.) (Emphasis added.)

During rebuttal closing argument, the prosecutor stated:

-34-

Appellate Case: 08-1925   Page: 39   Date Filed: 09/15/2009 Entry ID: 3586258

Ladies and gentlemen, decent people, decent citizens, fear for their lives because of drug traffickers like German Sinisterra. We cannot forget he was a member of a very efficient but unforgiving cocaine distribution organization and American society is a much different place than it was 50 years ago because of the German Sinisterra's of the world.

It is time to turn the tables on drug traffickers like this defendant. *Finish the message that you began with your verdict of guilt in this case. Tell this defendant* and those like him that murder will not be tolerated especially murder committed to further drug trafficking schemes. There is no worse crime. As you sit there you are not just twelve people. You are, like Mr. Valenti told you, the conscience of the community and you have a unique opportunity to make a difference. You have a unique opportunity to send a message. Don't squander that opportunity. Have the courage to do the right thing.

\* \* \* \*

German Sinisterra believes by his actions that murdering couriers over a drug debt is just a part of doing business. *Tell him he's wrong* and tell the other drug traffickers of the world if they come to Kansas City they are going to be dealt with in the most severe way, they are going to receive a sentence of death.

(T. Vol. XV at 2910-11.) (Emphasis added.)

Sinisterra's counsel did not object to these statements. (Appx. 306.)

The jury weighed both aggravating and mitigating factors and then determined that the death penalty should be imposed. (Appx. 26-51.)[6]

---

[6]The Government mistakenly included in its response to Sinisterra's § 2255 motion, and the district court in its Order, that the jury found that Sinisterra's "lack of guidance and support as an adolescent made him an easy (continued...)

-35-

Appellate Case: 08-1925    Page: 40    Date Filed: 09/15/2009 Entry ID: 3586258

## C. *Sinisterra's Background and Mental Health*

After Sinisterra lost his direct appeal, he filed a petition under 28 U.S.C. § 2255. Sinisterra's post-conviction counsel submitted a report about Sinisterra's upbringing and events that happened to him, however, *trial counsel Duchardt already knew about Sinisterra's background prior to trial.* (Duchardt Aff. 10, ¶ 13; Appx. 218.) A summary of Sinisterra's background that counsel stated he already was aware of included:

> Sinisterra grew up in poverty. (Appx. 155.) His father was violent and left the family while Sinisterra was a child. (Appx. 155.) Sinisterra was physically abused by his mother, and was once sexually assaulted by a group of young teens. (Appx. 156-57.) He dropped out of school after completing the first grade and ran away from home. (Appx. 157.) After living on the streets for approximately six years, with brief periods in juvenile correction facilities, Sinisterra returned home, where he was allegedly sexually assaulted by one of his older brothers. (Appx. 157-58.) Sinisterra remained at home until he illegally immigrated to the United States at the age of twenty as a stowaway on a commercial boat. (Appx. 158.) When he was in a shelter in Boston, Sinisterra was kicked out for violating the rules. He was subsequently deported back to Colombia, but then illegal entered into the United States two more times, living with one woman who bore his child, and then living with another woman. (Appx. 158-59.) Sinisterra went back to Colombia only to return to the United States a third time. He lived with his child's mother and sister, but impregnated another woman, Michelle Sinisterra, whom he later married. (Appx. 159.)

---

[6](...continued)
target of the violent drug culture," when in Sinisterra's motion, on page 43, he was actually referring to co-defendant Hinestroza. (Appx. 164.)

-36-

Appellate Case: 08-1925    Page: 41    Date Filed: 09/15/2009 Entry ID: 3586258

Sinisterra never had a steady job while in the United States. (Appx. 158-59.) He has also suffered head trauma on three occasions. (Appx. 160-61.) He also abused drugs and during his drug use he "would sometimes experience 'crazy episodes.'" (Appx. 161.)

In their affidavits, defense counsel Brewer and Mr. Grothaus contended that they were not aware of most of these potential mitigating evidence. (Appx. 308, 314-15.)

Sinisterra's post-conviction counsel had him evaluated by Dr. Antolin Llorente, a neuropsychologist. Dr. Llorente administered an aptitude test on which Sinisterra obtained an overall score of 68, placing him in the very low range. (Appx. 202.) However, when controlled for his low educational level, Sinisterra's score fell within the average range (65th percentile). (Appx. 202.) Dr. Llorente also determined that Sinisterra's low educational level and his profile" and his "overall wealth of information, history, in conjunction with is overall profile" are inconsistent with mental retardation. (Appx. 207.) Dr. Llorente further stated that "it is impossible to rule-out the presence of static encephalopathy (brain damage)" but in his opinion Sinisterra suffers from brain damage. (Appx. 206, 207.)

Appellate Case: 08-1925     Page: 42     Date Filed: 09/15/2009 Entry ID: 3586258

## SUMMARY OF THE ARGUMENTS

In his first point, that encompasses the first three issues this Court set forth in the certificate of appealability, Sinisterra argues that the district court erroneously denied his § 2255 motion without having an evidentiary hearing in finding that defense counsel provided effective assistance of counsel. The four issues this Court asked to be briefed are whether in (a) failing to retain and utilize a qualified mitigation expert; (2) failing to conduct a thorough mitigation investigation and present available mitigation evidence to the jury; (3) failing to investigate and present mental health evidence; and (4) failing to object to prosecutorial misconduct during closing argument, defense counsel rendered ineffective assistance of counsel.

First, lead defense counsel Frederick Duchardt's decision not to employ a traditional mitigation specialist, as he states in his affidavit to the district court, was a tactical decision. In her affidavit, Brewer's opinion is that Grothaus "is the best fact investigator one could ever find," and Duchardt decided to assign him to both phases of Sinisterra's case in order to obtain the higher rate of pay necessary to retain him. (Appx. 180, 211.) Duchardt believed that Grothaus's "background made him qualified, even more than those who often act as 'mitigation specialists' to take on the multifaceted tasks that confronted us as concerned investigation of both phases of the

-38-

trial." (Appx. 211.) As a strategic judgment, this decision was entitled to deference by the district court.

Second, Sinisterra's post-conviction counsel claims to have uncovered facts about Sinisterra's upbringing which could have been presented to the jury as mitigating evidence if known at the time of Sinisterra's trial. However, attorney Duchardt already knew about Sinisterra's childhood background. (Appx. 218.) Duchardt, did, obviously, conduct some investigation in order to know about Sinisterra's childhood background. Thus, Sinisterra cannot demonstrate that his counsel's investigation was unreasonable; he cannot prevail merely because new evidence supposedly has been uncovered – which is not the case here.

The records shows that Sinisterra's counsel performed an extensive mitigation investigation. Daniel J. Grothaus, who was hired in lieu of a traditional "mitigation specialist," interviewed Sinisterra's friends and family members in Houston, Texas, who provided him with a sense of Sinisterra's life. (Appx. 313.) Grothaus was paid $13,836.36 for his work on the mitigation phase, at a rate of $45 per hour. (Appx. 119, 211.)

Frederick Duchardt also performed work related to the mitigation investigation. He had Sinisterra evaluated by a mental health professional, worked with the mitigation witnesses from Houston, and obtained mitigation

-39-

testimony from Joe Brandenburg, an expert on prison issues. (Appx. 189, 218, 225.) Sinisterra's counsel attempted to obtain records from his childhood, but no records were available. (Appx. 219.)

Defense counsel Jennifer Brewer traveled to Colombia approximately two months prior to trial to conduct videotaped interviews of Sinisterra's family. These tapes were sufficient to help Brewer present Sinisterra's childhood poverty to the jury, as the tapes showed the deplorable living conditions in Colombia. (Tr. Vol. XV at 2895-96.)

In Duchardt's affidavit he states that he knew all of the information about Sinisterra's background contained in the amended petition. (Appx. 218.) If Duchardt did know this information, he, as lead counsel, made a decision to not present it at trial. Strategic decisions not to present certain evidence are generally entitled to deference.

Third, in regard to defense counsel presenting mental health evidence, Sinisterra's counsel had him evaluated by Dr. Enrique Dos Santos, a Spanish-speaking psychiatrist who found no evidence of mental problems. (Appx. 225.) In light of this evaluation, it was reasonable for Sinisterra's counsel not to continue their investigation. Sinisterra has not alleged any reason why his counsel should have questioned Dr. Dos Santos's evaluation. Therefore, the later evaluation by Dr. Llorente at the request of his post-

-40-

Appellate Case: 08-1925     Page: 45     Date Filed: 09/15/2009 Entry ID: 3586258

conviction counsel is not sufficient to demonstrate that Sinisterra's counsel were deficient.

Sinisterra argues that the record is unclear whether Dr. Dos Santos evaluated him for all potential mental health problems or only for competency. (Sinisterra Brf. 62-64.) Duchardt's statement that Dr. Dos Santos found "no mental problems" suggests that Dr. Dos Santos performed a thorough evaluation, particularly since Duchardt made this statement immediately after noting that he was being accused of not retaining an expert to evaluate Sinisterra's capacity to plan the crime. (Appx. 225.) Sinisterra has failed to bear the burden of alleging facts which, if true, would entitle him to relief.

He also contends that Dr. Dos Santos's evaluation was insufficient because the record does not show whether Dr. Dos Santos was given information about Sinisterra's background. (Sinisterra Brf. 63-64.) However, some of the information, which Sinisterra alleges should have been provided to Dr. Dos Santos, was unavailable at the time, and Sinisterra's counsel were not deficient in failing to uncover it.

In his last point, Sinisterra claims that both trial and appellate counsel provided ineffective assistance of counsel when they did not object to the alleged prosecutorial misconduct during the penalty phase closing argument.

-41-

Appellate Case: 08-1925    Page: 46    Date Filed: 09/15/2009 Entry ID: 3586258

Sinisterra alleges ineffective assistance of counsel occurred when his trial counsel did not object when the Government made its "familial love" and "conscience of the community" arguments. Neither of these arguments was improper. On direct appeal, under plain error review, this Court found that the Government's argument that even with their horrific acts of violence Hitler, Manson and Dahmer also had families that loved them, was not prejudicial. *United States v. Ortiz*, 315 F.3d 873, 903 (8th Cir. 2002). Even if defense counsel had objected and the district judge overruled the objection, and this Court reviewed the argument for abuse of discretion, the result would have been the same – the argument was not prejudicial.

Sinisterra also contends that the prosecutor , when he told the jury that, "[i]t would be wrong to base your verdict on how [Sinisterra's children] feel." (T. Vol. XV at 2908), that such statement impermissibly prevented the jury from considering mitigating evidence. The prosecutor's argument on rebuttal after Sinisterra's counsel's closing statement was:

> The octopus when in danger shoots out a dark ink into the water; shoots it out into the water so it can escape. If it doesn't get out of that, it shoots, it's fatal, the octopus dies. And that's what mitigation evidence is in this case. Ladies and gentlemen, it's a smoke screen. It's that ink. He's the octopus. What he wants is to escape in this case, he wants to escape justice.
>
> This case, ladies and gentlemen, is not about this. Has nothing to do about that. *What this case has to do is, this is*

-42-

Appellate Case: 08-1925     Page: 47     Date Filed: 09/15/2009 Entry ID: 3586258

*what this case is about. It's taking a thousand dollars to put a gun to somebody's head to blow their brains out. They don't want you to think about that but that's what it is.*

Sometimes, ladies and gentlemen, we have come to points in our lives that define you. November 28, 1998, defines German Sinisterra, when he could have walked away, he didn't have to come from Houston to Kansas City. He made a choice. And when he got here he still had the choice to leave. He still had the choice to go somewhere else. *No, his lust for a thousand dollars was more important than the life of another human being.*

*Ladies and gentlemen, this case is about this. That's what this case is about.* Ladies and gentlemen, remember this. This was worn by another human being, this red stained, this is blood. That duct tape, that was the duct tape that was around Julian Colon, that's what this case is about. This is what defines German Sinisterra.

\* \* \* \*

Ladies and gentlemen, this case is about cold premeditated murder. Counsel talked to you about the children of German Sinisterra. *And regardless of what she said she wants sympathy from you. There is no doubt, there is no doubt those children are deserving of sympathy, they are victims but they are victims of what this defendant has done. It would be wrong, ladies and gentlemen, it would be wrong to base your verdict on how they feel.*

\* \* \* \*

You, as jurors, however are not hurting anybody by *following the law and rendering a just verdict* as Mr. Valenti told you. Don't be manipulated in that way.

(T. Vol. XV at 2906-08.) (Emphasis added.)

-43-

Appellate Case: 08-1925     Page: 48     Date Filed: 09/15/2009 Entry ID: 3586258

A prosecutor is not prohibited from arguing that little or no weight should be given to any particular mitigating evidence. The prosecutor's argument in this case was not that the jury was legally prevented from considering the love of Sinisterra's children. Rather, his argument was that it would be wrong for the jury to base their verdict on this love, that is to find that this love outweighs the aggravating factors. Such an argument about how the jury should weigh aggravating and mitigating factors is constitutionally acceptable.

Lastly, the Government's references to "conscience of the community" in closing during the penalty phase was not a general appeal for the jury to impose the death sentence, but rather, in reviewing the entire argument in context, the remark was a call for the jury to look at the specific facts in this case in determining whether or not to impose a death sentence, and thus the remarks were not improper.

Appellate Case: 08-1925    Page: 49    Date Filed: 09/15/2009 Entry ID: 3586258

## ARGUMENTS

## I.

**The district court properly denied Sinisterra's § 2255 motion, without having an evidentiary hearing, since the district judge presided over both the trial and § 2255 motion and had firsthand observations of the trial proceedings, Sinisterra's demeanor and trial counsels' actions, and affidavits established that Sinisterra's trial counsel provided effective assistance when they (a) knew of the violent incidents in Sinisterra's background that could be used as mitigating evidence, (b) hired an investigator who acted as a "mitigation specialist" and who investigated Sinisterra's family and friends in Houston, (c) presented some mitigating evidence through both live and videotaped testimony from Sinisterra's family members to the jury, and (d) conducted a reasonable investigation into Sinisterra's mental health, had him evaluated, with the conclusion that Sinisterra did not have any mental health issues.**

In his first point, Sinisterra groups three of the issues of ineffective assistance of counsel that this Court certified to be appealed. He claims his counsel was ineffective in failing to (1) retain and utilize a qualified mitigation specialist, (2) conduct a thorough mitigation investigation and present available mitigation evidence to the jury, and (3) investigate and present mental health evidence. Counsel's representation on all of these issues was reasonable and did not amount to ineffective assistance. First, lead defense counsel Frederick Duchardt's decision not to employ a traditional mitigation specialist, as he states in his affidavit to the district

-45-

Appellate Case: 08-1925    Page: 50    Date Filed: 09/15/2009 Entry ID: 3586258

court, was a tactical decision. Duchardt believed that Grothaus's "background made him qualified, even more than those who often act as 'mitigation specialists' to take on the multifaceted tasks that confronted us as concerned investigation of both phases of the trial." (Appx. 211.) As a strategic judgment, this decision was entitled to deference by the district court.

Second, Sinisterra's post-conviction counsel claims to have uncovered facts about Sinisterra's upbringing which could have been presented to the jury as mitigating evidence if known at the time of Sinisterra's trial. However, attorney Duchardt already knew about Sinisterra's childhood background. (Appx. 218.) Duchardt, did, obviously, conduct some investigation in order to know about Sinisterra's childhood background. Thus, Sinisterra cannot demonstrate that his counsel's investigation was unreasonable; he cannot prevail merely because new evidence supposedly has been uncovered – which is not the case here.

The records shows that Sinisterra's counsel performed an extensive mitigation investigation. Daniel J. Grothaus, who was hired in lieu of a traditional "mitigation specialist," interviewed Sinisterra's friends and family members in Houston, Texas, who provided him with a sense of Sinisterra's life. (Appx. 313.) Duchardt also performed work related to the mitigation

-46-

Appellate Case: 08-1925     Page: 51     Date Filed: 09/15/2009 Entry ID: 3586258

investigation.  He had Sinisterra evaluated by a mental health professional, worked with the mitigation witnesses from Houston, and obtained mitigation testimony from Joe Brandenburg, an expert on prison issues.  (Appx. 189, 218, 225.)  Sinisterra's counsel attempted to obtain records from his childhood, but no records were available.  (Appx. 219.)

Defense counsel Jennifer Brewer traveled to Colombia approximately two months prior to trial to conduct videotaped interviews of Sinisterra's family.  These tapes were sufficient to help Brewer present Sinisterra's childhood poverty to the jury, as the tapes showed the deplorable living conditions in Colombia.  (Tr. Vol. XV at 2895-96.)  In Duchardt's affidavit he states that he knew all of the information about Sinisterra's background contained in the amended petition.  (Appx. 218.)  If Duchardt did know this information, he, as lead counsel, made a decision to not present it at trial. Strategic decisions not to present certain evidence are generally entitled to deference.

Third, in regard to defense counsel presenting mental health evidence, Sinisterra's counsel had him evaluated by Dr. Enrique Dos Santos, a Spanish-speaking psychiatrist who found no evidence of mental problems. (Appx. 225.)  In light of this evaluation, it was reasonable for Sinisterra's counsel not to continue their investigation.  Sinisterra has not alleged any

-47-

Appellate Case: 08-1925     Page: 52     Date Filed: 09/15/2009 Entry ID: 3586258

reason why his counsel should have questioned Dr. Dos Santos's evaluation. Therefore, the later evaluation by Dr. Llorente at the request of his post-conviction counsel is not sufficient to demonstrate that Sinisterra's counsel were deficient.

Duchardt's statement that Dr. Dos Santos found "no mental problems" suggests that Dr. Dos Santos performed a thorough evaluation, particularly since Duchardt made this statement immediately after noting that he was being accused of not retaining an expert to evaluate Sinisterra's capacity to plan the crime.  (Appx. 225.)  Sinisterra has failed to bear the burden of alleging facts which, if true, would entitle him to relief.

### A.    *Standard of Review*

The appellate court reviews "*de novo* the district court's denial of a section 2255 motion" to determine whether or not the district court abused its discretion in denying the movant's § 2255 motion without having an evidentiary hearing.  *United States v. Hernandez*, 436 F.3d 851, 854-55 (8th Cir. 2006) (quoting *Never Misses A Shot v. United States*, 413 F.3d 781, 783 (8th Cir. 2005)); *see also Holloway v. United States*, 960 F.2d 1348, 1357 (8th Cir. 1992).  "[A]ny underlying fact-findings are reviewed for clear error." *United States v. Davis*, 406 F.3d 505, 508 (8th Cir. 2005).  The appellate court reviews for an abuse of discretion the district court's decision

-48-

to deny such a hearing, but this review requires *de novo* consideration of the validity of the ineffective assistance of counsel claims as a matter of law in order to decide if an evidentiary hearing in the district court is warranted. *United States v. Nelson*, 297 Fed. Appx. 563, 565 (8th Cir. 2008). "In some cases, the clarity of the existing record on appeal makes an evidentiary hearing unnecessary," but "[a]bsent such clarity, an evidentiary hearing is required." *Latorre v. United States*, 193 F.3d 1035, 1038 (8th Cir. 1999).

## B. *Discussion*

The Eighth Circuit has issued a certificate of appealability on four of Sinisterra's ineffective assistance of counsel claims. These claims are governed by the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a party seeking post-conviction relief to demonstrate first that their counsel was deficient and second that this deficiency prejudiced their defense. *Id.* at 687; *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Deficiency is measured by an "objective standard of reasonableness under prevailing professional norms." *Rompilla*, 545 U.S. at 380 (internal citations omitted). To demonstrate prejudice, the petitioner must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

-49-

Appellate Case: 08-1925      Page: 54      Date Filed: 09/15/2009 Entry ID: 3586258

different." *Id.* at 390.  A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 393.

## A.     *The Investigation and Presentation of Mitigating Evidence*

### 1.     The district court properly denied having an evidentiary hearing.

Sinisterra's first three ineffective assistance of counsel claims relate to the investigation and presentation of mitigating evidence during the penalty phase of his trial.  He argues that, at a minimum, the district court should have held an evidentiary hearing on these claims.  To be entitled to an evidentiary hearing, a § 2255 petitioner must first state a valid claim by alleging facts which, if true, would entitle the petitioner to relief.  *United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005).  Once a valid claim has been stated, an evidentiary hearing should be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).

In *Lindhorst v. United States*, 585 F.2d 361 (8th Cir. 1978), the Eighth Circuit held that "[t]he district court erred in treating affidavits submitted by the government as part of the files and records of the case."  *Id.* at 365.  In support of this proposition, the court cited a Second Circuit decision holding that an "opposing affidavit by the Government is not part of the files and

-50-

Appellate Case: 08-1925     Page: 55     Date Filed: 09/15/2009 Entry ID: 3586258

records of the case which can be taken to conclusively show that the prisoner is entitled to no relief within 28 U.S.C. § 2255." *Id.* (*quoting Taylor v. United States*, 487 F.2d 307, 308 (2d Cir. 1973)).  Sinisterra argues that the district court erred in relying on an affidavit submitted by his lead trial counsel, Frederick Duchardt, to conclude that his § 2255 claims were without merit.  (Sinisterra Brf. 44-46.)  The district court, at the Government's request, ordered Duchardt to produce this affidavit. (Sinisterra Brf. 42.)  In effect, Sinisterra contends that *Lindhorst* prevents a district court from ever considering affidavits supporting the Government in determining whether an evidentiary hearing is required on a § 2255 petition. The Eighth Circuit's subsequent treatment of § 2255 petitions, however, demonstrates that this is not the proper interpretation of *Lindhorst*.  *See United States v. Arvizu*, 270 F.3d 605, 606 (8th Cir. 2001) (affirming the dismissal of a § 2255 petition without a hearing on the basis of trial counsel's affidavit stating that his client never instructed him to appeal); *Kingsberry v. United States*, 202 F.3d 1030, 1031-33 (8th Cir. 2000) (affirming dismissal on the basis of counsel's affidavit stating that the Government did not offer a plea deal).

Furthermore, such an interpretation of *Lindhorst* would be at odds with the Rules Governing § 2255 Cases, which have been promulgated by

-51-

Appellate Case: 08-1925     Page: 56     Date Filed: 09/15/2009 Entry ID: 3586258

the Supreme Court and approved by Congress.  *See* Rules Governing § 2255

Cases, approved by Pub. L. No. 94-426, § 1, 90 Stat. 1334; *see also*

*Kingsberry*, 202 F.3d at 1031 n. 2 (noting that the district court properly

considered counsel's affidavit as part of the record).  Rule 7(a) of the Rules

Governing § 2255 Cases provides that the district court judge may allow

parties to expand the record by submitting additional materials related to the

§ 2255 petition, and 7(b) states that  "[a]ffidavits also may be submitted and

considered as part of the record."  Rule 8 provides that in determining

whether an evidentiary hearing should be held, the judge should review "any

materials submitted under Rule 7."

The proper standard for using affidavits supporting the Government to

dismiss a § 2255 claim without an evidentiary hearing is similar to the

standard for using affidavits to decide a motion for summary judgment.  *See*

*Blackledge v. Allison*, 431 U.S. 63, 80-82 (1977); *see also United States v.*

*Aiello*, 814 F.2d 109, 113-14 (2d Cir. 1987) ("Like in a motion for summary

judgment in civil cases, both the petitioner's and government's

affidavits–taken together–are used to determine the existence of genuine

issues of material fact.").  In *Lindhorst*, the § 2255 petitioner alleged that the

key witnesses against him had perjured themselves at his trial and submitted

affidavits from the witnesses to this effect.  *Lindhorst*, 585 F.2d at 364.  The

-52-

Appellate Case: 08-1925     Page: 57     Date Filed: 09/15/2009 Entry ID: 3586258

Government submitted affidavits disputing this fact, and the district court dismissed the petitioner's § 2255 petition without a hearing after determining that the Government's affidavits were more credible. *Id.* The Eighth Circuit's holding, therefore, only relates to situations where affidavits create genuine disputes about material facts, particularly when credibility determinations are required. This is consistent with both the Rules Governing § 2255 Cases and *Copenhaver v. Bennett*, 355 F.2d 417 (8th Cir. 1966), which the *Lindhorst* court cited in support of its decision. *See* Advisory Committee Notes, Rules Governing § 2254 Cases, Rule 7 (stating that affidavits are seldom conclusive when the issue is one of credibility); *Copenhaver*, 355 F.2d at 421 ("[E]x parte affidavits, standing alone, may not be used to decide substantial disputed questions of fact. But, such material may be used to determine whether any substantial factual issues exist.") (cited in *Lindhorst*, 585 F.2d at 365 n. 7).

In this case, Duchardt's affidavit was not used by the district court to contradict any of Sinisterra's specific factual assertions. Rather, the undisputed facts contained in this affidavit were taken by the district court to show that Sinisterra's ineffective assistance of counsel claims are without merit. Such use of affidavits is proper.

-53-

Appellate Case: 08-1925     Page: 58     Date Filed: 09/15/2009 Entry ID: 3586258

Furthermore, since Judge Fenner presided over both the Sinisterra's trial and § 2255 motion, the judge had adequate basis for determining that recantation was not credible claims. As this Court noted in *Wadlington v. United States*, 428 F.3d 779, 784 (8th Cir. 2005), an evidentiary hearing is not necessary where the district judge observed the demeanor and credibility of the witness at trial or is otherwise thoroughly familiar with the record of the case.

### 2. Counsel's decision not to hire a "mitigation specialist" did not amount to ineffective assistance of counsel

Sinisterra's first § 2255 claim is that his counsel were ineffective in deciding not to hire a traditional "mitigation specialist." (Sinisterra Brf. 57-60.) American Bar Association guidelines recommend that in death penalty cases "[t]he defense team should consist of no fewer than two attorneys . . . , an investigator, and a mitigation specialist." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, published at 31 *Hofstra L. Rev.* 913, 952 (2003). Frederick Duchardt, Sinisterra's lead trial counsel, hired Daniel J. Grothaus to act as an investigator for both the guilt and penalty phases of Sinisterra's trial and to assist with work typically performed by a "mitigation specialist." (Appx. 210.) Attorneys Duchardt and Brewer, both of whom

-54-

Appellate Case: 08-1925    Page: 59    Date Filed: 09/15/2009 Entry ID: 3586258

had previous experience on death penalty cases, also performed work related to the mitigation investigation. (Appx. 212.) However, a separate mitigation specialist was not employed.

The Supreme Court has said that the ABA guidelines are "guides to determining what is reasonable" in evaluating an ineffective assistance of counsel claim. *Rompilla v. Beard*, 545 U.S. at 387 (internal citations omitted). However, the Court has been reluctant to "impose rigid requirements on defense counsel." *Id.* at 400-01 (Kennedy, J. dissenting) (noting that the Court has been careful to say that the ABA guidelines "do not establish the constitutional baseline for effective assistance of counsel"). In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court explained:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland*, 466 U.S. at 688-89.

Duchardt's decision not to employ a traditional mitigation specialist, as he states in his affidavit to the district court, was such a tactical decision. In her affidavit, Brewer's opinion is that Grothaus "is the best fact

-55-

Appellate Case: 08-1925     Page: 60     Date Filed: 09/15/2009 Entry ID: 3586258

investigator one could ever find," and Duchardt decided to assign him to both phases of Sinisterra's case in order to obtain the higher rate of pay necessary to retain him. (Appx. 180, 211.) Duchardt believed that Grothaus's "background made him qualified, even more than those who often act as 'mitigation specialists' to take on the multifaceted tasks that confronted us as concerned investigation of both phases of the trial." (Appx. 211.) As a strategic judgment, this decision was entitled to deference by the district court. *See Strickland*, 466 U.S. at 689. The record fails to show that this decision was so unreasonable as to constitute ineffective assistance. Grothaus had a background as a private investigator, had previously served as an investigative journalist, was trained in human relations, and had connections to the Houston area, where many of Sinisterra's family and people who knew him were located. (Appx. 210.)

The fact that a person with the title of "mitigation specialist" would have been available to testify in lieu of witnesses, who were some of Sinisterra's family members who lived in Colombia and were denied visas, is immaterial. As Duchardt stated in his affidavit, he believed that it would be more effective to present information from Sinisterra's family members directly rather than rely on a forensic social worker for testimony. (Appx. 221-22.) Nevertheless, he searched for a forensic social worker who was

-56-

familiar with Colombia but was unable to identify such a person. (Appx. 222.) In retrospect, counsel contends that a "mitigation specialist" could have been helpful once the witnesses' visas were denied. However, the Supreme Court has warned of the need to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" in assessing ineffective assistance of counsel claims. *Strickland*, 466 U.S. at 689. Duchardt's decision not to hire a "mitigation specialist" was reasonable at the time it was made because he believed, based on his experience as defense counsel in prior death penalty cases, either that the witnesses would be allowed to come to the United States or that Sinisterra would have a strong issue for appeal. (Appx. 219.)

Given the Supreme Court's reluctance to adopt *per se* rules for determining whether counsel's conduct was deficient, Duchardt's decision not to hire a separate "mitigation specialist" as recommended by the ABA guidelines should not constitute the basis of a distinct ineffective assistance of counsel claim as long as the overall mitigation investigation was constitutionally sufficient. This is particularly true given that the decision not to employ a traditional "mitigation specialist" was a reasonable, strategic decision about the best method of representing Sinisterra.

-57-

### 3. Mitigation investigation

#### a. *Counsel's representation was not deficient*

Sinisterra's post-conviction counsel claims to have uncovered facts about Sinisterra's upbringing which could have been presented to the jury as mitigating evidence if known at the time of Sinisterra's trial. However, attorney Duchardt already knew about Sinisterra's childhood background. (Appx. 218.)

The Supreme Court has held counsel to be deficient when similar evidence was not uncovered and presented as mitigation. *Rompilla v. Beard*, 545 U.S. 374, 394 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534-35 (2003); *Williams v. Taylor*, 529 U.S. 362, 394 (2000). However, the Court did not find counsel deficient in these cases merely because previously unknown mitigating evidence was later discovered, but rather because counsel failed to make "efforts to discover all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 526 (emphasis in the original). In *Rompilla*, for example, counsel failed to examine the defendant's prior conviction file, which was "a public document, readily available for the asking at the very courthouse where Rompilla was to be tried." *Rompilla*, 545 U.S. at 383-84. In *Wiggins*, counsel limited their investigation of the defendant's life history to his pre-sentence investigation report and records from the Department of

-58-

Appellate Case: 08-1925     Page: 63     Date Filed: 09/15/2009 Entry ID: 3586258

Social Services in spite of leads that suggested a troubled past. *Wiggins*, 539 U.S. at 523-24. In *Williams*, counsel failed to seek available prison and juvenile records. 529 U.S. at 395-95.

Sinisterra's case is not on point with the situations in these Supreme Court cases because his counsel, Frederic Duchardt, did, obviously, conduct some investigation in order to know about Sinisterra's childhood background. Thus, Sinisterra cannot demonstrate that his counsel's investigation was unreasonable; he cannot prevail merely because new evidence supposedly has been uncovered – which is not the case here.

The records shows that Sinisterra's counsel performed an extensive mitigation investigation. Daniel J. Grothaus, who was hired in lieu of a traditional "mitigation specialist," interviewed Sinisterra's friends and family members in Houston, Texas, who provided him with a sense of Sinisterra's life. (Appx. 313.) Grothaus was paid $13,836.36 for his work on the mitigation phase, at a rate of $45 per hour. (Appx. 119, 211.)

Frederick Duchardt also performed work related to the mitigation investigation. He had Sinisterra evaluated by a mental health professional, worked with the mitigation witnesses from Houston, and obtained mitigation testimony from Joe Brandenburg, an expert on prison issues. (Appx. 189,

Appellate Case: 08-1925    Page: 64    Date Filed: 09/15/2009 Entry ID: 3586258

218, 225.)  Sinisterra's counsel attempted to obtain records from his childhood, but no records were available.  (Appx. 219.)

Furthermore, Jennifer Brewer flew to Colombia to interview the members of Sinisterra's family who were located there.  However, she states that she did not ask Sinisterra's family questions about such topics as physical and sexual abuse.  (Appx. 219.)

Sinisterra contends that he is entitled to an evidentiary hearing because "it is unclear when Sinisterra's counsel began the process of gaining entry for his mitigation witnesses."  (Sinisterra Brf. 55-57.)  As an initial matter, an evidentiary hearing is not required on a § 2255 claim unless the petitioner alleges facts which, if true, would entitle that petitioner to relief *United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005).  Accordingly, Sinisterra bears the burden of alleging that his counsel were ineffective in not making timely efforts to bring the Colombian witnesses to the United States; he cannot merely argue that the record is unclear on this point. Nevertheless, the record demonstrates that timely efforts were made. Duchardt said that Sinisterra's counsel "took all appropriate steps to assist the witnesses in timely applying for entry visas."  (Appx. 219.)

The presentation of mitigating evidence was also reasonable under the circumstances.  As Brewer told the court, the videotapes of the Colombian

-60-

witnesses were the only thing they could come up with once the visas were denied.  (Tr. Vol. XIV at 2762.)  The tapes were sufficient to help Brewer present Sinisterra's childhood poverty to the jury, as the tapes showed the deplorable living conditions in Colombia.  (Tr. Vol. XV at 2895-96.)

In Duchardt's affidavit he states that he knew all of the information about Sinisterra's background contained in the amended petition.  (Appx. 218.)  If Duchardt did know this information, he, as lead counsel,  made a decision to not present it at trial.[7]  Strategic decisions not to present certain evidence are generally entitled to deference.

### b.      *Sinisterra was not prejudiced*

Even if Sinisterra's counsel were deficient in not thoroughly investigating or presenting mitigating evidence, Sinisterra must show that he was prejudiced by this deficiency.  *Rompilla*, 545 U.S. at 390.  Sinisterra, however, was not prejudiced because the alleged uncovered evidence is similar to mitigating evidence that was presented.  The jury was informed of Sinisterra's childhood poverty and lack of education (Tr. Vol. X at 2259-60, 2265-66), and Brewer emphasized these points in her penalty phase closing argument.  (Tr. Vol. XV at 2895-96.)

_____

[7]The Government is aware that Brewer and Grothous indicate in their affidavits that they did not know of any of Sinisterra's background experiences.

-61-

Appellate Case: 08-1925     Page: 66     Date Filed: 09/15/2009  Entry ID: 3586258

The Government further submits that even if the evidence of Sinisterra's upbringing had been presented at his trial, such evidence could have actually harmed his case. In finding that the failure to discover similar evidence in *Wiggins* was prejudicial, the Supreme Court noted that the case contained "little of the double edge" found in other cases because the defendant had no history of violent conduct. *Wiggins*, 539 U.S. at 535, 537. In contrast, the jury unanimously found that Sinisterra was "likely to commit criminal acts of violence in the future which would be a continuing and a serious threat to society" and unanimously rejected a finding that he could serve a life sentence peaceably. (Appx. 30, 33, 43, 46.)

The Sixth Circuit recently held that a defendant was not prejudiced by his counsel's failure to present evidence of past abuse because this evidence might have caused the jury to believe the defendant was even more dangerous and therefore more deserving of the death penalty. *West v. Bell*, 550 F.3d 542, 556 (6th Cir. 2008). However, a similar argument was rejected in *Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002), where the Eighth Circuit held that the failure to introduce evidence of past abuse was prejudicial because this evidence could make the defendant's violent conduct seem less culpable. *Id.* at 939. In this case, based on Duchardt's affidavit, he knew about Sinisterra's alleged past abuse, thus, it could have

-62-

been counsel's strategic decision to not delve into that background information because it could have harmed the defense argument that Sinisterra could serve a life sentence without incident. Consequently, although current counsel may second-guess Sinisterra's trial and penalty phase counsel's decisions, such does not amount to ineffective assistance of counsel.

Additionally, the Government also submits that Sinisterra was not prejudiced by his counsel's alleged failure to uncover and present the alleged mitigating evidence because the aggravating factors were so overwhelming that the jury would have imposed the death penalty anyway. In assessing whether a defendant was prejudiced by counsel's failure to present mitigating evidence, a court should "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. On the two counts the jury considered during the penalty phase, there were only seven aggravating factors and 16 mitigating factors for Count II; and only six aggravating factors and 16 mitigating factors for Count III that the jury considered. (Appx. 25-51.) The one statutory mitigating factor that none of the jurors found was "Factors in German Sinisterra's background, record, or character, or any other circumstances of the offenses, that mitigate against imposition of the death sentence." (Appx. 31, 44.) Even with the

-63-

Appellate Case: 08-1925    Page: 68    Date Filed: 09/15/2009 Entry ID: 3586258

small number of aggravating factors, the jury still unanimously found that a

sentence of death was appropriate for the heinous crime Sinisterra

committed.

In reviewing some of the alleged new information about Sinisterra's

upbringing, some of that information, such as his lack of respect for the law

in illegally entering the United States numerous times and his violent acts,

could have provided the Government with a basis to include them as

aggravating factors. Some the information includes the following:

> Sinisterra grew up in poverty. (Appx. 155.) His father was violent and left the family while Sinisterra was a child. (Appx. 155.) Sinisterra was physically abused by his mother, and was once sexually assaulted by a group of young teens. (Appx. 156-57.) He dropped out of school after completing the first grade and ran away from home. (Appx. 157.) After living on the streets for approximately six years, with brief periods in juvenile correction facilities, Sinisterra returned home, where he was allegedly sexually assaulted by one of his older brothers. (Appx. 157-58.) Sinisterra remained at home until he *illegally immigrated* to the United States at the age of twenty as a stowaway on a commercial boat. (Appx. 158.) When he was in a shelter in Boston, *Sinisterra was kicked out for violating the rules*. He was subsequently deported back to Colombia, but then *illegally entered into the United States two more times, living with one woman who bore his child, and then living with another woman.* (Appx. 158-59.) Sinisterra went back to Colombia only to return to the United States a third time. *He lived with his child's mother and sister, but impregnated another woman*, Michelle Sinisterra, whom he later married. (Appx. 159.) Sinisterra never had a steady job while in the United States. (Appx. 158-59.) He has also suffered head trauma on three occasions. (Appx. 160-61.) *He also abused*

-64-

> *drugs and during his drug use he "would sometimes experience 'crazy episodes.'* (Appx. 161.) (Emphasis added).

In light of the fact that Duchardt states that he knew about these facts of Sinisterra's background and there were no records available to support that information, his investigation was thorough, and hence, there was no need for Duchardt to conduct any further investigation. Therefore, counsel's strategic choices made after thorough investigation are virtually unchallengeable. *See Wiggins*, 539 U.S. 521. The Government is aware that Sinisterra only has to show that there is a reasonable probability that one juror would have decided to spare his life had the mitigating evidence been offered. *Id.* at 537. However, Sinisterra's background was a mix of horrible acts against him by others, and horrible acts by him, making his counsel's decision to not use any of that information reasonable. Given the discretion juries have in weighing aggravating and mitigating evidence and the existence of this mix of additional information, unlike the evidence deemed "powerful" in *Wiggins*, this Court's confidence in the jury's imposition of the death penalty should not be undermined. *Cf. Wiggins*, 539 U.S. at 534; and *Simmons*, 299 F.3d at 939. Thus, Sinisterra cannot demonstrate the necessary prejudice to prevail on his ineffective assistance of counsel claim.

### 4. *Sinisterra's mental health*

-65-

Appellate Case: 08-1925     Page: 70     Date Filed: 09/15/2009 Entry ID: 3586258

### a. *Counsel's representation was not deficient*

Five years after his trial, Sinisterra was evaluated by Dr. Antolin Llorente, who came to the opinion that Sinisterra suffers from organic brain damage. (Appx. 207.) Sinisterra alleges that his counsel were ineffective in not uncovering this condition prior to the penalty phase of his trial. (Sinisterra Brf. 36.) However, Sinisterra's counsel had him evaluated by Dr. Enrique Dos Santos, a Spanish-speaking psychiatrist who found no evidence of mental problems. (Appx. 225.) In light of this evaluation, it was reasonable for Sinisterra's counsel not to continue their investigation. *See Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008) (holding that a reasonable decision to cut off further investigation is a "virtually unchallengeable" strategic decision). As the Eighth Circuit has said, "Counsel is not required to shop for experts who will testify in a particular way." *Winfield v. Roper*, 460 F.3d 1026, 1041 (8th Cir. 2006). Rather, "the law is well-established that a lawyer who hires a qualified mental health expert is not ineffective in relying on that expert's opinion unless the lawyer has reason to doubt the expert's competence." *Marcrum v. Luebbers*, 509 F.3d 489, 505 (8th Cir. 2007). Sinisterra has not alleged any reason why his counsel should have questioned Dr. Dos Santos's evaluation. Therefore, Dr. Llorente's later evaluation is not sufficient to demonstrate that Sinisterra's

-66-

Appellate Case: 08-1925　　Page: 71　　Date Filed: 09/15/2009 Entry ID: 3586258

counsel were deficient.  *See id.* at 511.  ("The fact that a later expert, usually presented at habeas, renders an opinion that would have been more helpful to the defendant's case does not show that counsel was ineffective for failing to find and present that expert.").

Sinisterra argues that the record is unclear whether Dr. Dos Santos evaluated him for all potential mental health problems or only for competency.  (Sinisterra Brf. 62-64.)  Duchardt's statement that Dr. Dos Santos found "no mental problems" suggests that Dr. Dos Santos performed a thorough evaluation, particularly since Duchardt made this statement immediately after noting that he was being accused of not retaining an expert to evaluate Sinisterra's capacity to plan the crime.  (Appx. 225.)  The Government submits that Duchardt's statement is not ambiguous, and because Sinisterra bears the burden of alleging facts which, if true, would entitle him to relief, he must specifically allege that his evaluation was limited to competency.  *See United States v. Regenos*, 405 F.3d 691, 694 (8th Cir. 2005).

Sinisterra also contends that Dr. Dos Santos's evaluation was insufficient because the record does not show whether Dr. Dos Santos was given information about Sinisterra's background.  (Sinisterra Brf. 63-64.)  However, some of the information, which Sinisterra alleges should have

-67-

Appellate Case: 08-1925     Page: 72     Date Filed: 09/15/2009 Entry ID: 3586258

been provided to Dr. Dos Santos, was unavailable at the time, and Sinisterra's counsel were not deficient in failing to uncover it. (Appx. 307.) The only relevant information which was available was Sinisterra's low IQ. The record is unclear whether this was provided to Dr. Dos Santos, but Sinisterra bears the burden of alleging that his counsel were deficient in not providing it. *See Regenos*, 405 F.3d at 694. Even if the information was not provided, Sinisterra's counsel was not deficient given that any mental health expert is likely to concur that Sinisterra has a low intellectual capacity.

### b. <u>Sinisterra was not prejudiced</u>

Sinisterra's counsel did not present evidence of his low IQ to the jury during either the guilt or penalty phases of his trial, but Sinisterra was not prejudiced by this omission. When Sinisterra's IQ is controlled for his low educational level, it falls within the average range (65th percentile). (Appx. 202.) His low IQ, therefore, only represents his lack of education. The jurors were made aware of Sinisterra's limited education, and Brewer reminded them of it during her penalty phase closing argument. (T. Vol. X at 2259-60, 2265-66; T. Vol. XV at 2896.) The additional benefit, if any, that a particular IQ number would add is not sufficient to undermine confidence in the jury's imposition of the death penalty.

Appellate Case: 08-1925     Page: 73     Date Filed: 09/15/2009 Entry ID: 3586258

Prior to trial, Duchardt had Sinisterra evaluated for mental health problems by Dr. Enrique Dos Santos, a Spanish-speaking psychiatrist who was Clinical Director of the Fulton State Hospital. (Appx. 225.) Dr. Dos Santos, in an oral report, told Duchardt that Sinisterra had no mental problems, and in light of that finding Duchardt stated in his affidavit that, "I did not pursue the matter further." (Appx. 225.) Even after reading the report of Dr. Llorente, the neuropsychologist hired by post-conviction counsel, which was appended to Sinisterra's amended § 2255 pleading, Duchardt stated that he was not sure whether or not he would have used that report because of "its lack of strength." (Appx. 225.) Further, Duchardt explained that "[h]ad we relied on such an expert, it would have permitted evaluation of Mr. Sinisterra by a mental health expert of the government's choosing. Being familiar with the sorts of experts regularly relied upon by the government, I believe that the evidence from such an expert would likely be quite damaging, so as to counterbalance whatever benefit would be gained by Dr. Llorente's opinions." (Appx. 225-26.)

Since in Duchardt's affidavit he notes that he might not have used the information contained in Dr. Llorente's report even if he were aware of it because doing so would have allowed Sinisterra to be evaluated by a mental

-69-

Appellate Case: 08-1925    Page: 74    Date Filed: 09/15/2009 Entry ID: 3586258

heath expert chosen by the Government, whose testimony could have been

damaging, Sinisterra was not prejudiced.

Appellate Case: 08-1925     Page: 75     Date Filed: 09/15/2009 Entry ID: 3586258

## II.

**The district court also properly found that Sinisterra's trial counsel's representation was reasonable and effective because (a) the Government's comments during closing arguments about "familial love" was proper and that portion of the closing argument was reviewed for plain error on appeal and affirmed by this Court and would pass muster even if it had been reviewed for an abuse of discretion, (b) the Government's argument that the jurors should not solely base their verdict on the mitigating factor of Sinisterra's children's love for him, that is, to find that this love outweighs the aggravating factors, was not improper; and (c) the Government's rebuttal closing argument about being the "conscience of the community" was directed to the specific evidence in Sinisterra's case, and was not a general emotional appeal to the jury, and thus, neither trial counsel nor appellate counsel, in not objecting to or raising this closing argument on appeal, provided ineffective assistance.**

The last issue this Court wanted briefed is whether Sinisterra's trial and appellate counsel provided effective assistance of counsel when they did not object to the alleged prosecutorial misconduct during penalty phase closing argument. Sinisterra claims ineffective assistance of counsel occurred when his trial counsel did not object when the Government made its "familial love" and "conscience of the community" arguments. Neither of these arguments were improper. On direct appeal, under plain error review, this Court found that the Government's argument that even with their horrific acts of violence Hitler, Manson and Dahmer also had families

-71-

that loved them, was not prejudicial. *United States v. Ortiz*, 315 F.3d 873, 903 (8th Cir. 2002). Even if defense counsel had objected and the district judge overruled the objection, and this Court reviewed the argument for abuse of discretion, the result would have been the same – the argument was not prejudicial.

He also contends that the prosecutor on rebuttal in closing argument in the penalty phase, when he told the jury that, "[i]t would be wrong to base your verdict on how [Sinisterra's children] feel." (T. Vol. XV at 2908), that such statement impermissibly prevented the jury from considering mitigating evidence. A prosecutor is not prohibited from arguing that little or no weight should be given to any particular mitigating evidence. The prosecutor's argument in this case was not that the jury was legally prevented from considering the love of Sinisterra's children. Rather, his argument was that it would be wrong for the jury to base their verdict on this love, that is to find that this love outweighs the aggravating factors. Such an argument about how the jury should weigh aggravating and mitigating factors is constitutionally acceptable.

Furthermore, the Government's reference to "conscience of the community" in closing during the penalty phase was not a general appeal for the jury to impose the death sentence, but rather, in reviewing the entire

-72-

Appellate Case: 08-1925     Page: 77     Date Filed: 09/15/2009 Entry ID: 3586258

argument in context, the remark was a call for the jury to look at the specific facts in this case in determining whether or not to impose a death sentence, and thus the remarks were not improper.

## A. *Standard of Review*

The appellate court reviews "*de novo* the district court's denial of a section 2255 motion" to determine whether or not the district court abused its discretion in denying the movant's § 2255 motion without having an evidentiary hearing. *United States v. Hernandez*, 436 F.3d 851, 854-55 (8th Cir. 2006) (quoting *Never Misses A Shot v. United States*, 413 F.3d 781, 783 (8th Cir. 2005)); *see also Holloway v. United States*, 960 F.2d 1348, 1357 (8th Cir. 1992). "[A]ny underlying fact-findings are reviewed for clear error." *United States v. Davis*, 406 F.3d 505, 508 (8th Cir. 2005). The appellate court reviews for an abuse of discretion the district court's decision to deny such a hearing, but this review requires *de novo* consideration of the validity of the ineffective assistance of counsel claims as a matter of law in order to decide if an evidentiary hearing in the district court is warranted. *United States v. Nelson*, 297 Fed. Appx. 563, 565 (8th Cir. 2008). "In some cases, the clarity of the existing record on appeal makes an evidentiary hearing unnecessary," but "[a]bsent such clarity, an evidentiary hearing is required." *Latorre v. United States*, 193 F.3d 1035, 1038 (8th Cir. 1999).

-73-

Appellate Case: 08-1925     Page: 78     Date Filed: 09/15/2009 Entry ID: 3586258

Trial courts have broad discretion in controlling closing arguments, and the appellate court will not reverse absent an abuse of discretion. *United States v. Beckman*, 222 F.3d 512, 527 (8th Cir. 2000). The Eighth Circuit has set forth a two-part test for reviewing prosecutorial misconduct allegations: 1) the prosecutor's remarks or conduct must have been improper; and 2) such remarks or conduct must have prejudicially affected the defendant's substantial rights as to deprive him of a fair trial. *Id.* If the appellate court reaches the second part, then the factors for the court to consider are the cumulative effect of the misconduct, the strength of the properly admitted evidence of the defendant's guilt; and any curative actions taken by the trial court. *Id.*

## B. *Discussion*

The fourth issue this Court granted a certificate of appealability on is Sinisterra's claim that his counsel were ineffective in not objecting to three sets of statements made by prosecutors during penalty phase closing arguments. Since these remarks were constitutionally acceptable, Sinisterra has no valid ineffective assistance of counsel claim based on his counsels' failure to object. *See Graham v. Dormire*, 212 F.3d 437, 440 (8th Cir. 2000).

-74-

1. *The prosecutor's reference to Hitler, Manson and Dahmer were proper, as this Court has already ruled, because the reference was in regard to "familial love" not outweighing the aggravating circumstances of a crime in deciding on the appropriate sentence.*

The first set of remarks which Sinisterra claims were improper involved references to Ghandi and Hitler, and later on Hitler, Manson, and Dahmer. One of Sinisterra's mitigation themes was the love which Sinisterra's family felt for him. The prosecutor responded to this argument by noting that we judge people like Ghandi and Hitler by their actions, not by how much they were loved. (T. Vol. XV at 2882.) The prosecutor renewed this argument later, telling the jury that the love friends and family may have felt for Jeffrey Dahmer, Charles Manson, and Adolph Hitler did not excuse their conduct. (T. Vol. XV at 2891.) Contrary to what Sinisterra suggests in footnote 11 of his brief that "the improper remarks were numerous" in reference to Ghandi, Hitler, Manson and Dahmer, these are the only such remarks during closing argument. (*See* Sinisterra Brf. 77.) He makes this claim without citing any other references in the transcript to support this accusation. Furthermore, Sinisterra is also incorrect in his charge that this Court was erroneous in its opinion from the direct appeal that there was only one remark to "Hitler, Manson and Dahmer" in the Government's closing argument during the penalty phase.

-75-

Appellate Case: 08-1925     Page: 80     Date Filed: 09/15/2009 Entry ID: 3586258

Specifically, the record on those arguments were during closing argument in the death penalty phase, and the prosecutor noted, in talking generally about the mitigating and aggravating factors, that "people are defined by their actions" of good work, such as Ghandi, and bad work, such as Hitler. (T. Vol. XV at 2882.) After talking about the "victim impact" on Julian Colon's family and the Molina family, the prosecutor talks about the jury weighing the mitigating and aggravating factors – saying "you need to assess that value and assign a value and weight to these aggravating circumstances, these six aggravating circumstances outweigh this man's family love." The prosecutor argued that in Sinisterra's case a family's love does not outweigh the vile act, just as the families of people like Jeffrey Dahmer, Charles Manson and Adolph Hitler loved them, Sinisterra's family's love "alone does not outweigh the vile act, the premeditation, the fact that he was willing for monetary purposes to kill another human being, those things will never outweigh his action of November 28, 1998." (T. Vol. XV at 2891.)

As this Court noted when this issue was argued on direct appeal:

> The prosecutor *was not directly likening appellants' crimes or characters to those of Hitler, Manson, or Dahmer. Instead, the thrust of his argument was that familial love should not outweigh the aggravating circumstances* of a crime in deciding on the appropriate

-76-

Appellate Case: 08-1925     Page: 81     Date Filed: 09/15/2009 Entry ID: 3586258

punishment. This type of reference is *not prejudicial enough to deprive the defendants of their constitutional rights to a fair penalty phase hearing*.

*United States v. Ortiz*, 315 F.3d 873, 903 (8th Cir. 2002) (emphasis added.) (internal quotations omitted).

The Eighth Circuit has already found this argument constitutionally acceptable, under plain error review. If counsel had objected, the district court would have overruled the objection and this Court would have reviewed the district court's ruling under the abuse of discretion standard. Since this Court found that the remarks were not directly likening Sinisterra's crimes or character to those of these infamous persons, this Court would have found that the district court did not abuse its discretion in overruling such an objection. Consequently, the district court properly dismissed Sinisterra's ineffective assistance of counsel claim based on his counsel's failure to object to it. *See Graham*, 212 F.3d at 440.

    2.    *The prosecutor's statement that it would be wrong for the jury to base their verdict on the love of Sinisterra's children was an argument that little or no weight should be given to any particular mitigating evidence, which is not prohibited*.

The prosecutor also told the jury, "[I]t would be wrong to base your verdict on how [Sinisterra's children] feel." (T. Vol. XV at 2908.) Sinisterra argues that this statement impermissibly prevented the jury from

-77-

Appellate Case: 08-1925    Page: 82    Date Filed: 09/15/2009 Entry ID: 3586258

considering mitigating evidence.  (Sinisterra Brf. 72-73.)  The prosecutor's argument on rebuttal after Sinisterra's counsel's closing statement was:

> The octopus when in danger shoots out a dark ink into the water; shoots out into the water so it can escape.  If it doesn't get out of that, it shoots, it's fatal, the octopus dies.  And that's what mitigation evidence is in this case.  Ladies and gentlemen, it's a smoke screen.  It's that ink.  He's the octopus.  What he wants is to escape in this case, he wants to escape justice.

> This case, ladies and gentlemen, is not about this.  Has nothing to do about that.  *What this case has to do is, this is what this case is about.  It's taking a thousand dollars to put a gun to somebody's head to blow their brains out.  They don't want you to think about that but that's what it is.*

> Sometimes, ladies and gentlemen, we have come to points in our  lives that define you.  November 28, 1998, defines German Sinisterra, when he could have walked away, he didn't have to come from Houston to Kansas City.  He made a choice.  And when he got here he still had the choice to leave.  He still had the choice to go somewhere else.  *No, his lust for a thousand dollars was more important than the life of another human being.*

> *Ladies and gentlemen, this case is about this.  That's what this case is about.*  Ladies and gentlemen, remember this.  This was worn by another human being, this red stained, this is blood.  That duct tape, that was the duct tape that was around Julian Colon, that's what this case is about.  This is what defines German Sinisterra.

> * * * *

> Ladies and gentlemen, this case is about cold premeditated murder.  Counsel talked to you about the children of German Sinisterra.  *And regardless of what she said she*

-78-

Appellate Case: 08-1925     Page: 83     Date Filed: 09/15/2009 Entry ID: 3586258

> *wants sympathy from you. There is no doubt, there is no doubt*
> *those children are deserving of sympathy, they are victims but*
> *they are victims of what this defendant has done. It would be*
> *wrong, ladies and gentlemen, it would be wrong to base your*
> *verdict on how they feel.*

* * * *

> You, as jurors, however are not hurting anybody by
> *following the law and rendering a just verdict* as Mr. Valenti
> told you. Don't be manipulated in that way.

(T. Vol. XV at 2906-08.) (Emphasis added.)

The Supreme Court has held that a sentencer may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Furthermore, just "as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S.104, 114 (1982). Rather, the "jury must be allowed to consider and give effect to mitigating evidence." *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989). "A jury may be precluded from [giving effect to mitigating evidence] not only as a result of the instructions it is given, but also as a result of prosecutorial argument

-79-

Appellate Case: 08-1925   Page: 84   Date Filed: 09/15/2009 Entry ID: 3586258

dictating that such consideration is forbidden." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n. 21 (2007).

These cases only prohibit a prosecutor from making arguments which would lead members of the jury to believe that they are forbidden from considering or giving effect to some mitigating factor. In *Adbul-Kabir*, for instance, the prosecutor argued that the jury was not allowed to rely on mitigating evidence in answering two special questions when affirmative answers to these questions would, under Texas law, lead to an automatic sentence of death. *Id.* at 239-42. A prosecutor is not, however, prohibited from arguing that little or no weight should be given to any particular mitigating evidence. *See Roll v. Bowersox*, 177 F.3d 697, 700 (8th Cir. 1999) ("Although a sentencer cannot exclude relevant mitigating evidence from consideration, the sentencer may decide what weight the evidence warrants."). The prosecutor's argument in this case was not that the jury was legally prevented from considering the love of Sinisterra's children. Rather, his argument was that it would be wrong for the jury to base their verdict on this love, that is to find that this love outweighs the aggravating factors. Such an argument about how the jury should weigh aggravating and mitigating factors is constitutionally acceptable.

-80-

Appellate Case: 08-1925     Page: 85     Date Filed: 09/15/2009 Entry ID: 3586258

3.    *The prosecutors' references to the jury being the "conscience of the community" and the need to send a message, when taken in context, were directed to the evidence and Sinisterra specifically.*

Finally, Sinisterra argues that his counsel should have objected to the prosecutors' statements referring to the jury as the "conscience of the community" and telling them they should "send a message" with their verdict.  (Sinisterra Brf. 69-72.)   During rebuttal closing argument, the prosecutor stated:

> Ladies and gentlemen, decent people, decent citizens, fear for their lives because of drug traffickers like German Sinisterra.  We cannot forget he was a member of a very efficient but unforgiving cocaine distribution organization and American society is a much different place than it was 50 years ago because of the German Sinisterra's of the world.
>
> It is time to turn the tables on drug traffickers like this defendant.  *Finish the message that you began with your verdict of guilt in this case.  Tell this defendant* and those like him that murder will not be tolerated especially murder committed to further drug trafficking schemes.  There is no worse crime.  As you sit there you are not just twelve people.  You are, like Mr. Valenti told you, the conscience of the community and you have a unique opportunity to make a difference.  You have a unique opportunity to send a message.  Don't squander that opportunity.  Have the courage to do the right thing.
>
> * * * *
>
> German Sinisterra believes by his actions that murdering couriers over a drug debt is just a part of doing business.  *Tell him he's wrong* and tell the other drug traffickers of the world if

-81-

Appellate Case: 08-1925     Page: 86     Date Filed: 09/15/2009 Entry ID: 3586258

they come to Kansas City they are going to be dealt with in the most severe way, they are going to receive a sentence of death.

(T. Vol. XV at 2910-11.) (Emphasis added.)

Such statements may be impermissible if they "prevent[] an individual determination of the appropriateness of capital punishment." *Weaver v. Bowersox,* 438 F.3d 832, 841 (8th Cir. 2006). In *Weaver*, the Eighth Circuit held that the requirement of individualized sentencing was violated when the prosecutor told the jury at least five times that the case was bigger, more important, or went beyond the particular defendant and instead touched "all the dope peddlers and the murderers in the world." *Id.* at 837. The prosecutor also compared the jury to soldiers in a war against drugs, saying, "The drug dealers, they are taking our streets away from us. Are we going to take them back? Are we going to let them have the streets or are we going to fight back?" *Id.* at 836.

The prosecutor in Sinisterra's case, unlike the prosecutor in *Weaver*, did not focus the jury's attention on issues broader than Sinisterra's crimes. The statements about the jury being the "conscience of the community" referred to the role of the jury in determining the appropriate punishment for Sinisterra. For instance, the prosecutor argued, "[Sinisterra's] actions necessitated a reaction and that reaction is a court of law having a trial where

-82-

Appellate Case: 08-1925     Page: 87     Date Filed: 09/15/2009 Entry ID: 3586258

issues are talked about and argued about and where you twelve people, the conscience of this community come together and make a decision of what is just." (T. Vol. XV at 2881.) Likewise, the statements about the need to "send a message" were all made with reference to Sinisterra and those who might commit similar crimes in the future. The prosecutor was not arguing that Sinisterra should pay for the crimes of others. These statements did not so distract the jury from Sinisterra's case as to violate his right to an individualized sentence.

### a.     *Counsel was not deficient in not objecting.*

Even assuming the prosecutors' statements were improper, Sinisterra must establish that effective counsel would have objected to these statements in order to prevail on his ineffective assistance of counsel claim. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984). This requires the court to overlook later legal developments and ask whether it would have been so evident *at the time of trial* that the prosecutors' arguments were improper as to cause a reasonably competent attorney to object. *See id.* ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

-83-

Sinisterra relies on *Weaver v. Bowersox* in arguing that his counsel should have objected to the prosecutors' statements referring to the jury as the "conscience of the community" and asking them to "send a message." (Sinisterra Brf. 71-72.) However, *Weaver* was not decided until 2006, six years after Sinisterra's penalty phase. Legal precedent at the time of Sinisterra's trial was not sufficient to cause reasonably competent counsel to object to the prosecutors' statements. While penalty phase statements which included requests for the jury to "send a message" were found to violate due process in *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir. 1989), the jury in that case "was subjected to a relentless, focused, uncorrected argument based on fear, premised on facts not in evidence, and calculated to remove reason and responsibility from the sentencing process." *Id.* at 1338. This characterization cannot be applied to the prosecutors' statements during Sinisterra's penalty phase, which were far less extensive and far less egregious. *Cf.* Tr. 2881, 2892, 2910-11. Sinisterra also relies on *Copeland v. Washington*, 232 F.3d 969 (8th Cir. 2000), which was decided after Sinisterra's trial but before his direct appeal. In *Copeland*, the Eighth Circuit found that arguments which formed the "crux of the prosecutor's argument for imposing the death penalty" violated due process when they would result in "mob justice" rather than "reasoned deliberation." *Id.* at 975.

-84-

Appellate Case: 08-1925     Page: 89     Date Filed: 09/15/2009 Entry ID: 3586258

The arguments to which Sinisterra now objects are less inciting than those in *Copeland* and constituted only a minor part of the prosecutors' argument for the death penalty. *Newlon* and *Copeland* would not have caused a reasonably competent attorney to object to the prosecutors' statements during Sinisterra's penalty phase or to challenge these statements on direct appeal.

Sinisterra argues that legal precedents involving prosecutorial arguments during the *guilt phase* of a trial should have caused his counsel to object to the prosecutors' statements during his *penalty phase*. (Sinisterra Brf. 69-71) (citing *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992), and *United States v. Lee*, 743 F.2d 1240 (8th Cir. 1984)). Sinisterra is correct that penalty phase arguments should be scrutinized for constitutional acceptability. (Sinisterra Brf. 80-81.) However, this does not mean that an argument which would be improper during the guilt phase is necessarily improper when made during the penalty phase. During the guilt phase, the jury is responsible for determining whether the defendant committed the alleged crime. Statements about being the conscience of the community or asking the jury to send a message are immaterial to the defendant's guilt or innocence and are improper because they distract the jury from deciding the

-85-

Appellate Case: 08-1925     Page: 90     Date Filed: 09/15/2009 Entry ID: 3586258

issue of the defendant's guilt on the basis of the evidence. *See Johnson*, 968 F.2d at 771; *see also Lee*, 743 F.2d at 1252-53.

During the penalty phase, however, the jury is tasked with determining the appropriate punishment, and this involves considerations such as retribution and deterrence. *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976). Statements referring to the jury as the "conscience of the community" and asking them to "send a message" relate to these considerations. The jury acts as the conscience of the community in that it is tasked with determining the appropriate punishment for the defendant's crime. *See id.* at 184 ("[T]he decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death"). Asking the jury to "send a message" only reminds the jury of the potential deterrent value of the death penalty, which is a permissible consideration. *See Drake v. Kemp*, 762 F.2d 1449, 1459-60 (11th Cir. 1985) ("A jury is not barred from considering deterrence in its choice of punishment."). Given the distinctions between the guilt and penalty phases of a trial, a reasonably competent attorney would not assume that arguments which have been found

-86-

to be improper during guilt phases are improper during penalty phases. Therefore, Sinisterra's counsel were not deficient in failing to object.

### b. *There was no prejudice caused by counsel's failure to object.*

Even if Sinisterra's counsel were deficient in not objecting to these statements, Sinisterra has failed to demonstrate the necessary prejudice. The Court of Appeals has already held that Sinisterra was not prejudiced by the prosecutor's references to Hitler, Manson, and Dahmer. *Ortiz*, 315 F.3d at 903. Sinisterra responds by arguing that although these references were not prejudicial in themselves, the combined errors were prejudicial. (Sinisterra Brf. 77, 79.)

The prosecutor's statement that it would be wrong for the jury to base their verdict on the love Sinisterra's children felt for him was not prejudicial since the members of the jury were instructed multiple times that they could consider this evidence and give it whatever weight they deemed appropriate. In her closing argument, Brewer reminded the jury, "under the law you have to look at the mitigating circumstances that have been submitted to you in the instructions." (T. Vol. XV at 2894.) Furthermore, the district court at least twice instructed the members of the jury about the proper legal standard for considering mitigating evidence, telling them that they could decide what

-87-

Appellate Case: 08-1925    Page: 92    Date Filed: 09/15/2009 Entry ID: 3586258

weight to give the evidence and that "whether or not the circumstances in this case justify a sentence of death is a decision the law leaves entirely to you." (T. Vol. XIII at 2575-76, 2579; T. Vol. XV at 2866, 2867.) The court also told the jury, "[I]t would be a violation of your oath as jurors to base a verdict upon any view of the law other than that given to you in these instructions." (T. Vol. XV at 2855.) In light of these instructions, the prosecutor's statement would not have caused any reasonable juror to conclude that the jury was forbidden from considering or giving effect to any of Sinisterra's mitigating evidence.

Sinisterra was also not prejudiced by the prosecutors' statements referring to the jury as the "conscience of the community" and asking them to "send a message." These statements did not form a major portion of the prosecutors' closing argument. Rather, the prosecutor emphasized Sinisterra's crimes. (T. Vol. XV at 2879-92, 2906-13.) The statements were also not as distracting as those made in *Weaver*. (*Compare* Tr. 2881, 2892, 2910-11 *with Weaver*, 438 F.3d at 836-37.) The likelihood that the jury failed to provide Sinisterra with an individualized sentence is not so great as to undermine confidence in the outcome of Sinisterra's penalty phase. Thus, counsel was not ineffective in not objecting to this argument or raising it on appeal.

-88-

None of the prosecutor's death penalty phase arguments were misleading, inflammatory, ro prejudicial.  Even if there was error in not objecting to those arguments, the vast amount of evidence of Sinisterra's vile acts of beating victims and shooting Julian Colon in the head, which the jury had already unanimously found in finding him guilty, was overwhelming that any error was harmless.  *See United States v. Beckman*, 222 F.3d 512, 527 (8th Cir. 2000).

Appellate Case: 08-1925     Page: 94     Date Filed: 09/15/2009 Entry ID: 3586258

# CONCLUSION

For the reasons stated above, the United States respectfully requests this Court to affirm the district court's decision to not have an evidentiary hearing, uphold the court's rulings that defense counsel provided effective assistance in all aspects regarding mitigating and mental health issues, and also in relation to the closing argument issue.

Respectfully submitted,

MATT J. WHITWORTH
Acting United States Attorney

By          /s/ Lajuana M. Counts

LAJUANA M. COUNTS
Assistant United States Attorney

JEFFREY VALENTI
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Appellee*

-90-

Appellate Case: 08-1925    Page: 95    Date Filed: 09/15/2009 Entry ID: 3586258

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C), that this brief complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B) and contains 18,582 words.  The brief was prepared using WordPerfect for Windows, Version X3 software.  In making this certification, I have relied upon the word-count feature of WordPerfect for Windows, Version X3.  Furthermore, the enclosed disk has been scanned and been determined to be virus-free in compliance with Eighth Circuit Rule 28A(c).

/s/ Lajuana M. Counts
Lajuana M. Counts
Assistant United States Attorney

Appellate Case: 08-1925     Page: 96     Date Filed: 09/15/2009 Entry ID: 3586258

# CERTIFICATE OF SERVICE

I hereby certify that two copies of the Government's brief and a virus-free diskette were mailed this 14th day of September 2009, to:

Timothy M. Gabrielsen
Leticia Marquez
Assistant Federal Public Defenders
407 West Congress Street, Suite 501
Tucson, Arizona 85701-1310

John Jenab
Jenab & McCauley, LLP
110 S. Cherry Street, Suite 200
Olathe, Kansas 66061

*Attorneys for Petitioner-Appellant Sinisterra*

 /s/ Lajuana M. Counts
Lajuana M. Counts
Assistant United States Attorney

-92-